No. 25-30324

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,
v.

CURTIS SQUIRE,
*Defendant-Appellant*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:24-CR-41-1

# APPELLANT'S BRIEF

CLAUDE J. KELLY
Federal Public Defender
Eastern District of Louisiana

STEVEN E. SPIRES
Research and Writing Attorney
Office of the Federal Public Defender
500 Poydras Street, Suite 318
Hale Boggs Federal Building
New Orleans, Louisiana 70130
(504) 589-7930
steven_spires@fd.org

## CERTIFICATE OF INTERESTED PERSONS

*United States v. Curtis Squire*
No. 25-30324

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. *Defendant-Appellant:* Curtis Squire.
2. *Counsel for Defendant-Appellant:* Federal Public Defender Claude J. Kelly; Research and Writing Attorney Steven E. Spires.
3. *Former Counsel for Defendant-Appellant:* Assistant Federal Public Defender Annalisa Miron.
4. *Counsel for Plaintiff-Appellee:* Acting United States Attorney Michael Simpson; Assistant United States Attorneys Kevin G. Boitmann, Patrick Stevens Barr, Sarah Dawkins, and Megan Roberts.
5. *Former Counsel for Plaintiff-Appellee*: n/a

*/s/ Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney
Dated: October 22, 2025

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Squire respectfully requests oral argument. This appeal involves a legal issue that is narrow, yet of fundamental importance: Whether 18 U.S.C. § 922(g)(1) is unconstitutional under the Second Amendment as applied to an individual's possession of a firearm in his own home considering the long-established legal tradition privileging the right to use and possess arms in the home for self-defense and in the absence of a historical tradition of regulating possession of arms in the home, in contrast to public carry.

Further, this is an apparent issue of first impression, as none of this Court's cases have yet addressed a defendant's challenge to § 922(g)(1) as applied in the home. Resolving this question thus requires the Court to newly engage with a wide range of historical sources.

Given the important legal issue of first impression raised herein and the vast historical record, Mr. Squire submits that oral argument would assist the Court.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ..................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................... iii

TABLE OF AUTHORITIES ................................................................ vi

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES ........................................................... 2

STATEMENT OF THE CASE ............................................................. 3

SUMMARY OF THE ARGUMENT ..................................................... 11

ARGUMENT ..................................................................................... 13

I. 18 U.S.C. § 922(g)(1) is unconstitutional under the Second Amendment as applied to Mr. Squire's possession of a firearm in his own home. ............................ 13

A. The Second Amendment codified the "ancient right" of self-defense—a right originating in natural law and recognized by centuries of Anglo-American legal tradition. .......................................... 13

B. The "home" is a place of special significance in the English common law and early American law, as recognized most famously in the "Castle Doctrine." ........................................................................ 16

C. Modern constitutional jurisprudence likewise reflects a special solicitude for the home. .................... 22

D. The historical record reveals a tradition of regulating the public "carry" of weapons, but not a total and permanent prohibition on private "possession" of weapons in one's own home. ............... 29

E. The district court erred in denying the motion to dismiss as applied to Mr. Squire's possession in the home. .......... 36

F. Permanently prohibiting possession of firearms in one's own home is both antithetical and foreign to the Anglo-American tradition and imposes significant, real-world hardships on "the people" that cannot be ignored. .......... 40

II. The district court also misapplied *Bruen* and *Diaz*, while the government did not come close to meeting its burden.......... 44

A. The district court committed four additional reversible errors. .......... 44

B. Even introducing new evidence on appeal, the government will not be able to carry its burden under *Bruen* and *Diaz*.......... 47

III. 18 U.S.C. § 922(g)(1) is unconstitutionally vague. .......... 51

IV. 18 U.S.C. § 922(g)(1) is facially unconstitutional under the Second Amendment [presently foreclosed]. .......... 58

V. 18 U.S.C. § 922(g)(1) is unconstitutional because it exceeds Congress's power to regulate interstate and foreign commerce [presently foreclosed].......... 60

CONCLUSION .......... 63

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Alderman v. United States*, 562 U.S. 1163 (2011) .................................61
*Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982) .....................................41
*City of Chicago v. Morales*, 527 U.S. 41 (1999) .......................................57
*Colautti v. Franklin*, 439 U.S. 379 (1979), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ............53
*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989) ........................................................................................................41
*Dist. of Columbia v. Heller*, 554 U.S. 570 (2008) ........................... passim
*Hopkins v. Watson,* 108 F.4th 371 (5th Cir. 2024) .................................42
*Johnson v. United States*, 576 U.S. 591 (2015).......................................52
*McDonald v. City of Chicago*, 561 U.S. 742 (2010)..................... 14, 29, 42
*Minnesota v. Carter*, 525 U.S. 83 (1998) .................................................28
*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) [*"NFIB"*] ...60, 62
*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) ............................................................................................... passim
*Paris Adult Theatre I v. Slaton*, 413 U.S. 49 (1973).........................24, 28
*Payton v. New York*, 445 U.S. 573 (1980) .........................................11, 19
*Percoco v. United States*, 598 U.S. 319 (2023) ........................................56
*Range v. Att'y Gen. United States of Am.,* 69 F.4th 96 (3d Cir. 2023), *cert. granted, judgment vacated sub nom. Garland v. Range,* 144 S. Ct. 2706 (2024), *on remand*, 124 F.4th 218 (3d Cir. 2024) .................55
*Scarborough v. United States*, 431 U.S. 563 (1977)................................60
*Skilling v. United States*, 561 U.S. 358 (2010) ......................................57
*Stanley v. Georgia*, 394 U.S. 557 (1969) ................................... 22, 24, 25
*United States v. Alcantar*, 733 F.3d 143 (5th Cir. 2013) ........................61
*United States v. Branson*, 139 F.4th 475 (5th Cir. 2025) .......................52
*United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024)........... 35, 37, 58
*United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) ....................22
*United States v. Davis*, 588 U.S. 445 (2019) ....................................54, 56
*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) ..................... passim
*United States v. Hill*, 927 F.3d 188 (4th Cir. 2019)................................61
*United States v. Kimble*, 142 F.4th 308 (5th Cir. 2025) ....... 35, 42, 45, 48
*United States v. Kuban*, 94 F.3d 971 (5th Cir. 1996) .............................61

*United States v. Lopez*, 514 U.S. 549 (1995) .................................... 60, 62
*United States v. Morrison*, 529 U.S. 598 (2000) .................................... 60
*United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29 (1963) ............... 52
*United States v. Orito*, 413 U.S. 139 (1973) ........................................... 23
*United States v. Panter*, 688 F .2d 268 (5th Cir. 1982) .......................... 43
*United States v. Rahimi*, 602 U.S. 680 (2024) ........................... 14, 38, 58
*United States v. Reese*, 92 U.S. 214 (1875) ................................ 53, 56, 57
*United States v. Schnur*, 132 F.4th 863 (5th Cir. 2025) ......................... 50
*United States v. Seekins*, 52 F.4th 988 (5th Cir. 2022) .......................... 61
*United States v. Seekins*, No. 21-10556, 2022 WL 3644185 (5th Cir. Aug. 24, 2022) (unpublished) ................................................................... 60
*United States v. Tyerman*, 701 F.3d 552 (8th Cir. 2012) ........................ 51
*United States v. Williams*, 113 F.4th 637 (6th Cir. 2024) ...................... 55
*United States v. Williams*, 553 U.S. 285 (2008) ...................................... 56
*Winters v. New York*, 333 U.S. 507 (1948) ............................................... 56

**STATUTES**

18 U.S.C. § 3231 .......................................................................... 1
18 U.S.C. § 3742 .......................................................................... 1
18 U.S.C. § 922(g)(1) ............................................................... passim
28 U.S.C. § 1291 .......................................................................... 1
La. R.S. 14:62 ............................................................................. 49
La. R.S. 14:67 ............................................................................. 51
La. R.S. 14:68.4 ........................................................................... 50

**HISTORICAL SOURCES**

"An Act for Disarming Papists and Reputed Papists, refusing to take the oaths to the Government," in HENING, STATUTES AT LARGE, 7:35 (1756) ..................................................................................... 35
1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAW OF ENGLAND (1765) ..................................................................................... 15
1 Wm. & Mary, ch. 15 (1689) ..................................................................... 34
12 THE PAPERS OF JAMES MADISON (Charles F. Hobson et. al. eds., 1979) ..................................................................................... 34
2 COLLECTED WORKS OF JAMES WILSON (K. Hall & M. Hall eds.2007) ... 26
2 LEGAL PAPERS OF JOHN ADAMS (L. Wroth & H. Zobel eds. 1965) ......... 20
21 H. 7. 39 (K.B. 1506) ........................................................... 17, 18

3 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND (2d ed. 1648) ... 19
*Aymette v. State*, 21 Tenn. 154 (1840) ... 31
JOHN LOCKE, SECOND TREATISE OF GOVERNMENT (1690) ... 14
JOSEPH H. BEALE, A SELECTION OF CASES AND OTHER AUTHORITIES UPON CRIMINAL LAW, 569-70 (2d ed. 1907) ... 18
*Mallock v. Eastly*, 87 Eng. Rep. 1370 (K.B. 1744) ... 21
MONTESQUIEU, THE SPIRIT OF THE LAWS (Anne M. Cohler et al. eds. & trans., 1989) (1748) ... 14
*Rex v. Gardner*, 87 Eng. Rep. 1240 (K.B. 1739) ... 21
*Rex v. Knight*, 87 Eng. Rep. 73 (K.B. 1686) ... 22
*Semayne's Case*, 77 E.R. 194 (1506) ... 17, 19, 22
*State v. Reid*, 1 Ala. 612 (1840) ... 31
THOMAS HOBBS, LEVIATHAN (1651) ... 14
WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (Leach ed. 1788) (1716) ... 19

