No. 25-30324

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

CURTIS SQUIRE,
*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:24-CR-41-1

---

**APPELLANT'S REPLY BRIEF**

---

CLAUDE J. KELLY
Federal Public Defender
Eastern District of Louisiana

STEVEN E. SPIRES
Research and Writing Attorney
Office of the Federal Public Defender
500 Poydras Street, Suite 318
Hale Boggs Federal Building
New Orleans, Louisiana 70130
(504) 589-7930
steven_spires@fd.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................. iii

ARGUMENTS ON REPLY ...................................................................1

    I.    "Where" the government seeks to ban firearm possession is a question of constitutional significance...........4

    II.    The government's three historical laws do not justify permanently disarming Mr. Squire in his home....................8

    III.    *Kimble* did not resolve an as-applied challenge in the home, but it did reference historical sources that provided a home-based exception. ........................................12

    IV.    *Diaz* does not apply to Mr. Squire at all—but even if it did, the government and this Court must still contend with the Castle Doctrine....................................................14

    V.    The government's defense of § 922(g)(1)'s unconstitutional vagueness is contrary to *Johnson v. United States*....................................................................20

CONCLUSION ...................................................................................25

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES**

*Dist. of Columbia v. Heller*, 554 U.S. 570 (2008) .............................. 11, 14
*Johnson v. United States,* 576 U.S. 591 (2015)................. 4, 20, 21, 22, 23
*Kanter v. Barr,* 919 F.3d 437 (7th Cir. 2019)...............................................3
*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) .................................................................................... passim
*Percoco v. United States*, 598 U.S. 319 (2023) ............................................23
*United States v. Bonner*, 159 F.4th 338 (5th Cir. 2025) .........................21
*United States v. Bullock*, 123 F.4th 183 (5th Cir. 2024).....................9, 13
*United States v. Cockerham*, No. 24-60401, 2025 WL 3653336 (5th Cir. Dec. 17, 2025)................................................................................ 15, 16
*United States v. Coleman*, 609 F.3d 699 (5th Cir. 2010) .......................23
*United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024).......... 3, 7, 11, 13
*United States v. Davis*, 588 U.S. 445 (2019) ...........................................24
*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) ..................... passim
*United States v. Kimble*, 142 F.4th 308 (5th Cir. 2025) ... 3, 12, 13, 14, 22
*United States v. Lanier*, 520 U.S. 259 (1997) .........................................23
*United States v. Mancilla*, 155 F.4th 449 (5th Cir. 2025) ................21, 22
*United States v. Mitchell*, 160 F.4th 169 (5th Cir. 2025) ......................22
*United States v. Morgan*, 147 F.4th 522 (5th Cir. 2025) .......................17
*United States v. Orozco*, No. 24-50104, 2025 WL 2623429 (5th Cir. Sept. 11, 2025) (unpublished) ...............................................................21, 24
*United States v. Rahimi*, 602 U.S. 680 (2024) ............................... passim
*United States v. Schnur*, 132 F.4th 863 (5th Cir. 2025)................. passim
*United States v. Smith*, No. 24-60600, 2025 WL 2938691 (5th Cir. Oct. 16, 2025) (unpublished) ............................................................... 18, 19
*United States v. Traxler*, 764 F.3d 486 (5th Cir. 2014) ........................13
*United States v. Wiltberger*, 18 U.S. 76 (1820) ......................................25

**STATUTES**

18 U.S.C. § 922(g)(1).................................................................... passim
La. R.S. 14:62 .............................................................................................17
La. R.S. 14:68.4...........................................................................................15

**HISTORICAL SOURCES**

3 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND (2d ed. 1648) ..... 1

An Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws (Isaac Collins) ................................................................................. 9

An Act to Amend an Act Declaring What Crimes and Practices Against the State Shall Be Treason, ch. 6, § 9, 1777 N.C. Sess. Laws (James Davis 1778) ............................................................................... 10

**OTHER AUTHORITIES**

Wayne R. LaFave, 3 Subst. Crim. L. § 19.5(b) (3d ed. 2025) ................. 15

## ARGUMENTS ON REPLY

The appeal raises a specific and narrow, yet critically important, issue of first impression—namely, the role of the Castle Doctrine in post-*Bruen* Second Amendment jurisprudence. As Lord Coke explained centuries ago, "a man's house is his castle, & domus sua cuique est tutissimum refugium; for where shall a man be safe, if it be not in his house?" 3 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND, 161-62 (2d ed. 1648). The Castle Doctrine is part of our historical tradition, and it protects the keeping of arms in one's own home—his or her "castle"—to provide for safety and self-preservation.

