**FEDERAL PUBLIC DEFENDER**
**EASTERN DISTRICT OF LOUISIANA**
500 POYDRAS STREET, SUITE 318
HALE BOGGS FEDERAL BUILDING
**NEW ORLEANS, LOUISIANA 70130**

**Claude J. Kelly**
Federal Public Defender
**Samuel J. Scillitani**
First Assistant Defender
**Maura M. Doherty**
**Celia C. Rhoads**
**Samantha J. Kuhn**
**Annalisa Mirón**
**Anna L. Friedberg**
**Peter P. Finney, III**
**Nicholas R. Peruffo**
Assistant Federal Public Defenders
**Steven Spires**
Research and Writing Attorney

**TOLL FREE (800) 296-4046**
**TELEPHONE (504) 589-7930**
**FAX (504) 589-2556**

March 3, 2026

Mr. Lyle W. Cayce, Clerk of Court
U.S. Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130
*Via: CM/ECF*

**RE: Supplemental Authority Pursuant to Fed. R. App. 28(j)**
***United States v. Curtis Squire*, No. 25-30324**

Dear Mr. Cayce,

Appellant Curtis Squire respectfully submits this letter to draw the Court's attention to a significant authority issued after briefing concluded: *United States v. Hembree*, 165 F.4th 909 (5th Cir. 2026).

*Hembree* held that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to a prior drug possession conviction. In doing so, *Hembree* surveyed "the complexity of caselaw, both in [this] circuit and beyond," noting that it "strives to bring coherence." *Hembree*, 165 F.4th at 911-913 (collecting cases). As *Hembree* explained, this Court "ha[s] recognized certain predicates as falling within the constitutional bounds of § 922(g)(1)," while also "finding that certain predicate felony convictions are outside these very bounds." *Id.* at 913.

*Hembree* thus identified in § 922(g)(1) the exact vagueness problem condemned in *United States v. Reese*, 92 U.S. 214 (1875). *See* Opening Br. at 53-57. *Reese* considered "whether a penal statute. . . which is in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, can be limited by judicial construction so as to make it operate only on that which Congress may rightfully prohibit and punish." *Reese*, 92 U.S. at 221. *Reese* held no, calling a contrary result "dangerous." *Id.* "To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one." *Id.* Penal laws "should have no double meaning." *Id.* at 219.

Here, like in *Reese*, "certain predicates . . . fall[ ] within the constitutional bounds of § 922(g)(1)," while others "are outside these very bounds." *Hembree*, 165 F.4th at 913. To "leave it to the courts to . . . say who could be rightfully detained, and who should be set at large," "would be to make a new law, not to enforce an old one." *Reese*, 92 U.S. at 221.

While *Hembree* involved a different predicate, its analysis supports Mr. Squire's argument that his conviction should be reversed on Fifth Amendment grounds because § 922(g)(1) is unconstitutionally vague and violates the separation of powers. *See* Opening Br. at 51-57; Reply Br. at 20-25.

Sincerely,

CLAUDE J. KELLY
Federal Public Defender
Eastern District of Louisiana

*/s/ Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney
Office of the Federal Public Defender
500 Poydras Street, Suite 318
Hale Boggs Federal Building
New Orleans, Louisiana 70130
(504) 589-7930
steven_spires@fd.org

cc: Kevin G. Boitmann, kevin.boitmann@usdoj.gov
Patrick Stevens Barr, patrick.barr@usdoj.gov
Sarah Dawkins, sarah.dawkins@usdoj.gov
Megan Roberts, megan.roberts@usdoj.gov

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 27, 2026

Lyle W. Cayce
Clerk

---

No. 24-60436

---

United States of America,

*Plaintiff—Appellee*,

*versus*

Charles Hembree,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:22-CR-76-1

---

Before Higginson, Willett, and Engelhardt, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

Defendant–Appellant Charles Hembree was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He has a single predicate felony conviction: a 2018 conviction for simple possession of methamphetamine. On appeal, Hembree challenges whether § 922(g)(1) is unconstitutional as applied to him and raises various constitutional challenges to his conviction. For the reasons explained below, we find Hembree's conviction unconstitutional as applied and reverse the district court's conviction.

Case: 25-30324 Document: 53 Page: 2 Date Filed: 03/03/2026



I.

Hembree was convicted in 2018 of possession of methamphetamine in Mississippi state court. In 2022, Hembree was charged with possession of a firearm by a convicted felon in violation of § 922(g)(1). He filed a motion to dismiss the indictment, arguing that § 922(g)(1) violates the Second Amendment as applied to him in light of the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). The district court denied his motion on December 1, 2023.

Following that ruling, Hembree pleaded guilty pursuant to a plea agreement. As part of the plea agreement, Hembree waived his right to appeal his conviction and sentence "on any ground whatsoever," although he reserved the right to raise claims of ineffective assistance of counsel and to appeal the denial of his motion to dismiss the indictment pursuant to *Bruen*.