**OTHER AUTHORITIES**

50 AM. JUR. 2D LARCENY § 32 ... 51
C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J. L. & PUB. POL'Y 695 (2009) ... 30, 34
Carlton F.W. Larson*, Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371 (2009) ... 42
David B. Kopel, *The First Century of Right to Arms Litigation*, 14 GEO. J.L. & PUB. POL'Y 127 (2016) ... 22, 23, 34, 43
David B. Kopel, *The Natural Right of Self-Defense: Heller's Lesson for the World*, 59 SYRACUSE L. REV. 235 (2008) ... 15, 16
David I. Caplan & Sue Wimmershoff-Caplan, *Postmodernism and the Model Penal Code v. the Fourth, Fifth, and Fourteenth Amendments-and the Castle Privacy Doctrine in the Twenty-First Century*, 73 UMKC L. REV. 1073 (2005) ... passim
Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204 (1983) ... passim
Helen A. Anderson, *From the Thief in the Night to the Guest Who Stayed Too Long: The Evolution of Burglary in the Shadow of the Common Law*, 45 INDIANA L. REV. 629 (2012) ... 48

Joseph G. S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249(2020) ........ 59
Lucilius A. Emery, *The Constitutional Right to Keep and Bear Arms*, 28 HARV. L. REV. 473 (1915) ........ 32
Michael P. O'Shea, *The Right to Defensive Arms After District of Columbia v. Heller*, 111 W. VA. L. REV. 349 (2009) ........ 14, 15
*Most Dangerous Places in the U.S. in 2025-2026*, U.S. News & World Report/Real Estate, available at: https://realestate.usnews.com/places/rankings/most-dangerous-places ........ 41
Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. REV. 1343 (2009) ........ 30
Nicole Gelinas, *Commentary: New Orleans Still Drowning in Crime*, Manhattan Institute (published in the Dallas Morning News on May 13, 2007), available at https://manhattan.institute/article/new-orleans-still-drowning-in-crime ........ 41
Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139 (2007) ........ 33, 35

## STATEMENT OF JURISDICTION

This appeal is from the final judgment in a criminal case. Judgment was imposed on May 20, 2025. ROA.198-99, ROA.200-206. Mr. Squire filed a timely notice of appeal on May 23, 2025. ROA.207-08. The district court had jurisdiction over this criminal proceeding under 18 U.S.C. § 3231. This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

(1) Is 18 U.S.C. § 922(g)(1) unconstitutional under the Second Amendment specifically as applied to Mr. Squire's possession of a firearm in his own home?

(2) Is 18 U.S.C. § 922(g)(1) unconstitutionally vague, in violation of the Fifth Amendment's Due Process Clause?

(3) Is 18 U.S.C. § 922(g)(1) facially unconstitutional under the Second Amendment? [presently foreclosed]

(4) Is 18 U.S.C. § 922(g)(1) unconstitutional under the Commerce Clause? [presently foreclosed]

## STATEMENT OF THE CASE

On February 15, 2024, a shooting occurred in the Florida Area neighborhood in the Ninth Ward of New Orleans. *See* ROA.299-300. Ten days later, on February 25, 2024, officers with the New Orleans Police Department (NOPD) searched defendant-appellant Curtis Squire's home pursuant to a search warrant alleging Mr. Squire's involvement. ROA.315. After executing the warrant, officers found a handgun inside Mr. Squire's home, but no other evidence of criminal activity. As it turns out, Mr. Squire had been wrongly accused. ROA.315 & n.1; *see also* ROA.302-03. In fact, at the time of the shooting, he was picking up his young children from school and was not even present at the scene, though the shooting did occur in the neighborhood where he lived. ROA.303; ROA.323 (noting Mr. Squire's address as 2333 Desire Street). Tests later confirmed that the firearm he kept in his home was not linked to the shooting. ROA.302-03. Thus, state charges related to the shooting were dismissed. ROA.315 & n.1.

Nonetheless, federal prosecutors adopted the case, charging Mr. Squire for his mere possession of the firearm. Specifically, the government alleged that Mr. Squire's keeping of a firearm in his home

was unlawful because he had prior felony convictions, which stemmed from arrests that occurred in 2017, when he was 20 years old. ROA.318-20; ROA.332-35. By the time of his arrest in the instant case, Mr. Squire (then 27 years old) had served his time on those prior felony convictions and had completed parole supervision in 2020. *See id.*

On March 8, 2024, Mr. Squire was charged in a single-count indictment with possessing a firearm and ammunition after being convicted of a felony offense, in violation of 18 U.S.C. § 922(g)(1). ROA.36-38. The indictment alleged that Mr. Squire had prior felony convictions arising out of two state cases. First, he had convictions for a conspiracy and substantive count of possession with the intent to distribute heroin, a conspiracy and substantive count of possession of a firearm with a controlled substance, a conspiracy and substantive count of obstruction of justice, and a conspiracy count to possess stolen things. *Id.* Second, he had convictions for simple burglary and unauthorized use of a motor vehicle. *Id.* The indictment also alleged that the firearm and ammunition possessed had been in and affecting interstate commerce. *Id.*

Mr. Squire filed a motion to dismiss on constitutional grounds. ROA.66-93. He argued that § 922(g)(1) was unconstitutional under the

Second Amendment, both facially and as applied to him; that the statute was unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause; and unconstitutional because the statute exceeds Congress's power to regulate under the Commerce Clause (a claim he acknowledged was foreclosed). *See id.* Importantly, Mr. Squire's as-applied Second Amendment challenge raised both (1) the government's inability to show that permanently disarming people like him is consistent with historical tradition, *see* ROA.80-73; and (2) the government's inability to show prohibiting the keeping of arms in the home is consistent with historical tradition, *see* ROA.84-87.

The government opposed the motion. ROA.100-12. Notably, however, the government did *not* respond to Mr. Squire's argument concerning prohibition on possessing arms in the home—as he pointed out in reply. ROA.118-34, *esp.* ROA.133.[1] Mr. Squire also highlighted the government's failure to cite historical analogues. ROA.120-21.

The district court denied the motion. ROA.144-56. Regarding the Second Amendment challenges, the district court "reject[ed] the

[1] After Mr. Squire filed his motion to dismiss, but before the government filed its response, this Court decided *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), which foreclosed his facial Second Amendment challenge, but expressly allowed for as-applied challenges.

Defendant's argument that *Bruen*'s framework 'overruled prior Fifth Circuit precedent upholding § 922(g)(1),'" and it seemingly placed the burden on *Mr. Squire* to prove that the statute was unconstitutional—not on the *government* to prove its constitutionality, as required by *Bruen*. *See* ROA.150 & n.31 ("[T]he Defendant fails to establish that § 922(g)(1) . . . violates the Second Amendment either on its face or as applied.").

The district court then cited this Court's recent *Diaz* decision, reasoning that Mr. Squire's convictions for possession of stolen things, burglary, and unauthorized use of a motor vehicle were "very similar" to Mr. Diaz's conviction for vehicle theft. ROA.152-53. Notably, however, neither the government nor the district court identified actual historical analogues for Mr. Squire's specific convictions. *See id.*; ROA.105-106 (gov't citing *Diaz*, but not historical analogous).

Next, the district court did not rely on (or even address) Mr. Squire's drug-related convictions in declining to dismiss the charge against him. *See* ROA.152, n.43 ("The Court finds it unnecessary to address those arguments at this time."). It did, however, "note[]" his obstruction of justice convictions and said that "[t]he Court's research

points out the 'relevantly similar' law of treason . . . one of the most 'infamous crimes.'" *Id.* For support, the district court also cited a New York law from 1829 which made "Offences Affecting the Administration of Justice" a non-capital felony. *Id.* Based on its own research, "[t]he Court [was] fully satisfied that those prior convictions fit within the tradition of serious and permanent punishment justifying firearm regulation." *Id.*

Last, the district court rejected any "meaningful distinction" between firearm possession in the home and firearm possession in public. ROA.153, n.44. For support, the district court cited dicta in *District of Columbia v. Heller* that "'the right secured by the Second Amendment is not unlimited' . . . and, further, 'Nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . .'" *Id.* (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). The district court stated that "[t]he Defendant fails to address this language," *id.*, even though Mr. Squire's reply brief emphasized *Diaz*'s holding that "mere dicta" in *Heller* and its progeny "cannot supplant" the "historical inquiry" mandated by *Bruen*. ROA.119 (quoting *Diaz*, 116 F.4th at 465-66); *see also* ROA.133. The

district court also rejected Mr. Squire's vagueness and Commerce Clause challenges. ROA.154-56.

Mr. Squire pleaded guilty to the charge without the benefit of a plea agreement and did not waive his right to appeal. ROA.165; ROA.212; ROA.222; ROA.234; ROA.239. In the factual basis supporting his plea, he admitted to having prior felony convictions as alleged in the indictment and admitted that the firearm and ammunition he subsequently possessed were manufactured in another state and therefore traveled in interstate commerce. ROA.166-68. He also admitted that the firearm and ammunition were located in his residence. ROA.166; *see also* ROA.238.

In a sentencing memorandum, counsel shed additional light on who Mr. Squire was as a person and how he ended up before the court. *See* ROA.172-76. As counsel recounted, Mr. Squire had difficulties as a teenager. Most notably, when Mr. Squire was just 15 years old, his father was shot and killed, and his body was left in front of the family home for Mr. Squire and his mother to find. ROA.172-73; *see* also ROA.322 (PSR describing Mr. Squire's childhood, including the murder of his father). Mr. Squire was diagnosed with PTSD, but did not receive proper

counseling. *Id.* Instead, as a young man, he responded to the violent loss of his father by smoking marijuana and getting into trouble. *Id.*

In recent years though, as counsel recounted, Mr. Squire had led a law-abiding life. Except for the § 922(g)(1) instant offense, Mr. Squire's prior convictions all stemmed from arrests that occurred when he was between 18 and 22 years old. ROA.173. His felony convictions, more specifically, stemmed from arrests that occurred in 2017, when he was 20 years old, and he had successfully completed parole supervision for those prior felony convictions in 2020. *Id.*; ROA.318-20; ROA.332-35. Thus, counsel explained, "Mr. Squire's record shows a yearslong recent period of abstention from criminal activity prior to this offense, which coincides with his growing older and developing better decision making abilities." ROA.173.