Yet, the government alarmingly asserts that 18 U.S.C. § 922(g)(1) permits it to *permanently* prohibit a person from possessing a firearm in his or her own home for self-defense. That assertion is fundamentally at odds with the Second Amendment's text and history. The Castle Doctrine is part of our constitutional tradition, and the Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022) (citation omitted). This Court must reverse, vacate, and remand with instructions to dismiss.

The government's response brief is notable for what it does not say. The government says nothing of the Castle Doctrine and its well-established historical pedigree, which includes protections for keeping arms at home for self-defense. *See* Squire Br. at 13-21. Nor does the government mention the Supreme Court cases recognizing the role of the Castle Doctrine in our constitutional tradition. *See* Squire Br. at 22-29. And the government ignores the English and American laws that provided exceptions for keeping guns at home even when otherwise restricting the right to keep and bear arms. *See* Squire Br. at 29-36.

Rather than address these arguments head-on, the government insists broadly that "where" disarmament occurs is irrelevant to Second Amendment analysis—a position that is directly contrary to *Bruen* and the Castle Doctrine cases. Alternatively, the government attempts to defend its ability to permanently divest Mr. Squire of the right to possess a firearm in his own home by relying on three colonial laws to justify that position. But all three cited laws suffer from fatal infirmities, and none are relevantly similar to § 922(g)(1) as applied. In any event, cherry picking three isolated colonial laws does not satisfy the government's burden of establishing a historical *tradition*. That is particularly true

when the government urges this Court to interpret those laws at "a high level of generality" to negate the long-standing Castle Doctrine, unduly "water[ing] down the right" protected by the Second Amendment. *United States v. Rahimi*, 602 U.S. 680, 740 (2024) (Barrett, J., concurring).

The government also misreads and overextends this Court's caselaw. *Kimble* did not decide the Castle Doctrine issue, nor does it preclude its application here. Indeed, many discriminatory, class-based disarmament laws included exceptions for keeping arms at home for self-defense, and *Kimble* arose in a distinguishable as-applied context *outside* the home. *See* Squire Br. at 34-36. Further, all this assumes that *Kimble*'s discussion of history is the controlling interpretation. It is not, because *Kimble*'s interpretation conflicts with *Connelly*'s interpretation of some of the same history, and *Connelly* controls under the rule of orderliness.

Additionally, contrary to the government's argument, *Diaz* and *Schnur* not apply to Mr. Squire's convictions because they do not involve theft. But even if they did, this Court would still need to address the interaction of the Castle Doctrine and those cases. *See Kanter v. Barr,* 919 F.3d 437, 461 (7th Cir. 2019) (Barrett, J., dissenting) ("Those who ratified the Second Amendment would not have assumed that a free man,

previously convicted, lived in a society without any rights and without the protection of law."). This is an issue of first impression in this Circuit, and it would require the parties and the Court to re-engage with the historical record.

Finally, the government's defense of § 922(g)(1)'s unconstitutional vagueness is contrary to Justice Scalia's majority opinion in *Johnson v. United States*. Section 922(g)(1) suffers from the same kind of fatal defects that led the Supreme Court in *Johnson* to hold that the residual clause of the Armed Career Criminal Act (ACCA) is unconstitutionally vague. Moreover, like in *Johnson*, the unpredictable and divergent judicial efforts required to apply § 922(g)(1) renders it unconstitutionally vague and results in a denial of due process. Thus, this Court can rule for Mr. Squire on either of two independent grounds, under the Second Amendment or the Fifth Amendment's Due Process Clause.

## I. "Where" the government seeks to ban firearm possession is a question of constitutional significance.

First, the government claims that *Bruen* "does not require an analysis of 'where' the disarming applies." Gov't Br. at 16 (citing *Bruen*, 597 U.S. at 29-33). But that is simply not so; *Bruen* itself demonstrates that "where" is a central constitutional consideration. *See Bruen*, 597

U.S. at 30-31. (discussing the "where" question of potential firearm restrictions in "sensitive places"). Thus, in an as-applied challenge, this Court must consider where the disarmament occurs.