The district court sentenced Hembree below the guidelines range to six months of imprisonment, followed by three years of supervised release. Hembree filed a timely notice of appeal, and we have jurisdiction over the appeal under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

II.

Hembree's primary (and only preserved) argument is that § 922(g)(1) is unconstitutional as applied to him under the Second Amendment in light of the Supreme Court's decision in *Bruen* and our court's intervening decision in *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2822 (U.S. June 23, 2025). He contends that the government has not and cannot prove that disarming Hembree based on his conviction for possession of methamphetamine fits within this country's traditional regulation of firearms. Because Hembree preserved his as-applied challenge to § 922(g)(1) by raising it in his motion to dismiss the indictment, our court reviews the issue de novo. *See United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014).

Hembree also raises four challenges for the first time on appeal: (1) that § 922(g)(1) is facially unconstitutional under the Second Amendment; (2) that § 922(g)(1) is unconstitutionally vague; (3) that § 922(g)(1) violates the Commerce Clause; and (4) that § 922(g)(1) violates the Fifth Amendment's Equal Protection Clause. The government contends that these challenges were waived by the appeal waiver in Hembree's plea agreement, which only preserved his as-applied challenge.

We first turn to Hembree's primary as-applied challenge: whether § 922(g)(1) is unconstitutional as applied to Hembree under the Second Amendment due to his predicate of simple possession of methamphetamine.

A.

Before addressing Hembree's as-applied challenge, an overview of the complexity of caselaw, both in our circuit and beyond, is of moment because the "law regarding the interplay between the Second Amendment and § 922(g)(1) is rapidly evolving." *See United States v. Smith*, No. 24-60600, 2025 WL 2938691, at *2 (5th Cir. Oct. 16, 2025) (unpublished). The Second Amendment's "unqualified command," *Bruen*, 597 U.S. at 24, provides a starting point: it guarantees that "the right of the people to keep and bear Arms[ ] shall not be infringed." U.S. Const. amend. II. To assess the constitutional bounds of firearm regulations, the Supreme Court has provided a two-step framework, which requires considering (1) whether the Second Amendment's text on its face covers the regulated conduct, and (2) if so, whether the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

Circuits have diverged in application of *Bruen*'s framework. "[M]any of our sister circuits have held that § 922(g)(1) is constitutional as applied to *all* felons." *United States v. Mancilla*, 155 F.4th 449, 454 n.5 (5th Cir. 2025)

Case: 25-30324 Document: 55 Page: 4 Date Filed: 03/03/2026



(ELROD, C.J., concurring). Thus far, the Second, Fourth, Eighth, Ninth, Tenth, and Eleventh Circuits have taken this approach. *Id.* In *Diaz*, however, we recognized that § 922(g)(1) could be unconstitutional as applied to certain predicate felonies. *See Diaz*, 116 F.4th at 470 n.4 (permitting "as-applied challenges by defendants with different predicate convictions").

Separately, "the Third and Sixth Circuits allow as-applied challenges to § 922(g)(1), and both circuits require district courts to make individualized determinations of dangerousness when adjudicating those challenges. Courts in those circuits consider the person's entire criminal history, including the predicate offense and its underlying conduct." *Mancilla*, 155 F.4th at 454 n.5 (ELROD, C.J., concurring) (citations omitted). Our court has diverged here as well. In *United States v. Kimble*, our court explicitly did not "embrace the view that courts should 'look beyond' a defendant's predicate conviction 'and assess whether the felon's history or characteristics make him likely to misuse firearms.'" 142 F.4th 308, 318 (5th Cir. 2025) (quoting, *contra*, *Pitsilides v. Barr*, 128 F.4th 203, 211–12 (3d Cir. 2025)).

Our circuit has pursued a more iterative, evolving approach. While we have already held that "[t]he plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)," thus satisfying the first step in *Bruen*, the approach to the second step—justifying the regulation—remains the task at hand. *Diaz*, 116 F.4th at 467. We maintain that the government "bears the heavy burden to show that the challenged law is 'relevantly similar to laws that our tradition is understood to permit.'" *United States v. Mitchell*, 160 F.4th 169, at 177 (5th Cir. 2025) (quoting *United States v. Rahimi*, 602 U.S. 680, 692 (2024)).

Our court's decision in *Diaz* has been the primary catalyst in the Fifth Circuit's line of post-*Bruen* § 922(g)(1) analysis. In *Diaz*, decided after the district court's denial of Hembree's motion to dismiss, our court diverged

from earlier circuit precedent. *See Diaz*, 116 F.4th at 464–66 (overruling circuit caselaw to require the government to identify a relevant, similar historical tradition of firearm regulation and rejecting as dicta Supreme Court cautions that "felons and the mentally ill" may be permanently disarmed). *Diaz* made two advances:

> *First*, it defined the relevant scope of inquiry for an as-applied challenge to § 922(g)(1): a court may consider only crimes punishable by a term of imprisonment exceeding one year for predicate offenses. *Second*, it left the door open for § 922(g)(1) to be unconstitutional as applied to some felons.