Perhaps not coincidentally, Mr. Squire also became an active and engaged father of four during that time. ROA.173-74. When the mother of his oldest son was killed as an innocent bystander to a shooting, he took sole custody of his son, raising him alongside the children he shared with his current partner. *Id.*; *see also* ROA.322. As counsel explained, with attached letters of support, Mr. Squire took his children to and from

school, was active in their education, and provided for them financially through his small business. ROA.174-75.

The district court imposed a within-guidelines sentence of 52 months, followed by three years of supervised release. ROA.198-99; ROA.200-06. Mr. Squire filed a timely notice of appeal. ROA.207-08.

## SUMMARY OF THE ARGUMENT

"The zealous and frequent repetition of the adage that a 'man's house is his castle,' made it abundantly clear that both in England and in the Colonies 'the freedom of one's house' was one of the most vital elements of English liberty." *Payton v. New York*, 445 U.S. 573, 596-97 (1980). Moreover, centuries of English and American law make clear that the ancient right of self-defense and the right to possess arms in the home suitable for self-defense are part and parcel of this doctrine. These pre-existing rights were then codified in the Second Amendment.

The district court, however, disregarded this fundamental law. That was grievous error. There is no historical tradition that justifies permanently disarming a man in his own home—whether he has a prior felony conviction or not. And that is all Mr. Squire did. Years after being convicted of a felony and completing his sentence, Mr. Squire was convicted under 18 U.S.C. § 922(g)(1) and sentenced to imprisonment based solely on his act of keeping a firearm in his own home. This Court must vacate his conviction and remand with instructions to dismiss the indictment, because § 922(g)(1) is unconstitutional under the Second Amendment as applied to Mr. Squire's mere possession of a handgun in

his own home. This is an apparent issue of first impression, as this Court has yet to address a defendant's challenge to § 922(g)(1) as applied to mere possession in the home.

The district court committed additional errors under the *Bruen* and *Diaz* framework, and it further erred in not dismissing the indictment because § 922(g)(1) is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause, but this Court need not reach those errors if it vacates Mr. Squire's conviction on the basis that the statute is unconstitutional as applied in the home.

## ARGUMENT

### I. 18 U.S.C. § 922(g)(1) is unconstitutional under the Second Amendment as applied to Mr. Squire's possession of a firearm in his own home.

Mr. Squire's conviction must be vacated and his single-count indictment dismissed because 18 U.S.C. § 922(g)(1)—as applied to his possession of a firearm in his own home—violates the Second Amendment. As Mr. Squire's challenge to the constitutionality of § 922(g)(1) was preserved, this Court's review is *de novo*. *United States v. Copeland*, 820 F.3d 809, 811 (5th Cir. 2016).

#### *A. The Second Amendment codified the "ancient right" of self-defense—a right originating in natural law and recognized by centuries of Anglo-American legal tradition.*

In *Dist. of Columbia v. Heller*, the Supreme Court held that the Second Amendment "codified a *pre-existing* [individual] right" to possess weapons in the home—and not just a mere civil or statutory right, but an "ancient right" whose "central component" was "self-defense," especially the "defense of hearth and home." *Heller*, 554 U.S. at 592, 599, 628, 635 (emphasis in original). The Second Amendment right is far more than a modern political right; rather, it is grounded in first principles—like the individual right of self-preservation—that are deeply rooted in the Anglo-

American legal tradition. *See* Michael P. O'Shea*, The Right to Defensive Arms After District of Columbia v. Heller*, 111 W. VA. L. REV. 349, 363-66 (2009) [hereafter, "O'Shea"]. As the Supreme Court has repeatedly stressed, "the right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *United States v. Rahimi*, 602 U.S. 680, 690 (2024) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010)). "Self-defense is a basic right, recognized by many legal systems from ancient times to the present day," including "Jewish, Greek, and Roman law," as noted by Blackstone. *McDonald*, 561 U.S. at 767 & n.15

Natural law principles had a profound influence on the Anglo-American tradition, as evinced by classical liberalist theorists like Hobbes, Locke, Montesquieu, and others popular at the Founding, "who treated self-defense as a foundational individual right." O'Shea, at 364.[2] This view was also present in English legal commentator William Blackstone's description of the English right of arms.[3] As the Supreme

[2] *See* THOMAS HOBBS, LEVIATHAN*,* ch. 14 (first paragraph) (1651); JOHN LOCKE, SECOND TREATISE OF GOVERNMENT, § 16 (1690); MONTESQUIEU, THE SPIRIT OF THE LAWS*,* bk. X, ch. 2, at 138 (Anne M. Cohler et al. eds. & trans., 1989) (1748).

[3] As *Heller* noted, "Blackstone . . . 'constituted the preeminent authority on English law for the founding generation.'" 554 U.S. at 593-94 (quoting *Alden v. Maine*, 527 U.S. 706, 715 (1999)).

Court noted in *Heller*, "Blackstone connected 'the right of having and using arms for self-preservation and defence' with 'the natural right of resistance and self-preservation.'" *Id.* at 365 (quoting *Heller*, 554 U.S. at 594) (quoting 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAW OF ENGLAND, 139-40 (1765)). Thus, natural law (and its incorporation into English common law) "provides an obvious source to explain the general nature of the pre-existing right guaranteed by the Second Amendment." *Id.* at 366. And, importantly, *Heller* is infused with this understanding. *See Heller*, 554 U.S. at 592, 599, 635; *see also* David B. Kopel, *The Natural Right of Self-Defense: Heller's Lesson for the World*, 59 SYRACUSE L. REV. 235, 236 (2008) [hereafter "Kopel, *Natural Right*"] (explaining that *Heller* "reaffirm[ed]" that "[t]he right to arms . . . is a *pre-existing natural right* which is recognized and protected by the Constitution" (emphasis added)).

Therefore, at the Founding, the "'right of the people to keep and bear arms' . . . had a recognizable public meaning, rooted in the English right to arms," which included the fundamental, natural right of self-preservation. O'Shea, at 371.[4] "In a constitutional sense, the natural law

[4] *See also* Kopel, *Natural Right*, at 243, n.31 (explaining that "[e]ven if one

basis of the right to armed self-defense is part of the original public meaning of the Second Amendment." Kopel, *Natural Right*, at 240. Accordingly, the constitutional language "was strongly concerned with the keeping of private arms for self-defense," O'Shea, at 371, which makes sense because "[a] right of self-defense without a right to at least some defensive arms would be a right of little practical utility." Kopel, *Natural Right*, at 255, n.66.

And, as *Heller* explained, nowhere is the right of self-defense more fundamental than in one's own home. *See Heller*, 554 U.S. at 628 (recognizing that "the home" is "where the need for defense of self, family, and property is most acute").[5]

*B. The "home" is a place of special significance in the English common law and early American law, as recognized most famously in the "Castle Doctrine."*

Going back at least five centuries, English common law judges established special protections for the home, which included the right to

---

claims that there is no such thing as natural law, the right of self-defense is . . . well-established in the common law and in long-standing American tradition"); *id.* at 240 ("Although some modern scholars deny that natural law exists, there is no dispute that the Founders strongly believed in it.").

[5] Indeed, "British case law since 1330 had long recognized an absolute right to use deadly force against home invaders. The right to self-defense itself, along with its necessary implication of the right to use appropriate arms for self-defense, was considered to be firmly established by natural law." Kopel, *Natural Right*, at 236-37.

possess and use arms for self-defense—the core of the Second Amendment right that *Heller* recognized. To begin, *Semayne's Case*, one of the most celebrated cases in the English common law, held "[t]hat the house of every one is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose." *Semayne's Case*, 77 E.R. 194, 195 (1506). Thus, it was not a crime to kill a man who had invaded one's house, even though it would have been an offense had such a killing occurred in public. Likewise, "every one may assemble his friends and neighbours to defend his house against violence: but he cannot assemble them to go with him to the market, or elsewhere for his safeguard against violence: and the reason of all this is, because *domus sua cuique est tutissimum refugium*." *Id.*

"*Semayne*, in turn, relied upon four root fourteenth century common law cases." David I. Caplan & Sue Wimmershoff-Caplan, *Postmodernism and the Model Penal Code v. the Fourth, Fifth, and Fourteenth Amendments-and the Castle Privacy Doctrine in the Twenty-First Century*, 73 UMKC L. REV. 1073, 1082 (2005) [hereafter, "Caplan & Wimmershoff-Caplan"]. The "fourth root case," 21 H. 7. 39 (K.B. 1506), held:

> If one is in his house, and hears that such a one will come to his house to beat him, he may assemble folk of his friends and neighbors to help him, and aid in the safeguard of his person; but if one were threatened that if he should come to such a market, or into such a place, he should there be beaten, in that case he could not assemble persons to help him go there in personal safety, for he need not go there, and he may have a remedy by surety of the peace. But a man's house is his castle and defense, and where he has a peculiar [special] right to stay.

JOSEPH H. BEALE, A SELECTION OF CASES AND OTHER AUTHORITIES UPON CRIMINAL LAW, 569-70 (2d ed. 1907) (translation of 21 H. 7. 39).

This case "was fundamental for home defense and was cited in most all law books relied upon by the American colonists as a controlling authority in the common law." Caplan & Wimmershoff-Caplan, at 1089-90. Specifically, the case was interpreted "as supporting the right to keep arms in the house for home defense as part and parcel of the castle doctrine." *Id.* at 1090. As Lord Coke explained, citing 21 H. 7. 39 and *Semayne's* cases:

> And yet in some cases a man may not only use force and arms, but assemble company also. As any man may assemble his friends and neighbors, to keep his house against those that come to rob him, or kill him, or to offer violence in it, and is by construction excepted out of this Act [the 1328 Statute of Northhampton] . . . for a man's house is his castle, & domus sua cuique est tutissimum refugium; for where shall a man be safe, if it be not in his house?