Next, the government attempts to analogize Mr. Squire to the defendant in *Rahimi*, who was temporarily barred from possessing a firearm even while in his own home pursuant to a domestic violence restraining order. Gov't Br. at 16-17. Relying on *Rahimi*, the government argues that there is no distinction between banning home possession and public carry. *Id*. But that analogy does not hold, for both procedural and substantive reasons.

Substantively, *Rahimi* concerned a *temporary* prohibition on firearm possession imposed after a *judicial finding* of *present* danger to another person. The Supreme Court was crystal clear on this point, explaining "we conclude only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Rahimi*, 602 U.S. at 702. Not one of these salient features is present in this case. No court has found that Mr. Squire presently poses a credible threat to the safety of another person; rather, the government seeks to disarm him based on

5

past convictions. Further, and importantly, the government seeks to disarm him *permanently*, not temporarily. It should go without saying that this is a monumental difference of constitutional significance.

Procedurally, as the Supreme Court emphasized, *Rahimi* concerned a "facial challenge"—not an as-applied challenge. *Rahimi*, 602 U.S. at 700. As Justice Gorsuch explained in his concurrence, a facial challenge is the "most difficult challenge to mount successfully" because it requires a litigant to "show 'no set of circumstances' exists in which that law can be applied without violating the Second Amendment." *Id.* at 708 (Gorsuch, J., concurring) (citations omitted). Mr. Rahimi "failed to make that showing." *Id.* Thus, as Justice Gorsuch explained, consistent with the majority opinion's concluding language: "Our resolution of Mr. Rahimi's facial challenge to § 922(g)(8) necessarily leaves open the question whether the statute might be unconstitutional as applied in 'particular circumstances.'" *Id.* at 713.

The government, however, mistakenly treats *Rahimi* as if it were an "as applied" challenge, and thus overreads the opinion by citing a few lines of dicta as if it were a holding. *See* Gov't Br. at 16-17. This is directly contrary to both the majority opinion's conclusion and Justice Gorsuch's

caution that "the case before us does not pose the question whether the challenged statute is always lawfully applied, or whether other statutes might be permissible, but only whether this one has *any* lawful scope. Nor should future litigants and courts read any more into our decision than that." *Rahimi*, 602 U.S. at 713 (Gorsuch, J., concurring). *Rahimi* thus left questions arising in an as-applied context entirely unanswered. *See id.* (posing open questions including whether an individual could be disarmed without a judicial finding that he posed a credible threat to another; whether a person could be disarmed permanently; and whether exceptions existed for self-defense); *see also id.* ("Nor do we purport to approve in advance other laws denying firearms on a categorical basis to any group of persons.").

As this Court explained in *Connelly*: "Facial challenges should 'consider the circumstances in which [the challenged act i]s most likely to be constitutional' because 'when legislation and the Constitution brush up against each other, a court's task is to seek harmony, not to manufacture conflict.'" *United States v. Connelly*, 117 F.4th 269, 282 (5th Cir. 2024) (quoting *Rahimi*, 602 U.S. at 701) ("cleaned up" in original). Thus, for both procedural and substantive reasons, *Rahimi* did not—and

did not purport to—answer the question raised in this appeal. Nor has this Court addressed the Castle Doctrine issue raised herein. Accordingly, this Court must do so now by re-engaging with the historical record.

## II. The government's three historical laws do not justify permanently disarming Mr. Squire in his home.

The government eventually proffers three historical analogues that it claims justify applying § 922(g)(1)'s permanent prohibition to Mr. Squire's possession of a firearm for self-defense in the home: (1) the going armed laws; and (2) two colonial laws from 1777—one from New Jersey and one from North Carolina—that purportedly disarmed British Loyalists during the American Revolution. *See* Gov't Br. at 18-19. All three, both individually and combined, are wholly inadequate to establish the necessary historical tradition required by *Bruen*.