*Mitchell*, 160 F.4th at 179. The panel in *Diaz* took a felony-by-felony approach by assessing, as a categorical matter, whether there was a sufficient historical analogue for any of the particular offenses of which Diaz had been convicted. *See Diaz*, 116 F.4th at 467–71. The historical-law analogue must "share a common 'why' and 'how': they must both (1) address a comparable problem (the 'why') and (2) place a comparable burden on the right holder (the 'how')." *See United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024). *Diaz* clarified the "how" question, holding that historic laws imposing serious punishments such as death or estate forfeiture answer the "how" inquiry because such laws "achieved their goals by permanently punishing offenders, as does § 922(g)(1)." *Diaz*, 116 F.4th at 469.

The more challenging task, as our court has recognized, is whether the proposed analogue satisfies the "why" test. *See Kimble*, 142 F.4th at 313. "Answering *that* question—*i.e.*, 'deciding whether a conceptual fit exists between the old law and the new'—'requires the exercise of both analogical reasoning and sound judgment.'" *Id.* (quoting *United States v. Daniels*, 124 F.4th 967, 973 (5th Cir. 2025)).

In *Kimble*, we reaffirmed *Diaz* in holding that the key "consideration is a defendant's 'prior convictions that are punishable by imprisonment for a

term exceeding one year,' not unproven conduct charged contemporaneously with a defendant's (g)(1) indictment or prior conduct that did not result in a felony conviction." *Id.* at 318 (quoting *Diaz*, 116 F.4th at 467). Dangerousness is a consideration, although our court cabined the analysis to just the dangerousness of the predicate felony: the "Second Amendment allows Congress to disarm classes of people it reasonably deems dangerous, and § 922(g)(1)'s prohibition on gun possession by individuals convicted of drug-trafficking felonies enacts such a disarmament regime consistent with *Bruen*'s 'why' and 'how' test.'" *Id.* at 314–15.

Our caselaw strives to bring coherence to the felony-by-felony approach, but the challenge remains that certain predicate felonies have not yet been adjudged.[1] Thus far, we have recognized certain predicates as falling within the constitutional bounds of § 922(g)(1). *See United States v. Hernandez*, 159 F.4th 425, 428 (5th Cir. 2025) ("To date, this court has recognized 'three categories of offenses that doom a defendant's as-applied challenge . . . theft, violence, and violating the terms of one's release by possessing arms while on parole.'" (emphasis omitted) (quoting *Kimble*, 142 F.4th at 311–12)); *Kimble*, 142 F.4th at 314–15 (confirming inclusion of predicate felony convictions for drug trafficking). On the other hand, our court has recently issued a number of decisions finding that certain predicate felony convictions are outside these very bounds. *See Mitchell*, 160 F.4th at 194 (holding that predicate felonies that involved "present" intoxication with marijuana do not qualify, but those that involved "habitual" intoxication do); *United States v. Doucet*, No. 24-30656, 2025 WL 3515404, at *6 (5th Cir. Dec.

---

[1] *Compare United States v. Cockerham*, No. 24-60401, 2025 WL 3653336, at *8 (5th Cir. Dec. 17, 2025) (discussing our circuit's non-categorical approach to § 922(g)(1)), *with id.* *14-15 (HIGGINSON, J., dissenting) (discussing our circuit's felony-by-felony approach as posing an issue of notice for Americans with a prior felony conviction).

8, 2025) (unpublished) (holding that the predicate felony of attempted marijuana cultivation does not qualify); *United States v. Kendall*, No. 24-40441, 2025 WL 1983938, at *2 (5th Cir. July 17, 2025) (holding that "injury to the elderly" qualifies as a predicate, but leaving it unclear as to whether a separate, prior conviction for "unlawful possession of a firearm" would qualify as a valid predicate).

Hembree's challenge to § 922(g)(1), based on his prior felony conviction of simple possession of methamphetamine, presents a matter (or, rather, predicate) of first impression.[2] Because the parties present both a historical record and discussion of intervening caselaw on appeal, we are well situated to address Hembree's as-applied challenge and the government's proffered Founding-era analogues on appeal.[3]

---

[2] The following precedents included simple drug possession as one of multiple predicate felonies, but in each instance, our court's analysis focused entirely on the other predicates. *See, e.g.*, *United States v. Reyes*, 141 F.4th 682, 686 & nn.8–9 (5th Cir. 2025) (affirming Reyes's § 922(g)(1) conviction based on his "violent criminal history," pointing to the specific facts of his convictions for evading arrest and "deadly conduct discharge of a firearm"); *United States v. Alaniz*, 146 F.4th 1240, 1241 (5th Cir. 2025) (affirming Alaniz's § 922(g)(1) conviction based on his burglary predicate because "Founding-era burglary laws support the constitutionality of disarming felony burglary convicts"); *United States v. Simpson*, 152 F.4th 611, 614 (5th Cir. 2025) (affirming Simpson's § 922(g)(1) conviction on the basis of prior conviction of evading arrest or detention with a vehicle).