> Arma in armatos sumere jura sinunt. [And the laws allow arms to be taken against an armed foe.]
>
> But he cannot assemble force, though he be extremely threatened, to go with him to Church, or market, or any other place, but that is prohibited by this Act [the Statute of Northhampton].

*Id.* (quoting 3 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND, 161-62 (2d ed. 1648)) (internal footnotes omitted) (alterations in original).[6]

Taken together, *Semayne's Case* and other English root cases established that certain activities that were *unlawful* if undertaken in public—such as killing and "going armed"—were *lawfully protected* if they took place at one's own home. *See also* WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN, ch. 63, § 8 (Leach ed. 1788) (1716). As the Supreme Court explained centuries later: "The zealous and frequent repetition of the adage that a 'man's house is his castle,' made it abundantly clear that both in England and in the Colonies 'the freedom of one's house' was one of the most vital elements of English liberty." *Payton v. New York*, 445 U.S. 573, 596-97 (1980) (citing *Semayne's Case*

---

[6] Lord Coke, like Blackstone, was a prominent and highly respected authority for American lawyers at the Founding. *See Payton*, 445 U.S. at 594 (describing Lord Coke as "widely recognized by the American colonists 'as the greatest authority of his time on the laws of England.'").

and quoting 2 LEGAL PAPERS OF JOHN ADAMS, 142 (L. Wroth & H. Zobel eds. 1965)).

Further, the English cases protected "the right to keep arms in the house for home defense as part and parcel of the castle doctrine." Caplan & Wimmershoff-Caplan, at 1090; *see also* Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 205 n.5 (1983) (explaining that "the doctrine that 'a man's home is his castle' originated in cases upholding the right to possess and use arms for home defense," and citing English sources) [hereafter, "Kates"].

The right to keep arms in the home for self-defense was even protected by the common law courts against broad statutes that purported on their face to ban the possession of all arms. For example, the notorious Game Laws, "[t]aken literally, . . . would have banned the private possession of all implements that could be used to kill game, including guns." Caplan & Wimmershoff-Caplan, at 1115. "Nevertheless, in 1722 King's Bench excluded the simple possession of a firearm from the 1705 Game Law, because a person might keep a gun 'for the defense of his house.'" *Id.* "In 1738, King's Bench again refused to apply the Game

Laws to household possession of firearms, holding that the mere keeping of such arms was no offense under the game laws[.]" *Id.*

Thus, "English courts were vigilant in guarding the common law right to keep firearms for defending the home, even as the Game Laws threatened the possession of such arms." *Id.* And "[t]he drafters of the American Constitution were familiar with the narrow reading of the Game Laws by the common law courts animated by their concern for the safety and security of householders." *Id.*; *see also* Kates, at 240 & n.154 ("English court decisions, reports of which were available to the Founders, had recognized that 'a man may keep a gun for the defense of his house and family,' denying that the Game Acts then current 'prohibit a man from keeping a gun for his necessary defense. . . .'").[7]

Common law judges also read limitations into statutes regulating public carry, like the 1328 Statute of Northampton, which "literally banned the carrying of all arms in public." Caplan & Wimmershoff-Caplan, at 1113. "Common law judges, however, had read in the

[7] *See also Rex v. Gardner*, 87 Eng. Rep. 1240, 1241 (K.B. 1739) (holding that the Game Acts "do not extend to prohibit a man from keeping a gun for his necessary defense"); *Mallock v. Eastly*, 87 Eng. Rep. 1370 (K.B. 1744) ("[T]the mere having a gun was no offense within the game laws, for a man may keep a gun for the defense of his house and family.").

limitations that all indictments under the 1328 statute specify not only that the offense had taken place outside the home, but also that the manner of carrying the arms had terrorized the public." *Id.* (citing *Rex v. Knight*, 87 Eng. Rep. 73, 74 (K.B. 1686)). And, on this side of the Atlantic, "the Framers were well versed in common law commentaries, interpreting the 1328 Statute as covering only the carrying of arms to terrorize the community *and not applying it to peacefully having ordinary firearms at home*." *Id.* at 1114 (emphasis added).[8]

*C. Modern constitutional jurisprudence likewise reflects a special solicitude for the home.*

"The home occupies a special place in the pantheon of constitutional rights." *United States v. Craighead*, 539 F.3d 1073, 1077 (9th Cir. 2008). "Under the First Amendment, the 'State has no business telling a man, sitting alone in his house, what books he may read or what films he may watch.'" *Id.* (quoting *Stanley v. Georgia*, 394 U.S. 557, 565 (1969).

[8] *See also* David B. Kopel, *The First Century of Right to Arms Litigation*, 14 GEO. J.L. & PUB. POL'Y 127, 130 (2016) ("Two English cases were particularly important in shaping the American understanding of the right to keep and bear arms. *Semayne's Case* (1604) was about the home, stating that 'every man's home is his castle.' This became a foundation of American self-defense law, the 'Castle Doctrine.' The other case, *Sir John Knight* (1685), affirmed that the peaceable public carrying of arms is lawful, and that carrying with malicious intent to terrify people is not.") [hereafter, "Kopel, *First Century*"].

Likewise, "[t]he Second Amendment prohibits a federal 'ban on handgun possession in the home.'" *Id.* (quoting *Heller*, 554 U.S. at 635); *see also* *United States v. Orito*, 413 U.S. 139, 142 (1973) ("The Constitution extends special safeguards to the privacy of the home, just as it protects other special privacy rights such as those of marriage, procreation, motherhood, child rearing, and education." ); Kopel, *First Century*, at 131 ("In the U.S. Bill of Rights, the Second, Third, and Fourth Amendments are a cluster which protects pre-eminently (but not exclusively) the sanctity of the home.").

In *Heller*, the Court repeatedly compared the Second Amendment to the First Amendment. *Heller*, 554 U.S. at 579, 582, 595, 635; *id.* at 595 ("Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*.") (emphasis in original); *see also* Darrell A.H. Miller, *Guns As Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278, 1287, 1281 (2009) ("*Heller* signaled that the First and Second Amendments are cousins, and may be subject to similar limitations.") [hereafter, "Miller"]. Not surprisingly, given the historical tradition

discussed above, First Amendment jurisprudence reveals a special solicitude for the home. This jurisprudence, as *Heller* suggests, has relevance for the Second Amendment as well.

In *Stanley v. Georgia*, the Supreme Court unanimously held that "the mere private possession of obscene matter cannot constitutionally be made a crime." *Stanley*, 394 U.S. at 559. And this was so, the Court held, even though the Court had previously stated in numerous cases that "obscenity is not protected by the First Amendment." *Id.* at 560 (collecting cases). That was not the end of the matter, the Court explained, because those cases dealt with "public distribution or dissemination," not a "prosecution for private possession of obscene materials." *Id.* at 561.

The Court then focused on the place of procession, the home, in a manner evoking the Castle Doctrine: "Moreover, in the context of this case—a prosecution for mere possession of printed or filmed matter in the privacy of a person's own home—that right [meaning the First Amendment right to receive ideas] takes on an added dimension." *Id.* at 564; *see also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 66 (1973) (explaining that *Stanley* was "was hardly more than a reaffirmation that 'a man's home is his castle'"). "If the First Amendment means anything,

it means that a State has no business telling a man, *sitting alone in his own house*, what books he may read or what films he may watch." *Stanley*, 394 U.S at 565 (emphasis added).

A similar dynamic is evident in the Second Amendment context. In *Heller*, for example, the Supreme Court explained that the Second Amendment affords both the right to "keep arms" and the right to "bear arms"—with the former referring to the possession of arms and the latter referring to their carrying. *See Heller*, 554 U.S. at 581-92 (individually analyzing "the verbs 'keep' and 'bear'" and "the phrases 'keep arms' and 'bear arms'" and citing various definitions); *id.* at 592 ("Putting all of these textual elements together, we find that they [i.e. the operative clause of the Second Amendment, 'the right of the people to keep and bear Arms, shall not be infringed'] guarantee the individual right to possess *and* carry weapons in case of confrontation." (emphasis added)). The Court concluded that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id.* at 582. "'Keep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*." *Id.* at 583 (emphasis in original).[9]

[9] *See also* Miller, at 1287 ("The majority disaggregated the phrase—the right

Though "keeping" did not refer exclusively to possession in the home, it should not be surprising, given history, that sources cited in *Heller* repeatedly referenced the keeping of arms in a specific place: one's home. *See Heller*, 554 U.S. at 583 n.7 (collecting sources); *id.* at 615-66 (citing congressional testimony "that the founding generation 'were for every man bearing his arms about him and keeping them in his house, his castle, for his own defense'" (quoting Cong. Globe, 39th Cong., 1st Sess., 362, 371 (1866) (Sen. Davis)); *id.* at 585 ("Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right, for example, as a recognition of the natural right of defense 'of one's person or house'—what he called the law of 'self preservation.'") (quoting 2 COLLECTED WORKS OF JAMES WILSON 1142, and n. x (K. Hall & M. Hall eds.2007)); *see also* Kates, at 220 (explaining that "[b]ased on colonial statutory usage then, the amendment's phrase 'right of the people to keep' imports . . . a personal right to possess arms in the home").

This is not to suggest that the need for self-defense is *limited* to the home, as. *Bruen* makes clear. *New York State Rifle & Pistol Ass'n, Inc. v.*

to 'keep and bear' arms meant two distinct rights, not a unitary idiomatic expression. It meant the right 'to keep' arms and the right 'to bear' them. The right 'to keep' arms, according to the Court, was simple and straightforward—a right to 'have weapons.'")

*Bruen*, 597 U.S. 1, 33 (2022) ("Although we remarked in *Heller* that the need for armed self-defense is perhaps 'most acute' in the home, we did not suggest that the need was insignificant elsewhere." (internal citation omitted)). But *Bruen*'s discussion of the contours of the right likewise drew a common-sense distinction between keeping arms at home and bearing them in public:

> This definition of "bear" naturally encompasses public carry. Most gun owners do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table. *Although individuals often "keep" firearms in their home, at the ready for self-defense, most do not "bear" (i.e., carry) them in the home beyond moments of actual confrontation.* To confine the right to "bear" arms to the home would nullify half of the Second Amendment's operative protections.