Start with the going armed laws, which prohibited "riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land." *Rahimi*, 602 U.S. at 697 (quoting 4 Blackstone 149) (alteration in original). These laws in fact support *Mr. Squire's* argument that our historical tradition recognizes a distinction between arms restrictions in the home and in public places—not the government's

position that there is no distinction. *See* Squire Br. at 18-19, 21-22, 30-31. Furthermore, the going armed laws are not valid comparators for § 922(g)(1) as applied to Mr. Squire *anywhere*, whether within or outside the home, because none of Mr. Squire's prior felony convictions are analogous to the offense of "going armed." *Cf. United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) (manslaughter and aggravated assault with a firearm); *United States v. Schnur*, 132 F.4th 863, 868-70 (5th Cir. 2025) (aggravated battery).[1]

The government's two colonial era Loyalist laws fare no better, both qualitatively and quantitatively. For example, the 1777 New Jersey law provided that arms seized from Loyalists should be appraised and paid for by the State and then delivered to the State for use in the ongoing Revolutionary War. *See* An Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 84, 90 (Isaac Collins).[2] Further, that law applied

---

[1] Additionally, the punishment for violating the going armed laws was imprisonment and forfeiture of the arms used in the offense, not the permanent loss of the right to keep and bear arms at all. *See Rahimi*, 602 U.S. at 697 ("Therefore, the law punished these acts with 'forfeiture of *the arms* . . . and imprisonment.'" (quoting 4 Blackstone 149)). To the extent that *Diaz* read the historical record to suggest otherwise, it conflicts with the Supreme Court's historical analysis in *Rahimi*. *See United States v. Diaz*, 116 F.4th 458, 471 (5th Cir. 2024) ("The size of [the going armed] laws' burden on the right to bear arms is comparable to that of § 922(g)(1). They both provide for *permanent arms forfeiture* as a penalty.") (emphasis added).

[2] Available from the Duke Center for Firearms Law, Repository of Historical Gun Laws, at https://firearmslaw.duke.edu/laws/an-act-for-constituting-a-council-of-

only to "such Persons as [the Council of Safety] shall judge disaffected and dangerous to the present Government." *Id.* In other words, it was a wartime measure that both disarmed enemy sympathizers and secured sufficient arms for the State. And, notably, nothing in the 1777 New Jersey law prohibited Loyalists from acquiring new arms (meaning, there was no permanent disarmament); rather, it only authorized the government to seize arms they owned or possessed. *See id.*

The North Carolina law, by contrast, provided that certain persons "shall not keep Guns or other Arms within his or their House, but the same may be seized by a written Order of a Justice of the County in which he or they reside." *See* An Act to Amend an Act Declaring What Crimes and Practices Against the State Shall Be Treason, ch. 6, § 9, 1777 N.C. Sess. Laws 41, 43–44 (James Davis 1778).[3] But, critically, the Act only applied to persons refusing to take a loyalty oath. In other words, it was s contingent and temporary ban—not a permanent one—and was likewise a wartime measure.

---

safety-ch-40-20-1777-n-j-laws-84-90-isaac-collins-1777.
[3] Available at https://firearmslaw.duke.edu/laws/an-act-to-amend-an-act-declaring-what-crimes-and-practices-against-the-state-shall-be-treason-ch-6-9-1777-n-c-sess-laws-41-43-44-james-davis-1778.

Thus, both laws fail the *Bruen* "how" and "why" test when compared to § 922(g)(1), which is categorical and permanent, and motivated by criminal punishment concerns—not wartime concerns. Furthermore, reliance on these sorts of laws is contrary to the Supreme Court's discussion of English and American history in *Heller, Bruen*, and *Rahimi*. As *Rahimi* explained, citing to *Heller*: "By the time of the founding, . . . the Second Amendment had largely eliminated governmental authority to disarm political opponents on this side of the Atlantic." *Rahimi*, 604 U.S. at 624 (citing *Dist. of Columbia v. Heller*, 554 U.S. 570, 594-595, 600-603 (2008)). And *Bruen* likewise cast doubt that "military dictates were designed to align with the Constitution's usual application during times of peace." *Bruen*, 597 U.S. at n.26.

Finally, even if these two colonial laws *were* valid, relevantly similar comparators, they are not enough to carry the government's burden of establishing a *tradition* of in-home disarmament, because they are too few. As this Court has recognized, it is "a problem for the government" when its historical sources are "notably few" because "*Bruen* doubted that three *colonial-era* laws could suffice to show a tradition." *Connelly*, 117 F.4th at 281 (emphasis in original) (citation

11

omitted); *Bruen*, 597 U.S. at 46 ("For starters, we doubt that *three* colonial regulations could suffice to show a tradition . . . .") (emphasis original)). Such is this case here, especially when the government's limited historical evidence is considered alongside the deeply rooted historical tradition of the Castle Doctrine, which included protections for the right to keep arms at home.