[3] In some instances, we have remanded to allow party presentation of history and discussion of intervening caselaw before the district court. *See Smith*, 2025 WL 2938691, at *2 (remanding to the district court to consider intervening § 922(g)(1) precedents and to require the government to meet its *Bruen* burden). However, we have also decided the case and declined to remand when parties proffered sufficient records. *See United States v. Morgan*, 147 F.4th 522, 530–31 (5th Cir. 2025); *see also Mitchell*, 160 F.4th at 191–92. Similar to *Morgan*, the government provided robust historical discussion in its briefing and specifically "offer[ed] analogues to other felonies," for our review as well. *Morgan*, 147 F.4th at 530.

B.

The hallmark of our court's § 922(g)(1) jurisprudence, following *Diaz*, is looking to the second-level "why" historical analysis to determine whether "a conceptual fit exists between the old law and the new." *Daniels*, 124 F.4th at 973. The district court's denial of Hembree's motion to dismiss was issued before our court decided pertinent case law including *Diaz* and *Kimble*, and before the Supreme Court's decision in *Rahimi* as well. Thus, history was not frontal in the district court proceedings and the denial did not venture into analogical reasoning. On appeal, the parties—equipped with *Diaz* and understanding their burden to present historical analogues—provide our court with historical records responsive to our caselaw.

The government acknowledges that illegal drug possession was "a problem that the [founding-era legislatures] did not perceive" but anchors on the Supreme Court's statements in *Rahimi*, which were echoed by our court in *Diaz*, that "a 'dead ringer' for or 'historical twin' to past regulations" is not required to "pass constitutional muster." Instead, the government argues, "what matters is whether founding-era legislatures would have understood their powers to include the ability to pass such a law." The government highlights that our court "in *Diaz* pointed to two aspects of [historical] tradition: laws severely punishing certain crimes at the time of the founding and laws disarming persons who pose a danger with firearms."

Following that approach, the government draws on two bodies of law to justify its use of methamphetamine possession as a predicate felony for § 922(g)(1). First, it points to "[h]istorical laws authorizing severe punishment for knowing possession of contraband," arguing that these laws "show that permanent disarmament of those convicted of possessing illicitly obtained goods today, like Hembree, is consistent with the Second Amendment." Examples offered by the government include laws punishing the

Case: 24-60436 Document: 153 Page: 12 Date Filed: 03/02/2026



knowing receipt of a stolen horse, the theft of mail, and the counterfeiting and forgery of public securities with death. Next, it points to "[h]istorical laws disarming dangerous people" and argues that "[d]rug crimes are inherently dangerous, even in situations where a defendant has 'only' been convicted of 'mere' drug possession like Hembree, because the possession of narcotics entails the dealing with and enriching of drug traffickers." The government further urges that "the facts of the underlying case demonstrate the dangerous nature of narcotics," but the only facts it points to beyond the mere fact of Hembree's felony conviction are the facts of the *present* § 922(g)(1) case.[4]

Hembree takes a narrower view of the historical analogue. He cites that, until a century ago, "there was virtually no effective regulation of narcotics in the United States." David T. Courtwright, *A Century of American Narcotics Policy*, *in* TREATING DRUG PROBLEMS: VOLUME 2, 1 (Dean R. Gerstein & Henrick J. Harwood, eds., 1992). Hembree reasons that the "federal government did not even begin criminalizing non-medical drug use until the early Twentieth Century" and opium and other substances were legal. Further, Hembree posits that "[i]t was not until 1906 that the Pure Food and Drug Act first required that certain substances, such as alcohol, cocaine, and heroin, be accurately labeled, Pub. L. 59-384, 34 Stat. 768, 770 (repealed 1938), and the first ban on possession and distribution came about a decade later." Under *Diaz*, he argues that § 922(g)(1) can only be constitutionally

[4] The government also asserts in a footnote that, because the government has borne its burden of demonstrating that § 922(g)(1) is facially constitutional, *see Diaz*, 116 F.4th at 471–72, the burden shifts to Hembree to demonstrate that the statute is unconstitutional as applied to him. But our court is clear that the heavy burden is on the government. *See Connelly*, 117 F.4th at 274 ("It is the government's burden to demonstrate that the challenged regulation is 'relevantly similar to laws our tradition is understood to permit.'" (quoting *Rahimi*, 602 U.S. at 692)); *see also Mitchell*, 160 F.4th at 177 (describing the government as bearing "the heavy burden to show that the challenged law is relevantly similar to laws that our tradition is understood to permit" (quotations omitted)).