*Bruen*, 597 U.S. at 32 (emphasis added).

Of course, *Bruen also* explained that "[n]othing in the Second Amendment's *text* draws a home/public distinction with respect to the right to keep and bear arms," meaning, that the right was in force both at home and in public. *Bruen*, 597 U.S. at 32 (emphasis added). But the same is true of the First Amendment's text, with the *Stanley* castle doctrine nonetheless providing for heightened protection in the home. Moreover, as discussed in both the previous and the following sections, the historical record—which is relevant to determining the government's

power to regulate the right to keep and bear arms—reveals a tradition that resoundingly protected firearm possession in the home, even as it allowed for ample regulation of public carry.

*Stanley* and *Heller*, then, reflect a quasi-constitutionalized Castle Doctrine, as the Supreme Court itself has suggested. *See Paris Adult Theatre I*, 413 U.S. at 66; *Minnesota v. Carter*, 525 U.S. 83, 99-100 (1998) (Kennedy, J., concurring) ("The axiom that a man's home is his castle . . . has acquired over time a power and an independent significance justifying a more general assurance of personal security in one's home, an assurance which has become part of our constitutional tradition."); *see also* Miller, at 1301 ("The *Heller* Court . . . repeatedly referred to the First Amendment as an important interpretive analogue for the Second.").

As applied to the Second Amendment, "[h]owever the *Stanley* castle doctrine may be narrowed, it would be difficult logically to exclude from it the home possession of firearms since the doctrine that 'a man's home is his castle' originated in cases upholding the right to possess and use arms for home defense." Kates, at 205 n.5. "If the Second Amendment right means anything, then, it means that the government has no business telling a man he cannot have a gun to protect his home." Miller,

at 1301; *see also* Kates, at 205 n.5 (positing that *Stanley*'s doctrine "surely encompasses the right to equip one's 'castle' with firearms, locks, metal grilles and other devices specifically designed to protect its privacy"). Were it otherwise, possession of obscenity in the home would have more constitutional protection than possession of a handgun in the home for self-defense. That result would be contrary both to the history discussed *supra* and to constitutional doctrine holding that the Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780).

*D. The historical record reveals a tradition of regulating the public "carry" of weapons, but not a total and permanent prohibition on private "possession" of weapons in one's own home.*

From the foregoing, it is clear that "the [English] common law drew a bright line between the right to have arms in the home as opposed to wantonly carrying them in public—the former being an absolute right—but the latter being a qualified right that government may regulate." Caplan & Wimmershoff-Caplan, at 1121. That common law understanding carried over to the colonies and was then codified in the Second Amendment. *See* Kates, at 240 ("Reference to the great common

law commentators known to the Founders shows Hawkins, Bracton and Coke all affirming the existence of a common law right to possess arms for home defense[.]").

Importantly, the history of regulations on *keeping* arms (as distinguished from regulations on *carrying*) is scarce. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J. L. & PUB. POL'Y 695 (2009) [hereafter, "Marshall"].[10] As described in previous sections, the English common law regulated the *carrying* of arms in public, but not the *keeping* of arms for self-defense. *See id.* at 714. Thus, "notwithstanding his celebration of the basic principle of self-defense, Blackstone also wrote without hesitation that the Laws of England restricted the public's ability to assemble with and transport arms." Miller, at 1324 (citing discussion of the "going armed" laws in 4

[10] *See also* Nelson Lund, *The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. REV. 1343, 1357 & n.33 (2009) ("While acknowledging that this history cannot solve all line-drawing problems, Mr. Marshall makes a powerful case that the traditional understanding of the right to arms did not authorize much more than laws forbidding those convicted of crimes of violence to carry firearms outside their homes, and possibly also forbidding them to possess easily concealable weapons, at least for as long as the offender continued to present a credible threat of recidivism," though "[e]ven limited bans on the possession of concealable weapons by violent felons were apparently not adopted until well into the twentieth century." (citing Marshall, at 707-08, 728-35)); *id.* at n.36 ("Unlike Justice Scalia [in *Heller*], Mr. Marshall provides a great deal of historical evidence to support his conclusions. The result of his analysis of the evidence is that Justice Scalia's broad endorsement of bans on firearms possession by all felons is unsupported.").

Blackstone, at 149). Thus, "[a]lthough it is true that by the founding era the bare possession of a gun 'for defence of a house' could not be a crime, men were still going to the gallows for the public brandishing of arms on the roads and highways of England—at least when disguised." *Id.* (citing cases). *Cf. Rex v Gardner*, 93 E.R. 1056 (K.B. 1738) (holding that "[t]he bare keeping a gun is no cause of conviction" under the Game Laws "whereas a gun is necessary for defence of a house").

Early American history is likewise devoid of a tradition of regulations targeting the *keeping* of arms, as distinguished from regulations on *carrying* in public. *Id.* at 710. This distinction is also reflected in nineteenth century American case law. *See, e.g.*, *Aymette v. State*, 21 Tenn. 154, 160 (1840) (explaining that "[t]he citizens have the unqualified right to *keep* the weapon, . . . [b]ut the right to *bear* arms is not of that unqualified character," such that the legislature may regulate "as the manner in which they are worn and circumstances under which they are carried" (emphasis added)); *State v. Reid*, 1 Ala. 612, 616-17 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be

clearly unconstitutional. But a law which is intended . . . to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, . . . does not come in collision with the constitution.”).

Indeed, before World War I, “the overwhelming focus of gun regulation in the States (there was none from the Federal Government) was on *carrying* weapons,” and the “States avoided the more extreme approach of banning *possession*.” *Id.* at 707 (emphasis in original). More specifically, “one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I.” *Id.* at 708. Even proponents of the since-discredited “collective rights” theory, which the Supreme Court definitively rejected in *Heller*, took it as a given that the government was “powerless” to prohibit “the simple possessing or keeping weapons,” even as they simultaneously asserted that the government had wide latitude “to restrict and even forbid carrying weapons by individuals.” Lucilius A. Emery*, The Constitutional Right to Keep and Bear Arms*, 28 HARV. L. REV. 473, 476 (1915).

“[A]t no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body

politic. In essence, American law recognized a zone of immunity surrounding the privately owned guns of citizens." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 142 (2007) [hereafter, "Churchill"]. Though "the police power was both theoretically broad and vigorously applied in early America, some aspects of social behavior remained beyond its regulatory reach. *The keeping of arms by members of the body politic was one such behavior*." *Id.* at 155 (emphasis added). By contrast, "[i]n early America, the legal immunity surrounding the possession of guns by members of the body politic did not extend to their use," and, therefore, "colonial and early state governments routinely exercised their police powers to restrict the time, place, and manner in which Americans used their guns." *Id.* at 161. But while "[c]olonial and state governments thus did not hesitate to regulate the use of guns in order to promote public safety and to protect private property," they did not legislate to "curb the ownership of guns" until the 20th century "Progressive Era reevaluation of the police power." *Id.* at 164 & n.61.

Notably, even discriminatory laws imposing arms restrictions on Catholics who refused to denounce the Pope provided an exception for keeping necessary arms for self-defense. *See* Marshall, at 714, 722-23.[11] "In England, a statute allowed a Catholic to keep firearms with permission from a local justice of the peace 'for the defence of his House or person.'" Kopel, *First Century*, at 136, n.47 (citing 1 Wm. & Mary, ch. 15 (1689); Kates, at 239, n.151 (explaining that "[e]ven Catholics, though forbidden to stockpile arms, were acknowledged the right to retain such as were necessary to defend their homes by the 1689 [Act]"); *see also* Miller, at 1324 ("Even if one reads in this disarmament act a right for Catholics to possess arms for self-preservation, it just as clearly contemplates some limitation on that right demarcated by the home."). And Virginia, the only colony to restrict the arms-bearing rights of Catholics, also exempted "such necessary weapons as shall be allowed

[11] The vitality of such discriminatory laws in the subsequent American constitutional tradition, however, is historically suspect: "James Madison, of course, expressly intended that the Second Amendment would abolish the arms restrictions on religious minorities." Kopel, *First Century*, at 138, n.51. "In Madison's notes for his speech introducing the Bill of Rights into the House of Representatives, he described the arms rights amendment as remedying two crucial defects in the English Declaration of Right: that the right included only the Protestant population, and that the right was, as a statutory enactment, efficacious against the King, but not against the actions of later Parliaments." *Id.* at 244 (citing Notes for Speech in Congress (June 8, 1789), in 12 THE PAPERS OF JAMES MADISON 193-94 (Charles F. Hobson et. al. eds., 1979)).

him by order of the justices of the peace at their court, for the defense of his house and person." Churchill, at 157 (citing "An Act for Disarming Papists and Reputed Papists, refusing to take the oaths to the Government," in HENING, STATUTES AT LARGE, 7:35 (1756)).

These discriminatory laws are also the same kinds of laws that this Court relied on in *Kimble* to justify applying § 922(g)(1) to persons with prior felony convictions for drug distribution on grounds of perceived dangerousness: "The government invokes much of the same historical evidence that it did in *Connelly* . . . namely, English laws disarming political and religious dissidents and American statements and practices suggesting that dangerous individuals could lose their Second Amendment rights." *United States v. Kimble*, 142 F.4th 308, 315-16 & n.13 (5th Cir. 2025); *see also United States v. Connelly*, 117 F.4th 269, 277 (5th Cir. 2024) (more specifically discussing "laws that disarmed religious minorities—especially Catholics"). Crucially, in *Kimble*, the defendant's § 922(g)(1) offense "stem[med[ from his arrest . . ., when law enforcement agents attempted to stop him for outstanding warrants" and "[a]s [he] fled, officers observed him discard a handgun from his waistband." *Kimble*, 142 F.4th at 309.