**III. *Kimble* did not resolve an as-applied challenge in the home, but it did reference historical sources that provided a home-based exception.**

The government also argues that Mr. Squire's as-applied challenge is barred based on his drug distribution convictions, citing to *United States v. Kimble*, 142 F.4th 308 (5th Cir. 2025). *See* Gov't Br. at 13-15. But, in doing so, it again tries to waive away any distinction between possession in the home and public carry. The government's reliance is misplaced for two reasons.

First, as Mr. Squire previously explained, *Kimble* is factually distinguishable and did not involve an as-applied challenge to possession in the home. *See* Squire Br. at 35-36. Moreover, *Kimble* referenced historical laws disarming minorities that provided *exceptions* for keeping arms in the home for self-defense—thus supporting Mr. Squire's

argument, not the government's. *See id.* The government fails to engage with or even mention disarmament laws that provided exceptions for keeping guns at home for self-defense, which is notable considering that Mr. Squire has now briefed the issue both in district court and on appeal. *See* Squire Br. at 35-36.[4]

Second, the government's overreliance on *Kimble* is particularly precarious because *Kimble* interpreted history contrary to *Connelly*—and *Connelly*, which was decided first-in-time, controls under the rule of orderliness. *See Bullock*, 123 F.4th at 185 (explaining that "the Second Amendment analysis is a legal inquiry into the text and history related to the relevant regulation"); *United States v. Traxler*, 764 F.3d 486, 499 (5th Cir. 2014) (discussing the rule of orderliness).

For example, *Kimble* cited the Militia Act of 1662 as supporting a tradition of class-based disarmament, *see* 142 F.4th at 315-16 & nn. 13-15, even though *Connelly* had already held that "the Militia Act, passed to disarm political dissidents and reined in well before the Founding by the English Bill of Rights, almost certainly does not survive the Second

---

[4] Additionally, contrary to the government's implicit suggestion, *see* Gov't Br. at 13-14, *Kimble* did not rely on or mention the going armed laws.

Amendment's categorical command," *Connelly*, 117 F.4th at 278; *see also Rahimi*, 602 U.S. at 694 (explaining that "[t]he Glorious Revolution cut back on the power of the Crown to disarm its subjects unilaterally," for example, pursuant to the Militia Act, and that "[b]y way of rebuke, Parliament adopted the English Bill of Rights"); *Heller*, 554 U.S. at 593 (explaining that the English Bill of Rights "has long been understood to be the predecessor to our Second Amendment").

Thus, *Kimble* does not make the government's case. Rather, the government must bring forth historical evidence to support § 922(g)(1) as applied to Mr. Squire's possession of a firearm in his home—and, as explained above, it has not done so.

## IV.  *Diaz* does not apply to Mr. Squire at all—but even if it did, the government and this Court must still contend with the Castle Doctrine.

The government also broadly argues that Mr. Squire's as-applied challenge is foreclosed "based on his theft related conviction," citing to *Diaz* and *Schnur*. *See* Gov't Br. at 9. According to the government, "[t]hat same logic and reasoning applies to Squire's burglary conviction." *Id.* at 11. That is incorrect. Mr. Squire's prior convictions are meaningfully different from the convictions at issue in *Diaz* and *Schnur*, so mere

citation to those cases does not satisfy the government's burden in this case. Instead, the government needs to bring forth historical analogues in the form of Founding-era felonies that are relevantly similar to *Mr. Squire's* specific convictions. It has failed to do so.

First, the government takes the radical position that an "intent to permanently deprive the owner" is not necessary to classify an offense as theft-related, Gov't Br. at 11, even though such an intent is and has always been the *sine quo non* of theft. *See* Squire Br. at 50-51 (citing sources); *see also United States v. Cockerham*, No. 24-60401, 2025 WL 3653336, at *4 (5th Cir. Dec. 17, 2025) (citing LaFave). Nevertheless, in its next sentence, the government asserts that "[t]here are enough similarities between Squire's crime, the carjacking committed by Diaz, and the thefts analyzed by the *Diaz* Court" for mere citation to that case to carry the day. Gov't Br. at 11. The government is wrong. [5]

Indeed, the government cites zero record support for its assertion that there are "similarities," while the actual record reveals material