Case: 25-30324 Document: 103-1 Page: 13 Date Filed: 03/03/2026



applied to a defendant if "his disqualifying convictions would have been subject to [harsh felony] punishments in the Founding Era." Because "conduct similar to possession of methamphetamine was not even criminal, much less subject to the death penalty or forfeiture of estate," at the Founding, Hembree argues that the government has not met its burden of proving that disarming him is within the tradition of regulations and punishment at the Founding.

Finally, the parties submitted post-briefing letters pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure ("Rule 28(j)") with respect to our decision in *Kimble*. Hembree opposes the government's proposed analogues in its Opposition Brief and cites *Kimble* to note that these analogues were insufficient in *Kimble* and remain insufficient: "[the government's] contention—that historical laws severely punishing recipients of stolen goods or counterfeit securities justifies lifetime disarmament for individuals today convicted of selling illicit drugs—stretches the analogical reasoning prescribed by *Bruen* and *Rahimi* too far." *Kimble*, 142 F.4th at 314. The government responds by reasoning that, since *Kimble* "held that disarming drug traffickers accords with the nation's history and tradition of firearm regulation," and since some of the underlying facts in Hembree's presentence report relate to the dealing of drugs, Hembree can be treated as Kimble was.

Armed with the foregoing thorough history from the parties, we now consider whether such history provides an analogue for disarming individuals with a predicate felony conviction of simple possession of methamphetamine, such as Hembree.

## C.

The Supreme Court has clarified that courts should not require "a 'historical twin' rather than a 'historical analogue.'" *Rahimi*, 602 U.S. at 701 (quoting *Bruen*, 597 U.S. at 30). And in *Diaz*, our court similarly held that

Case: 24-30324 Document: 103-1 Page: 11 Date Filed: 03/02/2026



the historical justification is not an abstraction at a high level, but instead requires demonstrating that the justification, as applied to the specific predicate felony, is grounded in our nation's disarmament tradition. *See Diaz*, 116 F.4th at 464–66.

The parties take diverging views on this very point: the scope of the historical analogue required. The government proffers two core arguments to support the historic underpinnings: (1) severe punishment for possession of contraband and (2) a tradition of disarming "dangerous persons." Hembree argues more narrowly, reasoning that possession of drugs—notably opium—was not illegal at the Founding and is a more recent invention in the last century, rendering the government's analogues insufficient. Again, the government carries the burden of demonstrating that permanent disarmament of Hembree comports with "the Nation's history and tradition of disarming individuals whose past criminal conduct demonstrates a special danger of misusing firearms." *Doucet*, 2025 WL 3515404, at *5. Taking each analogue in turn, we find that the government did not carry its burden.

1.

The government's first historical basis for permanently disarming Hembree is that his underlying predicate conviction of simple possession of methamphetamine is analogous to severe punishments for "knowing possession of contraband." As the government has offered in prior cases, examples of such contraband include "knowing receipt of a stolen horse, mail theft, and counterfeiting," which were severely punished at the Founding, including punishable with death. *Doucet*, 2025 WL 3515404, at *3.

In both *Kimble* and *Doucet*, however, our court held that these very same analogues are not sufficiently similar either to the felony predicates of drug trafficking in the former, or attempted marijuana cultivation in the latter. *See Kimble*, 142 F.4th at 314; *Doucet*, 2025 WL 3515404, at *3. "Those

Case: 24-60324 Document: 55 Page: 12 Date Filed: 03/03/2026



Founding-era offenses—knowing receipt of a stolen horse, mail theft, and counterfeiting—'concern theft, fraud, or deceit,' not the 'use and sale of addictive drugs.'" *Doucet*, 2025 WL 3515404, at *3 (quoting *Kimble*, 142 F.4th at 314). Our court's reasoning in *Doucet* is particularly apt: these analogues were not "sufficiently similar" to "Doucet's attempted marijuana cultivation offense, which [] targets the production of intoxicating substances rather than the trade in illicit goods more generally." *Id.* This reasoning extends to Hembree as well; the analogue does not address Hembree's predicate conviction, which targets the possession of intoxicating substances.

2.

The government's second historical basis for permanently disarming Hembree is that our Nation has maintained a "history and tradition of disarming dangerous individuals." Specifically, the government reasons that "[d]rug crimes are inherently dangerous, even in situations where a defendant has 'only' been convicted of 'mere' drug possession like Hembree, because the possession of narcotics entails the dealing with and enriching of drug traffickers." The only direct support the government proffers to support this assertion are three out-of-circuit opinions that, in the government's own words, "rule[] that drug *dealing* offenses are dangerous."[5]

The government's proposition regarding the dangerousness of *dealing* drugs is consistent with our court's decision in *Kimble*, which held that a predicate felony conviction of drug trafficking was constitutional under § 922(g)(1). *See Kimble*, 142 F.4th at 314–15. There, a panel of our court approved of the government's analogy to "English laws disarming political

---

[5] *See Folatjar v. Att'y Gen.*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J., dissenting); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011); *United States v. Williams*, 113 F.4th 637, 659 (6th Cir. 2024).

and religious dissidents and American statements and practices suggesting that dangerous individuals could lose their Second Amendment rights," *id.* at 315, and concluded that "[l]ike legislatures in the past that sought to keep guns out of the hands of potentially violent individuals, Congress today regards felon drug traffickers as too dangerous to trust with weapons," *id.* at 316.