Thus, *Kimble* did not present the issues present in Mr. Squire's appeal, because the defendant in that case was carrying a firearm in public (while apparently under indictment, no less). Mr. Squire, by contrast, possessed a firearm in the privacy of his own home. Thus, his conduct fits within the historical tradition permitting persons who were otherwise barred from carrying firearms from possessing them at home for self-defense.

*E. The district court erred in denying the motion to dismiss as applied to Mr. Squire's possession in the home.*

In *Bruen*, the Supreme Court explained that the framework for analyzing the constitutionality of firearm regulations is rooted in the Second Amendment's text and history and expressly abrogated the means-end scrutiny framework previously adopted by this Court and its sister circuits, making clear that "means-end scrutiny" has no role to play in the Second Amendment context. *See Bruen*, 597 U.S. at 19-24. Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 17, 24. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. In other words, to pass Second

Amendment muster, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

In *United States v. Rahimi*, the Supreme Court reaffirmed that "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" and explained that "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29) (alteration in original). "Why and how the regulation burdens the right are central to this inquiry." *Id.*

Critically, "[i]t is the government's burden to demonstrate that the challenged regulation is 'relevantly similar' to laws our tradition is understood to permit . . . by finding and explicating 'historical precursors' supporting the challenged law's constitutionality." *Connelly*, 117 F.4th at 274 (citations omitted). While the government may rely on "analogous historical regulation[s]" and need not identify a "historical twin," a court must always "hold the government to its heavy burden, as the Second

Amendment 'is *not* a second-class right.'" *Id.* (quoting *Bruen*, 597 U.S. at 70) (emphasis in original).

As this Court explained post-*Rahimi*, "'[w]hy' and 'how' a regulation burdens the right presents two separate questions." *Id.* at 273. As to "why": "if laws at the Founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category." *Id.* at 274 (quoting *Rahimi*, 602 U.S. at 692). As to "how": "a law . . . may not be compatible with the right if it [is regulated] to an extent beyond what was done at the Founding[,]" "*even when [that] law regulates arms-bearing for a permissible reason*." *Id.* (quoting *Rahimi*, 602 U.S. at 692 (alterations and emphasis in original)). Importantly, "[t]he challenged and historical laws are 'relevantly similar' if they share a common 'why' and 'how': they must *both* (1) address a comparable problem (the 'why') *and* (2) place a comparable burden on the right holder (the 'how')." *Id.* (emphasis added).

In this case, the district court failed to apply this framework to the issue of whether § 922(g)(1) is constitutional as applied to Mr. Squire's possession of a firearm in his own home. Both the government and the

district court did not engage with Mr. Squire's argument or the historical sources he cited. Instead, the district court relied on dicta from *Heller* to reject his argument out-of-hand, in a footnote. ROA.153, n.44. This was error. In *Diaz*, this Court specifically held that "mere dicta"—even in Supreme Court cases—"cannot supplant the most recent [historical] analysis set forth by the Supreme Court." *Diaz*, 116 F.4th at 466 ("Without precedent that conducts *Bruen*'s historical inquiry into our Nation's tradition of regulating firearm possession by felons in particular, we must do so ourselves."). In doing so, the Court rejected the government's contention that § 922(g)(1) analysis can "begin and end" with dicta in earlier decisions opining that prohibitions on the possession of firearms by "felons and the mentally ill" are "presumptively lawful." *Id.* at 465-66. The government made the same type of argument before the district court here. *See* ROA.101 (citing dicta to argue that the Supreme Court has "hinted that the law remains constitutional"); ROA.110 (citing dicta in *Heller*).[12]

[12] The district court also stated that Mr. Squire "fail[ed] to address this language," referring to the *Heller* dicta. ROA.153, n.44. However, Mr. Squire's reply brief did in fact address *Diaz*'s holding that "mere dicta" in *Heller* and its progeny "cannot supplant" the "historical inquiry" mandated by *Bruen*. ROA.119 (quoting *Diaz*, 116 F.4th at 465-66).

While Mr. Squire identified historical sources that treated possession in the home and possession in public differently, the government ignored his argument entirely—even though it is the government's burden to prove the constitutionality of the statue under *Bruen*. *Compare* ROA.86-87 (Mr. Squire's motion), w*ith* ROA.110-11 (gov't opposition); *see also* ROA.133 (reply). The district court, however, also did not engage with the historical record on this issue. Instead of holding the government to its burden, as required by *Bruen*, it relied on dicta, which was error under *Diaz*. The district court therefore reversibly erred in denying the motion to dismiss.

*F. Permanently prohibiting possession of firearms in one's own home is both antithetical and foreign to the Anglo-American tradition and imposes significant, real-world hardships on "the people" that cannot be ignored.*

Finally, just as Justice Alito did in *McDonald*, it is worth noting the real-world implications of affirming the district court's ruling. A holding that people like Mr. Squire may be permanently prohibited from possessing a firearm in the home for self-defense would leave many millions of people in this country at the mercy of harm by others. There is no right to receive police protection, nor does the government have a duty "to protect an individual against private violence." *DeShaney v.*

*Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("But there is no constitutional right to be protected by the state against being murdered by criminals or madmen. It is monstrous if the state fails to protect its residents against such predators but it does not violate the due process clause . . . or, we suppose, any other provision of the Constitution.").

In response to these realities, Justice Alito in *McDonald* rejected "the proposition that the Second Amendment right does not protect minorities and those lacking political clout" and explained that "the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials." 561 U.S. at 789-90. Regrettably, the City of New Orleans, where Mr. Squire and his family lived at the time of the instant offense, has long had one of the highest crime rates in the country.[13] Indeed, Mr. Squire and his family have experienced the tragic impacts of violent crime firsthand, as both his father and his oldest son's mother were

[13] *See, e.g. Most Dangerous Places in the U.S. in 2025-2026*, U.S. News & World Report Real Estate, available at: https://realestate.usnews.com/places/rankings/most-dangerous-places; Nicole Gelinas, *Commentary: New Orleans Still Drowning in Crime*, Manhattan Institute (published in the Dallas Morning News on May 13, 2007), available at https://manhattan.institute/article/new-orleans-still-drowning-in-crime.

murdered. ROA.172-74; ROA.322. Under the circumstances, possessing a firearm in the home for self-defense may be the best, most rational choice available to people like Mr. Squire, who live in high-crime neighborhoods and, unfortunately, cannot necessarily rely on the police to adequately protect them from violence in a pre-emptive or timely fashion. *See McDonald*, 561 U.S. at 750-51.

Felons are obviously among "those lacking political clout," as they can be permanently disenfranchised. *See Hopkins v. Watson,* 108 F.4th 371 (5th Cir. 2024). Nonetheless, felons are part of "the people" with Second Amendment rights. *See Kimble*, 142 F.4th at 311("[C]onvicted felons are 'unequivocally among "the people" protected by the Second Amendment."') (citation omitted). "It is very hard to see how the felon's interest in personal defense, in protecting his or her home and family (many of whom may be completely innocent of any crime), is diminished by his or her status as a convicted felon." Carlton F.W. Larson*, Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1382 (2009). "Indeed, it does not seem unreasonable to believe that many convicted felons may be the

most in need of a gun for purposes of self-defense"—for example, because "they may live in dangerous and crime-ridden neighborhoods." *Id.*

"The right to defend oneself from deadly attack is fundamental." *United States v. Panter*, 688 F .2d 268, 271 (5th Cir. 1982). "At the time of the framing of the United States Constitution, all common law authorities upheld the unvarnished, absolute, unqualified right to keep arms in the house for home defense against thieves and stranger-intruders." Caplan & Wimmershoff-Caplan, at 1074. Thus, the right to keep arms was "inextricably enmeshed with the home privacy castle doctrine." *Id.* "These rights were firmly embedded in American law at the time of the framing of the U.S. Constitution," and they maintain their validity today. *Id.* at 1076. Indeed, "*Semayne*'s maxim that 'a man's house is his castle' is in twenty-first century America probably the best-known language from any English case." Kopel, *First Century*, at 131.

If the district court's ruling is allowed to stand, however, people like Mr. Squire, who live in a high-crime neighborhood and have felony records, will be permanently deprived of the most ancient and fundamental right to possess arms suitable for self-preservation *while in their own homes*. For people like Mr. Squire, the district court's rule

means that his home is emphatically *not* his castle. This Court must vacate and remand.

## II. The district court also misapplied *Bruen* and *Diaz*, while the government did not come close to meeting its burden.

The foregoing is wholly sufficient to vacate Mr. Squire's conviction and remand with instructions to dismiss the indictment: Simply put, there is not a historical tradition that justifies permanently prohibiting Mr. Squire from possessing a firearm in his own home for self-defense. That ends the inquiry. Notably, though, the district court committed additional *Bruen* and *Diaz* errors that independently mandate reversal. Though this Court need not reach these issues in light of the error discussed above, these additional errors are addressed below. This Court's review is *de novo*. *See Copeland*, 820 F.3d at 811.

### *A. The district court committed four additional reversible errors.*

The district court committed at least four additional *Bruen* and *Diaz* errors that independently warrant reversal.

First, the district court placed the burden of proof on the wrong party—Mr. Squire, the defendant. *See* ROA.150 (stating that "*the Defendant* fails to establish that § 922(g)(1) . . . violates the Second Amendment either on its face or as applied" (emphasis added)). This is

directly contrary to Supreme Court precedent and constitutes reversible error in and of itself.

Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 17, 24. "The *government* must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24 (emphasis added). In other words, to pass Second Amendment muster, "*the government must affirmatively prove* that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19 (emphasis added). And, after *Diaz*, there is no doubt that "[t]he plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)." *Diaz*, 116 F.4th at 467. Thus, the district court erred in not properly placing the burden on the government.