---

[5] As LaFave explains, "[a] large number of states have singled out the motor vehicle for special treatment, making it a crime (generally called 'joyriding,' a crime somewhat less serious than larceny) to take such a vehicle with intent to use it and return it." Wayne R. LaFave, 3 Subst. Crim. L. § 19.5(b) (3d ed. 2025). One of the state laws cited by LaFave is Louisiana Revised Statute 14:68.4, the statute Mr. Squire was convicted of violating. *Id.* at n.28.

dissimilarities. Mr. Diaz was convicted of stealing a car. Mr. Squire, by contrast, was convicted of using one without authorization. ROA.334. Those are materially different offenses, and the government has pointed to no historical evidence to show that unauthorized use of a horse (or any other item) was punishable by death at the Founding. *See Cockerham*, 2025 WL 3653336, at *4 (rejecting the government's attempt to analogize felony failure to pay child support to Founding-era theft merely by invoking *Diaz*).

The government makes the same sort of error when addressing Mr. Squire's conviction for burglary of a vehicle. As it must, the government first agrees with Mr. Squire and concedes that "the contemporary understanding of 'burglary' has diverged a long way from its common law roots." Gov't Br. at 12 (citing *Taylor v. United States*, 495 U.S. 575, 593 (1990), and Squire Br. at 48). But the government then asserts that "an examination of founding era burglary is not needed" because "modern burglary is a 'theft-related felony conviction[].'" *Id.* Again, the government is wrong on both counts.

Not all modern burglaries are theft related. More importantly, there is no evidence that Mr. Squire's specific conviction was theft-

16

related.[6] Contrary to the government's assertion, *see* Gov't Br. at 12, this Court's precedent requires a factual inquiry into the conduct underlying the prior conviction when necessary to determine whether it is analogous to a Founding-era felony. *See United States v. Morgan*, 147 F.4th 522, 528 & n.25 (5th Cir. 2025) (holding that an "account of [the defendant's] conduct underlying the predicate offense is both permissible and revealing" and collecting cases). The government, which carries the burden under *Bruen* and *Diaz*, has not even attempted to satisfy that inquiry, nor could it on this record.[7]

Therefore, pursuant to this Court's precedent in *Diaz*, an examination of Founding-era burglary would be essential to determining whether permanently disarming Mr. Squire based on this conviction accords with a historical tradition of executing burglars at the Founding.

---

[6] In other words, the government's argument is based on a logical fallacy: It mistakenly reasons that because *Mr. Schnur's* burglary conviction was theft-related, *all* burglaries are theft related, but that is not so, as Mr. Squire's case demonstrates. The Louisiana statute he was convicted of violating criminalizes "the unauthorized entry of any . . . vehicle . . . with the intent to commit a felony *or* any theft therein," La. R.S. 14:62(A) (emphasis added), and the PSR does not reflect any theft, ROA.334. Rather, the PSR suggests intent to commit the felony of unauthorized use of a motor vehicle, which is distinct from theft. *See supra.*

[7] Indeed, the government's account of Mr. Squire's prior offense does not use the word "theft" when recounting the underlying circumstances, instead accurately referring to the "unauthorized use of a motor vehicle." Gov't Br. at 2. Again, this is fatal, because it is the government's burden under *Diaz* to prove that a prior conviction is theft-related.

As explained previously, that analogy would also fail given the material differences between the two offenses. *See* Squire Br. at 48-50.

The government here repeats the same kind of errors that it recently made in another case before this Court, *United States v. Smith*, No. 24-60600, 2025 WL 2938691 (5th Cir. Oct. 16, 2025) (unpublished). "Smith's predicate felony convictions [were] breaking and entering a vehicle and receiving stolen property, both charged under Alabama law." *Id.* at *1. The district court denied the defendant's motion to dismiss prior to this Court issuing its *Diaz* decision, and "[b]efore the district court, the Government did not present historical analogues and rested instead on the general premise that history, tradition, and precedent support disarming all felons." *Id.* at *2 & n.2. On appeal, "the Government contend[ed] that knowingly receiving a stolen horse was a felony punishable by death in colonial Virginia and that Smith's predicate felonies [were] sufficiently 'theft-related' to warrant permanent disarmament." *Id.* at n.4.