But our decision in *Kimble* was narrow. Importantly, we explained that the government's proposed analogues were "a closer fit for drug traffickers than for occasional drug users." *Id.* at 316. Whereas *Kimble* has been extended to predicates that involve possession with intent to distribute, *see, e.g.*, *Mancilla*, 155 F.4th at 452, there is still a common element between trafficking and distribution that is not present, even on the face of the criminal statute, with possession. Thus, the government's analogue here does not speak to whether drug *possession* felonies should be considered sufficiently dangerous as a categorical matter to justify disarmament under § 922(g)(1).

The government attempts to support its proposition that Hembree's possession conviction is dangerous. For one, the government characterizes Hembree's prior conviction for simple possession as necessarily the same as possession with intent to distribute, because both the lesser and greater charges were included in his indictment. But this is a common occurrence in criminal indictments. Evidence of a potential greater charge does not support the government's historical reasoning because our binding caselaw restricts us to reviewing only Hembree's predicate conviction: possession of methamphetamine. *See Kimble*, 142 F.4th at 318 ("The relevant consideration is a defendant's 'prior convictions that are punishable by imprisonment for a term exceeding one year,' not unproven conduct charged contemporaneously with a defendant's (g)(1) indictment or prior conduct that did not result in a felony conviction." (quoting *Diaz*, 116 F.4th at 467)). Moreover, in one of its letters to our court pursuant to Rule 28(j), the government seeks to reference

Case: 24-60324 Document: 155-1 Page: 14 Date Filed: 03/03/2026



the very orbital facts that we excepted in *Kimble*. The government argues that Hembree is similar to Kimble in that "the record establishes that he deals drugs." Hembree correctly responds that these facts are from his charged § 922(g)(1) offense conduct as alleged in the presentence report—and are not related to his predicate felony conviction.

Finally, we recognize that our court has decided cases that present different predicate convictions but are apposite to Hembree's underlying conviction. Given our court's fragmented approach to § 922(g)(1), such horizontal analogies are important to square as well in pursuit of broader coherence. For one, as described above, a panel of our court recently held that a predicate conviction of attempt to cultivate marijuana is not supported by our Nation's history and tradition. *See Doucet*, 2025 WL 3515404, at *6. There, our court recognized—as Hembree argues—that "we have previously looked to Founding-era regulations of alcohol as the 'next-closest historical analogue' for the historical treatment of intoxicating substances." *Id.* at *5 (quoting *Connelly*, 117 F.4th at 279). Rooted in history, our court has continued to find that there is no historical tradition regulating "ordinary citizens who consumed alcohol," *Connelly*, 117 F.4th at 281, nor the illegal production or manufacturing of alcohol, *Doucet*, 2025 WL 3515404, at *5. Our court in *Doucet* further recognized that the government did not carry its burden of demonstrating that attempted marijuana cultivation "necessarily signif[ies] involvement in the drug trade." *Doucet*, 2025 WL 3515404, at *5. At minimum, the government has similarly not met its burden of demonstrating that possession is inherently involved in the trade.

Additionally, we draw on our court's reasoning in the § 922(g)(3) context. In *United States v. Connelly*, our court held that, when there is no evidence of intoxication at the time of the § 922(g)(3) offense, regulating a defendant's "habitual or occasional drug use [would impose] a far greater burden on her Second Amendment rights than our history and tradition of

Case: 25-30324 Document: 155-1 Page: 15 Date Filed: 03/02/2026



firearms regulation can support." 117 F.4th at 282. In *Mitchell*, our court recently applied this reasoning in the context of a § 922(g)(1) offense where the predicate felony is a § 922(g)(3) conviction itself. *See Mitchell*, 160 F.4th at 173–74. There, in reliance on *Rahimi*, the government focused, and urged the court to focus, on dangerousness. *Id.* at 187. But, "*Rahimi* did not sweepingly proclaim that 'dangerousness' is the new standard for Second Amendment challenges." *Id.* (citing *Rahimi*, 602 U.S. at 690); *see also Connelly*, 117 F.4th at 277 ("Indeed, not one piece of historical evidence suggests that, at the time they ratified the Second Amendment, the Founders authorized Congress to disarm anyone it deemed dangerous." (emphasis in original)). Our court in *Mitchell* emphasized that the government's anchoring to dangerousness precedents does not "come to its rescue," and that we are bound by reading cases "in proper context with *Bruen* and *Diaz*." *Mitchell*, 160 F.4th at 189. And so too here, we remain bound.