Second, the district court failed to recognize that *Bruen* rendered prior Fifth Circuit precedent "obsolete." *Diaz*, 116 F.4th at 465; *see also Kimble*, 142 F.4th at 311 ("In *Diaz*, we began by recognizing that *Bruen* abrogated our precedents upholding the constitutionality of (g)(1) in all its applications."); *contra* ROA.150, n.31 ("[T]he Court rejects the

Defendant's argument that *Bruen*'s framework 'overruled prior Fifth Circuit precedent upholding § 922(g)(1).'"). This misunderstanding surely influenced the rest of the district court's analysis and requires, at minimum, remand.

Third, the district court misapplied the *Diaz* test. Instead of holding the government to its burden of bringing forth historical analogues that were specific to Mr. Squire's prior felony convictions, the district court—at the urging of the government—instead engaged in the wrong type of analogical reasoning by merely comparing Mr. Squire to Mr. Diaz. *See* ROA.152-53 (ruling that "Squire follows in Diaz's shoes" because of his "very similar"—yet, different—prior convictions); *see also* ROA.105-106 (asserting that *Diaz* foreclosed Mr. Squire's as-applied challenge, without engaging in the requisite historical analysis).

Fourth, the district court *sua sponte* reasoned that obstruction of justice is "relevantly similar" to the "law of treason . . . one of the most 'infamous crimes.'" ROA.152, n.43. This was error for two reasons: (1) obstruction of justice is not "relevantly similar" to the most infamous crime of treason, which was punished by death; and (2) the historical record shows that obstruction offenses were instead non-capital crimes,

which are insufficient under *Diaz* to justify application of § 922(g)(1).[14] For example, the 1790 Crimes Act—the first federal criminal law—punished treason with death. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 112 (1790) ["1790 Crimes Act"]). By contrast, the Act punished offenses like obstruction of process, perjury, and related crimes with the temporary punishments of terms of imprisonment, fines, and whippings. *See id.* at 115-17. Likewise, the only relevantly similar historical statute the district court cited was an 1829 New York law that punished "Affecting the Administration of Justice" as a *non-capital* crime. *See* ROA.152, n.43. In other words, the punishment was not "permanent." Therefore, the district court's historical analogue fails the *Diaz*'s test.

*B. Even introducing new evidence on appeal, the government will not be able to carry its burden under* Bruen *and* Diaz.

Mr. Squire anticipates that the government will now seek to satisfy *Diaz* with historical evidence for the first time on appeal as to his prior convictions for simple burglary and unauthorized use of a movable, though it did not even attempt to do so by introducing historical

[14] The government did not rely on Mr. Squire's prior conviction for obstruction of justice to defend the constitutionality of § 922(g)(1) as applied, much less marshal any historical evidence in support of that position.

analogues in district court. Respectfully, that would be procedurally improper. But no matter. The government will be unable to carry its burden in any event, because Mr. Squire's prior convictions are not analogues to Founding-era felonies.[15]

Mr. Squire has a prior Louisiana conviction for simple burglary, but his offense was a "far cry" from common-law burglary. As the Supreme Court has explained, "the contemporary understanding of 'burglary' has diverged a long way from its common law roots." *Taylor v. United States*, 495 U.S. 575, 593 (1990). Today, "[t]he modern crime is a far cry from our idea of the common law offense." Helen A. Anderson, *From the Thief in the Night to the Guest Who Stayed Too Long: The Evolution of Burglary in the Shadow of the Common Law*, 45 INDIANA L. REV. 629, 630 (2012). Indeed, "[f]ew crimes have changed as much over the years as burglary," and "[s]ome of the most significant changes have occurred during the past fifty years." *Id.*

---

[15] The only prior convictions that the government *did* address with historical evidence in district court in the context of *Diaz* were Mr. Squire's drug priors. ROA.108-09 *see also* ROA.122-27 (Mr. Squire's reply). But this Court, in *Kimble*, subsequently rejected the government's argument that mail theft, counterfeiting U.S. securities, and trading in stolen horses were "relevantly similar" to drug trafficking because it "stretches the analogical reasoning prescribed by *Bruen* and *Rahimi* too far." *Kimble*, 142 F.4th at 312-14. Thus, the government can no longer rely on that argument.

At the time of the Founding, burglary referred to the act of breaking and entering another person's home at night with the intent to kill or commit some other felony within. *See id.* at 633. At the time of Mr. Squire's offense, by contrast, Louisiana defined simple burglary far more broadly as "the unauthorized entering of any dwelling, vehicle, watercraft, or other structure, movable or immovable, or any cemetery, with the intent to commit a felony or any theft therein" La. R.S. 14:62(A). Notably, the PSR shows that Mr. Squire's offense involved a vehicle—not a dwelling. ROA.334. That is a significant difference.

In *Diaz*, this Court looked for evidence "more targeted to Diaz's circumstances" to determine whether his prior conviction "was considered a felony at the time of the Founding." *Diaz*, 116 F.4th at 468. And it looked to the Founding-era definition of the crime, because that is what Supreme Court precedent requires: "Simply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny." *Id.* The same applies here: "[N]ot all [burglars] today would have been considered [burglars] at the Founding," and, therefore, "[s]imply classifying a crime as a [burglary] does not meet the level of historical rigor required by *Bruen* and its progeny." *See id.* Instead, the

government must bring forth other evidence "specifically targeted to [Ms. Squire's] circumstances" to show that *his* simple burglary offense is analogous to burglary offenses at the Founding. It has not done so.

Nor was there any proof introduced below that Mr. Squire's simple burglary offense involved a theft, which distinguishes his case from *Schnur*, where this Court referred to *that* defendant's burglary conviction as a "theft-related felony." *United States v. Schnur*, 132 F.4th 863, 870-71 (5th Cir. 2025). Thus, the government cannot merely cite *Schnur* to carry its burden here either.

Mr. Squire also had prior convictions for unauthorized use of a motor vehicle. But, again, the government did not bring forth any historical laws analogous to that crime—which, unlike theft, does not require an intent to permanently dispossess the victim: "Unauthorized use of a motor vehicle is the intentional taking or use of a motor vehicle which belongs to another, either without the other's consent, or by means of fraudulent conduct, practices, or representations, *but without any intention to deprive the other of the motor vehicle permanently*." La. R.S. 14:68.4(A) (emphasis added). At common law, however, the felony offense of theft or larceny required an intent to permanently deprive the owner

of the property. *See* 50 AM. JUR. 2D LARCENY § 32 ("At common law and under some statutes, it is specified that there must be a criminal intent to deprive the owner of his or her property wholly and permanently."); *United States v. Tyerman*, 701 F.3d 552, 565 (8th Cir. 2012) (noting that "intent to permanently deprive is an element of common-law larceny").[16] Thus, as to this prior conviction, the government cannot carry its burden under *Bruen* either.

Finally, even if the government *could* satisfy these hurdles, it would still need to contend with the historical tradition, arising from the Castle Doctrine, that protects possession of arms suitable for self-defense in the home, discussed in Part I—an issue this Court has yet to address in the context of an as-applied *Bruen* challenge.

## III. 18 U.S.C. § 922(g)(1) is unconstitutionally vague.

Alternatively, the statute is unconstitutionally vague, in violation of the Fifth Amendment's Due Process Clause, and violates separation of powers principles. In *United States v. Branson*, 139 F.4th 475, 479 (5th

---

[16] *See also* La. R.S. 14:67(A) ("Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. *An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.*") (emphasis added).

Cir. 2025), this Court rejected an unpreserved vagueness challenge on plain-error review. Mr. Squire's claim, however, is preserved, and therefore reviewed *de novo*.

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." The Supreme Court has explained that the government "violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983)). A statute that leaves "grave uncertainty" about its reach cannot pass Due Process muster. *Id.* at 592, 598. Rather, a statute "must be sufficiently focused to forewarn of both its reach and coverage." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 33 (1963). This is "especially true where the uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights"—like the Second Amendment right to keep and bear arms at issue here. *See Colautti v. Franklin*, 439 U.S. 379, 391 (1979), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*,

597 U.S. 215 (2022) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 109; *Smith v. Goguen*, 415 U.S. 566, 573 (1974); *Keyishian v. Board of Regents*, 385 U.S. 589, 603-604 (1967)).

These are longstanding principles that have been in place for more than a century. In *United States v. Reese*, the Supreme Court considered "whether a penal statute enacted by Congress ,. . . which is in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, can be limited by judicial construction so as to make it operate only on that which Congress may rightfully prohibit and punish." 92 U.S. 214, 219 (1875). In other words, the question was "whether [a court] can introduce words of limitation into a penal statute so as to make it specific, when, as expressed, it is general only." *Id.* The Court held no and struck down the law for two interrelated reasons. *Id.* First, the Court identified due process concerns: "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *Reese*, 92 U.S. at 221. And second, it identified separation of powers concerns that resulted from the statute's vagueness: "This would, to some extent,

substitute the judicial for the legislative department of the government." *Id.* "To limit this statute in the manner now asked for would be [to] make a new law, not to enforce an old one. This is no part of [the judicial] duty." *Id.*; *see also United States v. Davis*, 588 U.S. 445, 451 (2019) ("Our doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers."). Thus, a criminal law that utilizes general language to prohibit conduct that is both within and without constitutional power to prohibit—like § 922(g)(1) does—is unconstitutionally vague.

The concerns identified by the Supreme Court in *Reese* apply with full force to § 922(g)(1). The statute uses general language to prohibit firearm possession by "any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." Congress's use of such broad and general language, however, means that the statute covers persons and activities that are both within and outside its power to prohibit consistent with the Second Amendment. In response, numerous courts—including this Court—have limited the statute via judicial construction on an as-applied, case-by-case, ad hoc basis to keep the statute within the strictures of the Second Amendment.

*See, e.g. Range v. Att'y Gen. United States of Am.,* 69 F.4th 96, 103-06 (3d Cir. 2023), *cert. granted, judgment vacated sub nom. Garland v. Range,* 144 S. Ct. 2706 (2024), *on remand*, 124 F.4th 218 (3d Cir. 2024); *Diaz*, 116 F.4th at 470 n.4; *United States v. Williams*, 113 F.4th 637, 663 (6th Cir. 2024). The upshot is insurmountable due process and separation of powers concerns that render the statute unconstitutional.