This Court vacated and remand: "Considering the briefing and the record on appeal, we conclude that the district court's lack of opportunity to apply our *Bruen* framework warrants remand." *Id.* at *2 (internal

18

footnote omitted). The Court explained that "[t]he parties should be heard first in the party presentation context before the district court, which has the full set of tools available to resolve the parties' historical dispute." *Id.* In other words, *Diaz* and *Schnur* did not foreclose the defendant's as-applied challenge. Far from it, the government's reliance on a single colonial law, its citation to *Diaz* and *Schnur*, and its bare assertion that Mr. Smith's convictions were "theft-related" was insufficient to carry its *Bruen* burden on appeal. And that is because Mr. Smith's convictions, like Mr. Squire's, were different than the convictions at issue in those prior cases.

Such is this case here, except that reversal is required—not only vacatur and remand—because the parties and the district court already had the benefit of *Diaz* when the motion to dismiss was decided in the first instance. Thus, the government has already had two chances—in district court and on appeal—to bring forth its best historical sources to carry its burden. It isn't entitled to a third try.

Finally, it is worth noting yet another fatal defect: Even if Mr. Squire's prior convictions *were* theft-related (though they are not), that would *still* not be the end of the matter, because *Diaz* did not involve

an as-applied challenge to possession in the home. In other words, the impact of the Castle Doctrine on § 922(g)(1) as applied in the home remains an open question that this Court would need to decide based on the historical record. Thus, there are fatal defects at every stage of the government's argument—and each of those defects independently mandates reversal.

**V.    The government's defense of § 922(g)(1)'s unconstitutional vagueness is contrary to *Johnson v. United States.***

Alternatively, this case can be resolved pursuant to the Fifth Amendment's Due Process Clause. In *Johnson v. United States,* 576 U.S. 591 (2015), Justice Scalia's majority opinion held that the residual clause of the Armed Career Criminal Act (ACCA) was unconstitutionally vague precisely because the judicial effort required to apply it rendered it so. As Justice Scalia explained, "the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." *Johnson,* 576 U.S. at 597. Thus, the statute "denies due process of law." *Id.* Because the statute's language left "grave uncertainty" as to its proper application, it "produce[d] more unpredictability and arbitrariness than the Due

Process Clause tolerates." *Id.* at 597-98. The overly broad language of § 922(g)(1) suffers from the same defects, as this Court's and other courts' post-*Bruen* caselaw demonstrates.

Post-*Bruen*, this Court has struggled "to establish any generally applicable test" to § 922(g)(1), as numerous judges have noted in separate writings. *Id.* at 600; *see United States v. Mancilla*, 155 F.4th 449, 455 (5th Cir. 2025) (Graves, J., dissenting) (noting intra-circuit split in the caselaw); *United States v. Orozco*, No. 24-50104, 2025 WL 2623429, at *2 (5th Cir. Sept. 11, 2025) (unpublished) (Higginson, J., concurring in the judgment) (noting same and explaining that current course "result[s] in inconsistent and ambiguous guidance" to district judges as to proper application); *United States v. Bonner*, 159 F.4th 338, 345 (5th Cir. 2025) (Willett and Duncan, JJ., concurring) ("At times, however, we have slipped into a hypothetical 'what-if' statute analysis, treating § 922(g)(1) as though it were some imagined statute altogether."). As Justice Scalia explained in *Johnson*, ACCA residual clause caselaw suffered from the same defects, rendering it unconstitutionally vague.

Moreover, the various Courts of Appeals take wildly divergent approaches to applying § 922(g)(1), just like they did in the ACCA

residual clause context. *See United States v. Mitchell*, 160 F.4th 169, 178 (5th Cir. 2025) ("An entrenched circuit split has now emerged *about its proper application*." (emphasis added); *Schnur*, 132 F.4th at 871 (Higginson, J., concurring) (noting analytical Circuit split); *Kimble*, 142 F.4th at 321 (Graves, J., concurring in part and in the judgment) (same); *Mancilla*, 155 F.4th at 454 (Elrod, J., concurring) (same). As Justice Scalia explained in *Johnson*, "[t]he most telling feature of the lower courts' decisions is . . . pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider." *Id.* at 601. "Invoking so shapeless a provision to condemn someone to prison . . . does not comport with the Constitution's guarantee of due process." *Id.* at 602. So too here.

Thus, contrary to the government's brief, judicial construction of a federal statute is highly relevant to the vagueness analysis. *See Johnson,* 576 U.S. at 598 (quoting *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 91 (1921) ("This Court has acknowledged that the failure of 'persistent efforts . . . to establish a standard' can provide evidence of vagueness."). As the Supreme Court explained in a case involving another federal statute, "the touchstone is whether the statute, either

standing alone *or as construed*, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997) (emphasis added); *see also United States v. Coleman*, 609 F.3d 699, 706 (5th Cir. 2010) (citing *Lanier*).