* * *

Our court's § 922(g)(1) caselaw has rapidly evolved and continues to do so. But we are bound by our precedent, pending further clarification from our full court to reconcile our incremental approach or from the Supreme Court to reconcile the circuit split. We therefore find that the government did not meet its burden to prove that history and tradition support simple possession as a valid felony predicate under § 922(g)(1). We decline to reach so far as to find possession to be part and parcel with the drug trade, and the government's analogy to possession of contraband has been foreclosed. *See Doucet*, 2025 WL 3515404, at *3. Accordingly, we are compelled to reverse Hembree's conviction as unconstitutional as-applied.

Moreover, because we reverse Hembree's conviction on the as-applied challenge, we need not reach any of the other challenges on appeal. *See also Mitchell*, 160 F.4th at 195.

## III.

For the foregoing reasons, we hold that Hembree's § 922(g)(1) conviction violates the Second Amendment as applied to him and REVERSE his conviction.

Further, Hembree filed a motion to supplement the record, and we GRANT this motion as well.

Don R. Willett, *Circuit Judge*, concurring:

In September 1787, when "We the People" first glimpsed the document that would become our founding charter, it wasn't exactly love at first sight. Impressive as it was, the Constitution was incomplete—and conspicuously so. For all its world-shaking ambition, it bore a striking omission: unlike nearly every state constitution,[1] it contained no bill of rights.

How could Madison, Hamilton, Washington, Wilson, Franklin—plus the document's thirty-four other signatories—have made such a choice? The Federalists answered with a structural defense. A bill of rights, they contended, would be "not only unnecessary . . . but would even be dangerous."[2] Why? Because while a state constitution operates on the premise that "everything which is not reserved is given," the federal Constitution rests on the opposite rule: "everything which is not given is reserved."[3] Congress's powers, they emphasized, were "few and defined,"[4] and thus incapable of endangering individual liberty. Why, then, "declare that things shall not be done which there is no power to do?"[5] Such

---

[1] *See* Brutus, Essay II (Nov. 1, 1787), *reprinted in* 2 The Complete Anti-Federalist 372, 374 (Herbert J. Storing ed., 1981) ("[I]n all the constitutions of our own states; there is not one of them but what is either founded on a declaration or bill of rights, or has certain express reservation of rights interwoven in the body of them.").

[2] The Federalist No. 84, at 513 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

[3] Speech of James Wilson, Oct. 6, 1787, *reprinted in* Pennsylvania and the Federal Constitution, 1787–1788, at 143 (John Bach McMaster & Frederick D. Stone eds., 1888).

[4] The Federalist No. 45, at 292 (James Madison).

[5] The Federalist No. 84, at 513.

Case: 25-30324 Document: 55 Page: 218 Date Filed: 03/02/2026



declarations, the Federalists warned, would only "furnish . . . a plausible pretense for claiming that power."[6]

The Anti-Federalists were unmoved. They pressed the "infinite advantages" of a bill of rights.[7] Limited though Congress's powers might be, they countered, those powers "are as complete, with respect to every object to which they extend, as th[ose] of any state government"—authority enough to draw "[l]ife, liberty, and property . . . under its controul."[8] And when Congress inevitably stretched its enumerated powers beyond their seams, the people would need something firm to grasp—something "under which we might contend against any assumption of undue power."[9] What, they asked, was the harm in a belt-and-suspenders Constitution? As Patrick Henry put it, with trademark bluntness: "our rights are reserved.—Why not say so? Is it because it will consume too much paper?"[10]

History split the difference. The Anti-Federalists lost their fight against ratification. The Constitution took effect in 1789 and has served the Nation with distinction ever since. But they succeeded in securing a bill of rights: "most States voted for the Constitution only after proposing

---

[6] *Id.* at 514; *see also* Speech of James Wilson, *supra*, at 144 ("[T]hat very declaration might have been construed to imply that some degree of power was given, since we undertook to define its extent.").

[7] Federal Farmer, Letter XVI (Jan. 20, 1788), *reprinted in* 2 THE COMPLETE ANTI-FEDERALIST, *supra*, at 324.

[8] Brutus, Essay II, *supra*, at 374.

[9] Old Whig No. II, *reprinted in* 3 THE COMPLETE ANTI-FEDERALIST, *supra*, at 25.