The statute violates due process because it does not provides fair notice that permits an individual previously convicted of a crime punishable by more than a year of imprisonment to determine whether he or she can exercise his or her constitutionally protected right to possess a firearm without the risk of criminal prosecution and imprisonment up to 15 years, creating an untenable chilling effect on the Second Amendment. *See Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids."). The statute "tie[s] criminal culpability" to overly broad, general language "without statutory definitions, narrowing context, or settled legal meanings," rendering it unconstitutionally vague. *United States v. Williams*, 553 U.S. 285, 306

(2008). Thus, § 922(g)(1) leaves ordinary people uncertain as to what "convict[ions]" for what "crime[s]" actually fall within the constitutional ambit of the statutem and which "person[s]" and what "possess[ions]" are actually prohibited from possessing firearms as a result. *See Winters v. New York*, 333 U.S. 507, 515-16 (1948) ("The vagueness may be from uncertainty in regard to persons within the scope of the act, or in regard to the applicable tests to ascertain guilt." (internal citation omitted)).

The statute's vagueness also results in a delegation of the legislative function to the judiciary in violation of separation of powers principles. Courts' applying § 922(g)(1)'s vague text on a case-by-case basis to bring it within its constitutional limits "threaten[s] to hand responsibility for defining crimes" to judges. *Davis*, 588 U.S. at 451 (citations omitted). This is not how our tripartite system of government is supposed to work: "Under our system of separated powers, the Legislative Branch must do the hard work of writing federal criminal laws. Congress cannot give the Judiciary uncut marble with instructions to chip away all that does not resemble David." *Percoco v. United States*, 598 U.S. 319, 337 (2023) (Gorsuch, J., concurring) (citing *Reese*, 92 U.S. at 221). Yet, that is what Congress has done with § 922(g)(1). Congress

has "set a net large enough to catch all possible offenders, and [left] it to the courts to step inside and say who could be rightfully detained, and who should be set at large"—something the Supreme Court held not only unconstitutional, but "dangerous." *Reese*, 92 U.S. at 221.

As Justice Scalia succinctly explained, "[a] statute that is unconstitutionally vague cannot be saved . . . by judicial construction that writes in specific criteria that its text does not contain." *Skilling v. United States*, 561 U.S. 358, 415-16 (2010) (Scalia, J., concurring) (citing *Reese*, 92 U.S. at 219-21). Nor is there any de minimis exception to vagueness concerns. Indeed, "even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). Here, § 922(g)(1) fails to establish constitutional standards for the police, prosecutors, judges, and the public. Thus, it is unconstitutionally vague.

For this independent, alternative reason, Mr. Squire's conviction should be vacated and the indictment dismissed.

## IV. 18 U.S.C. § 922(g)(1) is facially unconstitutional under the Second Amendment [presently foreclosed].

Though the issue is currently foreclosed by *Diaz*, Mr. Squire also seeks to preserve for further review that § 922(g)(1) is facially unconstitutional because there is no historical support for *permanently* prohibiting firearm possession by all felons. *See Rahimi*, 602 U.S. at 692 ("Even when a law regulates arms-bearing for a permissible reason . . . it may not be compatible with the right if it does so to an extent beyond what was done at the founding."); *see also Connelly*, 117 F.4th at 274. Rather, the historical evidence shows that the type of regulation contained in § 922(g)(1) is wholly inconsistent "with the principles that underpin our regulatory tradition," and therefore the statute violates the Second Amendment. *Rahimi*, 602 U.S. at 692.

For example, as the Supreme Court explained in *Rahimi*, surety laws and "going armed" laws establish a regulatory tradition of "temporary" disarmament, but only after a judicial determination that the person posed a credible threat to the physical safety of others. *Rahimi*, 602 U.S. at 697-99. Further, according to *Rahimi*, a person subject to a surety bond received "significant procedural protections" and, importantly, "could obtain an exception if he needed his arms for self-

defense or some other legitimate reasons." *Id.* at 697. "Many postfounding going armed laws" incorporated similar exceptions. *See id.* at 769 (Thomas, J., dissenting). Not so for § 922(g)(1).

Additionally, people who were temporarily disarmed for political or religious reasons in the Founding Era "could often regain their rights once they were no longer perceived as dangerous." Joseph G. S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 250 (2020). Even "armed insurrectionists" regained their rights. *Id.* at 269. Again, not so for § 922(g)(1).

It was not until the 20th century that legislatures began to pass categorical, permanent firearms bans—eventually expanding those bans to include all persons who have ever been convicted of a criminal offense punishable by imprisonment for a term exceeding one year, i.e., "felons." *See* Greenlee at 272-75. Accordingly, § 922(g)(1)'s permanent firearm prohibition for all so-called "felons" violates the Second Amendment.

### V. 18 U.S.C. § 922(g)(1) is unconstitutional because it exceeds Congress's power to regulate interstate and foreign commerce [presently foreclosed].

Finally, while recognizing that the issue is presently foreclosed by circuit precedent, Mr. Squire raises to preserve for further review that 18 U.S.C. § 922(g)(1) exceeds Congress's authority to regulate interstate and foreign commerce and that his factual basis failed to establish the requisite interstate commerce nexus to support a valid conviction. *See United States v. Seekins*, No. 21-10556, 2022 WL 3644185, at *2 (5th Cir. Aug. 24, 2022) (unpublished) (summarizing precedent). This argument was raised in the district court and is therefore preserved.

The permissive test for federal regulation of gun possession articulated in *Scarborough v. United States*, which requires only the "minimal nexus that the firearm have been, at some time, in interstate commerce," 431 U.S. 563, 575 (1977), is inconsistent with the Supreme Court's more recent Commerce Clause jurisprudence in *United States v. Lopez*, 514 U.S. 549 (1995); *United States v. Morrison*, 529 U.S. 598 (2000); and *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) [*"NFIB"*]. A fair reading of *Scarborough* suggests that the case was concerned with statutory interpretation and did not purport to resolve

any constitutional issues. *See United States v. Seekins*, 52 F.4th 988, 991 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc). This Court, however, has adhered to the view that *Scarborough*'s "minimal nexus" is sufficient both to prove guilt under § 922(g)(1) and to bring any subsequent act of firearm possession within Congress's power to regulate. *See, e.g., United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013).

Members of the Supreme Court and judges on lower courts have acknowledged the irreconcilability of *Lopez* and a constitutional reading of *Scarborough*. *See Alderman v. United States*, 562 U.S. 1163, 1166 (2011) (Thomas, J., dissenting from denial of certiorari); *United States v. Hill*, 927 F.3d 188, 215 n. 10 (4th Cir. 2019) (Agee, J., dissenting); *United States v. Kuban*, 94 F.3d 971, 977 (5th Cir. 1996) (DeMoss, J., dissenting in part). Indeed, if *Scarborough* is a constitutional decision, then it grants the federal government unlimited power to regulate the affairs of citizens. *See Alderman*, 562 U.S. at 1167 (Thomas, J., dissenting from denial of certiorari) ("[T]he lower courts' reading of *Scarborough*, by trumping the *Lopez* framework, could very well remove any limit on the commerce power."). Any physical object has almost certainly crossed a

state line at some point in the past. To hold that this past travel grants Congress a perpetual right to regulate what someone does or does not do with that object is to eliminate any restrictions on Congress's power. *See NFIB*, 567 U.S. at 557 ("The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions.").

*Lopez* held "that the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." 514 U.S. at 559. And *NFIB* held that the commerce power only reaches "activity," meaning, active engagement in a commercial market. *See NFIB*, 567 U.S. at 551, 556-57. Under *Lopez* and its progeny, Mr. Squire's conviction must be reversed because § 922(g)(1) violates the Commerce Clause and is unconstitutional. Alternatively, if the statute can be interpreted in a manner that would avoid rendering it unconstitutional, Mr. Squire's factual basis is plainly insufficient because the mere fact that the gun and ammunition at some point crossed state lines does not bring his conduct within the constitutional limits expounded in *NFIB*. In either scenario, his conviction must be vacated.

## CONCLUSION

Incarceration for merely possessing a gun in one's own home is something "our ancestors would never have accepted." *Bruen*, 597 U.S. at 30. This Court must vacate Mr. Squire's conviction and remand with instructions to dismiss.

Respectfully submitted,

CLAUDE J. KELLY
Federal Public Defender
Eastern District of Louisiana

*/s/ Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney
500 Poydras Street, Suite 318
Hale Boggs Federal Building
New Orleans, Louisiana 70130
(504) 589-7930
steven_spires@fd.org

**CERTIFICATE OF SERVICE**

The undersigned certifies that on October 22, 2025, the foregoing Appellant's Brief was filed with the Clerk of Court via the electronic filing system, which will send an electronic Notice of Docket Activity to the following Filing Users:

Kevin G. Boitmann, kevin.boitmann@usdoj.gov,
Patrick Stevens Barr, patrick.barr@usdoj.gov,
Sarah Dawkins, sarah.dawkins@usdoj.gov,
Megan Roberts, megan.roberts@usdoj.gov,
Assistant United States Attorneys.

"The court's electronic Notice of Docket Activity constitutes service of the filed document on all Filing Users." 5TH CIR. R. 25.2.5.

*/s/Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,962 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, 14-point font for text and 12-point font for footnotes.

3. This brief complies with the privacy redaction requirement of Fed. R. App. P. 25(a)(5), 5th Cir. R. 25.2.13, and Fed. R. Crim. P. 49.1, because it has been redacted of personal data identifiers.

4. This electronic submission is an exact copy of the paper document, in compliance with 5th Cir. R. 25.2.1.

5. This brief is free of viruses because it has been scanned for viruses with the most recent version of Symantec Endpoint Protection, in compliance with 5th Cir. ECF Filing Standard A(6).

*/s/ Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney
Dated: October 22, 2025