Finally, the Court in *Johnson* did *not* require the petitioner to prove that the law was unconstitutionally vague in *his case*, just as it rejected the dissenting opinion's insistence that "a statute is void for vagueness only if it is vague in all its applications." *Id.* at 603; *but see* Gov't Br. at 23 (urging a case-specific approach). To the contrary, *Johnson* explained that Supreme Court caselaw "squarely contradict[s] the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Id.* at 602-03 (collecting cases).

Simply put, today, § 922(g)(1)'s text does not mean what it says, and courts (including this one) are understandably struggling to give the words predictable meaning consistent with the Second Amendment. As Justice Gorsuch wrote in his *Percoco* concurrence, this presents "a situation that leaves prosecutors and lower courts in a bind." *Percoco v. United States*, 598 U.S. 319, 336 (2023) (Gorsuch, J., concurring). "But

they are not the main victims here. That plight belongs to private citizens." *Id.* As Judge Higginson put it when discussing § 922(g)(1), this Court "must ensure Americans are given particularized notice. To that end, we must give district courts clear instructions as to how, when, and by whom the determination that a felony predicate qualifies for § 922(g)(1) must be made." *Schnur*, 132 F.4th at 871 (Higginson, J., concurring). "Needless to say, [the current] scattershot Second Amendment approach gives no clear test to district courts and, worse, gives no adequate notice to Americans who wish to possess firearms legally, without jeopardy of felony prosecution and jail." *Orozco*, 2025 WL 2623429, at *3 (Higginson, J., concurring).

"Vague laws" impermissibly "hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges, and they leave people with no sure way to know what consequences will attach to their conduct." *United States v. Davis*, 588 U.S. 445, 448 (2019). Given the due process quagmire in which § 922(g)(1) is stuck, this Court should hold the law unconstitutionally vague, in violation of the Due Process Clause, and thereby give Congress a chance to write a new statute that comports with the Second Amendment's

24

commands. "It is the legislature, not the Court, which is to define a crime, and ordain its punishment." *United States v. Wiltberger*, 18 U.S. 76, 95 (1820). For this alternative, independent reason, this Court should reverse, vacate, and remand with instructions to dismiss the indictment.

## CONCLUSION

Under either the Second Amendment or the Fifth Amendment, this Court must reverse the district court's order denying Mr. Squire's motion to dismiss, vacate his conviction, and remand with instructions to dismiss the indictment, for the reasons given herein and in Mr. Squire's opening brief.

Respectfully submitted,

CLAUDE J. KELLY
Federal Public Defender
Eastern District of Louisiana

*/s/ Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney
500 Poydras Street, Suite 318
Hale Boggs Federal Building
New Orleans, Louisiana 70130
(504) 589-7930
steven_spires@fd.org

# CERTIFICATE OF SERVICE

The undersigned certifies that on January 8, 2026, the foregoing Appellant's Reply Brief was filed with the Clerk of Court via the electronic filing system, which will send an electronic Notice of Docket Activity to the following Filing Users:

Kevin G. Boitmann, kevin.boitmann@usdoj.gov,
Patrick Stevens Barr, patrick.barr@usdoj.gov,
Sarah Dawkins, sarah.dawkins@usdoj.gov,
Megan Roberts, megan.roberts@usdoj.gov,
       Assistant United States Attorneys.

"The court's electronic Notice of Docket Activity constitutes service of the filed document on all Filing Users." 5TH CIR. R. 25.2.5.

*/s/Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney

# CERTIFICATE OF COMPLIANCE

The undersigned certifies that:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,190 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, 14-point font for text and 12-point font for footnotes.

3.  This brief complies with the privacy redaction requirement of Fed. R. App. P. 25(a)(5), 5th Cir. R. 25.2.13, and Fed. R. Crim. P. 49.1, because it has been redacted of personal data identifiers.

4.  This electronic submission is an exact copy of the paper document, in compliance with 5th Cir. R. 25.2.1.

5.  This brief is free of viruses because it has been scanned for viruses with the most recent version of Symantec Endpoint Protection, in compliance with 5th Cir. ECF Filing Standard A(6).

*/s/ Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney
Dated: January 8, 2026