[10] Speech of Patrick Henry in the Virginia Ratifying Convention, June 16, 1788, *reprinted in* 3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS, ON THE ADOPTION OF THE FEDERAL CONSTITUTION 445, 448 (Jonathan Elliot ed., 2d ed. 1888).

amendments," and the First Congress promptly obliged. The Bill of Rights followed, ratified in 1791.[11]

Fast forward nearly 240 years, and cases like this one vindicate the Anti-Federalists' instinct to hedge their bets. As I have previously explained, 18 U.S.C. § 922(g)(1)—the federal felon-in-possession ban—rests uneasily alongside a bedrock principle: "Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution."[12] Given the expansive interpretation of the commerce power, "the natural first place to look is the Interstate Commerce Clause,"[13] which grants Congress the "Power . . . [t]o regulate Commerce . . . among the several States."[14] Perplexingly, the Supreme Court once declared that this power "is not confined to the regulation of commerce among the states."[15] More recently, however, the Court has "endeavored to more sharply define and enforce limits on" the commerce power,[16] confining it to "three general categories

---

[11] *United States v. Morrison*, 529 U.S. 598, 638 n.11 (2000) (Souter, J., dissenting).

[12] *United States v. Bonner*, 159 F.4th 338, 340 (5th Cir. 2025) (Willett, J., concurring) (quoting *Morrison*, 529 U.S. at 607 (majority opinion)); *accord id.* at 340–43; *Alderman v. United States*, 131 S. Ct. 700, 700–03 (2011) (Thomas, J., dissenting from the denial of certiorari); *United States v. Seekins*, 52 F.4th 988, 988–92 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc); *see also United States v. Wilson*, --- F.4th ---, 2026 WL 83506, at *7–11 (5th Cir. Jan. 12, 2026) (Willett, J., concurring) (expressing similar concerns about the federal machinegun possession ban, 18 U.S.C. § 922(o)).

[13] *Wilson*, --- F.4th at ---, 2026 WL 83506, at *9 (Willett, J., concurring).

[14] U.S. Const. art. I, § 8, cl. 3.

[15] *United States v. Darby*, 312 U.S. 100, 118 (1941).

[16] *Alderman*, 131 S. Ct. at 701 (Thomas, J., dissenting from the denial of certiorari).

of regulation."[17] And "[m]ere possession of a firearm fits uneasily within any of these categories."[18]

Hembree contends that § 922(g)(1) exceeds Congress's enumerated powers, a claim he concedes is foreclosed by our precedent.[19] Even so, as the majority explains, his prior conviction—for simple possession of methamphetamine—does not render his disarmament consistent with the Second Amendment. Thus, where the enumerated-powers belt slips—as the Anti-Federalists foresaw[20]—the Second Amendment suspenders hold, at least for Hembree.

This case vividly illustrates the Constitution's deliberate redundancy. Individual liberty is preserved not by any single safeguard, but by "four interlocking mechanisms" working in concert: representative government, separation of powers, federalism, and the Bill of Rights.[21] The Framers trusted none of them to suffice on its own.

---

[17] *Gonzales v. Raich*, 545 U.S. 1, 16 (2005). "First, Congress can regulate the channels of interstate commerce. Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce. Third, Congress has the power to regulate activities that substantially affect interstate commerce." *Id.* at 16–17 (citations omitted).

[18] *Bonner*, 159 F.4th at 341 (Willett, J., concurring).

[19] *See United States v. Rawls*, 85 F.3d 240 (5th Cir. 1996) (per curiam) (rejecting an enumerated-powers challenge to § 922(g)(1)).

[20] *See, e.g.*, Old Whig No. II, *supra*, at 25 ("[W]ho can overrule [Congress's] pretensions?—No one . . . ."); Brutus, Essay XII (Feb. 7, 1788), *reprinted in* 2 The Complete Anti-Federalist, *supra*, at 425 ("[T]he courts will in their decisions extend the power of the government to all cases they possibly can . . . .").

[21] *Wilson*, --- F.4th at ---, 2026 WL 83506, at *8 (Willett, J., concurring).

Case: 25-30324 Document: 55 Page: 24 Date Filed: 03/03/2026



Those protections, however, do not run on autopilot.[22] "[E]ach generation must decide whether to honor those structural limits as boundaries to uphold—or to treat them as obstacles to outwit."[23] When the Bill of Rights halts an aggressive assertion of federal power, it should sharpen our respect for those limits—not lull us into forgetting them.

The Judiciary should heed that lesson as well. In an appropriate case, I remain open to reconsidering whether § 922(g)(1) truly falls within Congress's enumerated powers.[24] For now, however, I join the majority's conclusion that § 922(g)(1), as applied here, violates Hembree's right to keep and bear arms.

---

[22] *Cf.* NEIL GORSUCH, A REPUBLIC, IF YOU CAN KEEP IT 8 (2019) ("This republic belongs to us all—and it is up to all of us to keep it. I think that's what Benjamin Franklin was getting at when he spoke publicly after he emerged from the Constitutional Convention. A passerby asked what kind of government the delegates intended to propose, and Franklin reportedly replied: 'A republic, *if you can keep it.*'" (emphasis in original)).

[23] *Wilson*, --- F.4th at ---, 2026 WL 83506, at *7 (WILLETT, J., concurring).

[24] *See Bonner*, 159 F.4th at 343 (WILLETT, J., concurring).