No. 25-30324

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

CURTIS SQUIRE,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:24-CR-41-1

**PETITION FOR REHEARING EN BANC**

CLAUDE J. KELLY
Federal Public Defender
Eastern District of Louisiana

STEVEN E. SPIRES
Research and Writing Attorney
Office of the Federal Public Defender
500 Poydras Street, Suite 318
Hale Boggs Federal Building
New Orleans, Louisiana 70130
(504) 589-7930
Steven_Spires@fd.org

# CERTIFICATE OF INTERESTED PERSONS

*United States v. Curtis Squire*
No. 25-30324

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.  *Defendant-Appellant:* Curtis Squire.

2.  *Counsel for Defendant-Appellant:* Federal Public Defender Claude J. Kelly; Research and Writing Attorney Steven E. Spires.

3.  *Former Counsel for Defendant-Appellant:* Assistant Federal Public Defender Annalisa Miron.

4.  *Counsel for Plaintiff-Appellee:* Acting United States Attorney Michael Simpson; Assistant United States Attorneys Kevin G. Boitmann, Patrick Stevens Barr, Sarah Dawkins, and Megan Roberts.

5.  *Former Counsel for Plaintiff-Appellee*: n/a

/s/ *Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney
Dated: June 16, 2026

# RULE 40(b)(2) STATEMENT

This petition concerns a question of exceptional importance: The constitutionality of 18 U.S.C. § 922(g)(1) under the Commerce Clause. En banc resolution is especially warranted because current circuit precedent conflicts with Supreme Court precedent.

In a series of cases beginning with *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court made clear that while the Commerce Clause permits regulation of economic activities that substantially affect interstate commerce, it does not authorize plenary federal regulation of noneconomic conduct, including mere firearm possession. As the Court explained, such limits on the commerce power are necessary to protect federalism and to prevent the federal government from exercising a general police power, which is strictly reserved for the States. *See United States v. Morrison*, 529 U.S. 598 (2000); *Nat'l Fed'n of Indep. Bus. v. Sebelius* [*NFIB*], 567 U.S. 519 (2012).

This Court's § 922(g)(1) precedent, however, ignores *Lopez* and, in doing so, impermissibly expands the federal government's ability to regulate noneconomic conduct far beyond what the Commerce Clause permits. *See United States v. Rawls*, 85 F.3d 240 (5th Cir. 1996). Under

that precedent, for a federal firearm regulation to past constitutional muster, this Court requires only a "minimal nexus" between mere firearm possession and interstate commerce—a low bar that this Court deems automatically cleared if the firearm possessed was simply manufactured in another state and therefore crossed state lines at some time in the past. *Id.* at 243.

That precedent is based on an erroneous reading of *Scarborough v. United States*, 431 U.S. 563 (1977), a pre-*Lopez* case that concerned only questions of statutory interpretation and did not engage in any Commerce Clause analysis. Relying on *Scarborough*—and ignoring the *Lopez* framework—this Court has foreclosed Commerce Clause challenges to § 922(g)(1). That puts this Court's caselaw in irreconcilable conflict with the Supreme Court's Commerce Clause precedent. It also means this Court's precedent fails to enforce meaningful limits on the Commerce Clause's reach.

En banc intervention is necessary to reverse *Rawls,* apply the *Lopez* framework to § 922(g)(1), and bring this Court's precedent into conformity with Supreme Court precedent and the Constitution.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................. ii

RULE 40(b)(2) STATEMENT ................................................................. iii

TABLE OF AUTHORITIES .................................................................. vi

ISSUE MERITING EN BANC CONSIDERATION ...................................... 1

STATEMENT OF PROCEEDINGS AND SUMMARY OF FACTS ........... 2

ARGUMENT AND AUTHORITIES ......................................................... 3

    I.     The Supreme Court has articulated meaningful limits on Congress's power to regulate commerce, as expressed in the *Lopez* framework. ................................................. 3

    II.    This Court's § 922(g)(1) precedent is irreconcilable with the *Lopez* framework. ................................................................ 9

    III.   Under the *Lopez* framework, § 922(g)(1) violates the Commerce Clause. ................................................................ 14

    IV.   The en banc Court should correct this significant and recurring constitutional error. ..................................................... 16

CONCLUSION .................................................................................. 17

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES**

*Alderman v. United States*, 131 S. Ct. 700 (2011) ................. 5, 11, 12, 13
*Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157 (2004) .............. 12
*GDF Realty Invs. v. Norton*, 326 F.3d 622 (5th Cir. 2003) .................... 15
*Nat'l Fed'n of Indep. Bus. v. Sebelius* [*NFIB*], 567 U.S. 519 (2012) passim
*Scarborough v. United States*, 431 U.S. 563 (1977) ...................... passim
*United States v. Alderman*, 565 F.3d 641 (9th Cir. 2009) .................... 14
*United States v. Bass*, 404 U.S. 336 (1971) ................................... 16
*United States v. Bonner*, 159 F.4th 338 (5th Cir. 2025) ................ passim
*United States v. Hill*, 927 F.3d 188 (4th Cir. 2019) .............................. 14
*United States v. Kuban*, 94 F.3d 971 (5th Cir. 1996) ................ 10, 13, 15
*United States v. Lopez*, 514 U.S. 549 (1995) .................................. passim
*United States v. Morrison*, 529 U.S. 598 (2000) ............................ passim
*United States v. Patton*, 451 F.3d 615 (10th Cir. 2006) ........................ 14
*United States v. Rawls*, 85 F.3d 240 (5th Cir. 1996) ...................... passim
*United States v. Seekins*, 52 F.4th 988 (5th Cir. 2022) .......... 9, 13, 16, 17

**STATUTES**

18 U.S.C. § 922(g)(1) .................................................................. passim

**OTHER AUTHORITIES**

Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES
(6th ed. 2019) ......................................................................... 5

**ISSUE MERITING EN BANC CONSIDERATION**

Whether this Court's precedent holding that 18 U.S.C. § 922(g)(1) constitutes a valid exercise of congressional authority under the Commerce Clause conflicts with the Supreme Court's decision in Lopez, which set strict limits on Congress's commerce power.

# STATEMENT OF PROCEEDINGS AND SUMMARY OF FACTS

In February 2024, appellant Curtis Squire was wrongly accused of a shooting—an accusation that led to a search of his home.[1] Although local law enforcement found no evidence linking Mr. Squire to the crime, they did discover an unrelated firearm and ammunition, which Mr. Squire kept in his home. ROA.302-03. State charges related to the shooting were dismissed, ROA.315 n.1, but Mr. Squire was federally indicted for violating 18 U.S.C. § 922(g)(1), which permanently prohibits people with felony convictions from possessing firearms and ammunition "in or affecting commerce," ROA.36-37.

Mr. Squire filed a timely motion to dismiss, challenging the charge as, *inter alia*, exceeding Congress's authority under the Commerce Clause, though he acknowledged his argument was foreclosed under Fifth Circuit precedent. ROA.66-93. Subsequently, he pleaded guilty, without a plea agreement. ROA.165. In the factual basis, Mr. Squire admitted "that prior to his possession of the firearm and ammunition, both traveled in interstate commerce" and "were manufactured outside

---

[1] It later came to light that Mr. Squire was picking up his young children from school at the time of the shooting. ROA.303.

2

the state." <u>ROA.167</u>. The factual basis also stated, however, that "[a]ll of the events below occurred within the Eastern District of Louisiana." <u>ROA.166</u>. Nowhere did the factual basis establish either that Mr. Squire was engaged in interstate commerce or that his firearm possession affected interstate commerce.

The district court imposed a within-guidelines sentence of 52 months, followed by three years of supervised release. <u>ROA.200-06</u>. Mr. Squire appealed, raising, among other issues, the preserved Commerce Clause challenge. <u>ROA.207-08</u>. A panel of this Court affirmed, noting that Commerce Clause challenges to § 922(g)(1) are currently foreclosed.[2]

## ARGUMENT AND AUTHORITIES

I.  **The Supreme Court has articulated meaningful limits on Congress's power to regulate commerce, as expressed in the *Lopez* framework.**

"The Federal Government 'is acknowledged by all to be one of enumerated powers.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius* [*NFIB*], <u>567 U.S. 519, 534</u> (2012) (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 405

---

[2] The panel also rejected Mr. Squire's Second Amendment and vagueness challenges. While Mr. Squire is not raising those issues in this petition for rehearing en banc, he does wish to preserve them for Supreme Court review.

(1819)). "The enumeration of powers is also a limitation of powers, because '[t]he enumeration presupposes something not enumerated.'" *Id.* (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 195 (1824)). "And the Federal Government 'can exercise only the powers granted to it.'" *Id.* at 534-35 (quoting *McCulloch, supra,* at 405). For example, the Constitution "withhold[s] from Congress a plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez*, 514 U.S. 549, 566 (1995).

Among the enumerated powers, Article I, § 8 of the Constitution provides that "Congress shall have power" to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." For the first century of the Republic, "the Court's Commerce Clause decisions dealt but rarely with the extent of Congress' power." *Lopez*, 514 U.S. at 553. For the next fifty years—from the apogee of the Gilded Age, through the Progressive Era, and into the early years of the Great Depression—commerce-clause jurisprudence developed in response to a modernizing economy, often employing "formal distinction[s]" between "direct" and "indirect" effects. *Id.* at 554-55.

4

During this era, many regulatory laws were struck down as exceeding the scope of the limited power described in the Commerce Clause. *Id.*

In the mid-1930s, however, the New Deal "ushered in an era of Commerce Clause jurisprudence that greatly expanded the previously defined authority of Congress under that Clause." *Id.* at 556. For the next sixty years, the Supreme Court's view of the commerce power was "expansive, and indeed almost unlimited." Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 259 (6th ed. 2019). "From 1937 until 1995, not one federal law was declared unconstitutional as exceeding the scope of Congress's commerce power." *Id.* Indeed, "it [was] difficult to imagine anything that Congress could not regulate under the commerce clause so long as it was not violating another constitutional provision." *Id.* at 276.

That changed in 1995, when the Supreme Court, in *United States v. Lopez*, "took a significant step toward reaffirming this Court's commitment to proper constitutional limits on Congress' commerce power." *Alderman v. United States*, 131 S. Ct. 700, 703 (2011) (Thomas, J., dissenting from denial of certiorari); *id.* at 701 (explaining that *Lopez* "endeavored to more sharply define and enforce limits" on the commerce

power). In *Lopez*, the Court surveyed a century of commerce jurisprudence, 514 U.S. at 552-58, and then established the test for the scope of Congress's power to regulate activities that "affect" interstate commerce: "We conclude, consistent with the great weight of our case law, that the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce," *id.* at 559.[3]

Ultimately, the Court in *Lopez* struck down a federal law that prohibited possession of a firearm in a school zone. *Id.* at 551. The Court explained: "The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at 567. "Even . . . the most far reaching example of Commerce Clause authority over intrastate activity" in the Court's New Deal jurisprudence, the Court

---

[3] *Lopez*, in total, "identified three broad categories of activity that Congress may regulate under its commerce power." 514 U.S. at 558. In addition to "activities that substantially affect interstate commerce," the Court explained that Congress can regulate "use of the channels of interstate commerce" and "instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Id.* at 558-59 (internal citation omitted). "Mere possession of a firearm fits uneasily within any of these categories," but "[t]he closest candidate might be 'activities that substantially affect interstate commerce.'" *United States v. Bonner*, 159 F.4th 338, 341 (5th Cir. 2025) (Willett, J., concurring). Indeed, *Lopez* itself analyzed firearm possession only under the substantial effects test after "quickly dispos[ing] of" the other two categories. *See* 514 U.S. at 559.

observed, "involved economic activity in a way that the possession of a gun in a school zone does not." *Id.* at 560 (citing *Wickard v. Filburn*, 317 U.S. 111 (1942)).

Five years later, in *United States v. Morrison*, 529 U.S. 598 (2000), the Court reaffirmed these critical limits on the reach of the Commerce Clause, striking down another federal law for exceeding Congress's commerce authority. In doing so, the Court confirmed that the nature of the regulated activity was central to the analysis, noting that "in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor." 529 U.S. at 611; *see also id.* at 613 ("[T]hus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity *only where that activity is economic in nature.*" (emphasis added)). Accordingly, the Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 616.

Most recently, in *NFIB*, Chief Justice Roberts explained that, "[a]s expansive as our cases construing the scope of the commerce power have

been, they all have one thing in common: They uniformly describe the power as reaching '*activity*.'" 567 U.S. at 551 (emphasis added). And not just any activity, but "existing commercial activity." *Id.* at 552, 556. As an illustration, the Chief Justice provided the following example: "An individual who bought a car two years ago and may buy another in the future is not 'active in the car market' in any pertinent sense." *Id.* at 556.

In other words, Congress can regulate individuals' activity when they are "currently engaged in commerce" but not "individuals as such." *Id.* at 557. "Any police power to regulate individuals as such, as opposed to their activities, remains vested in the States." *Id.* "The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions." *Id.* Four other Justices echoed Chief Justice Roberts's analysis, emphasizing that Congress could only regulate "*activity affecting commerce*[.]" *Id.* at 658 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting) (emphasis in original).

As *Lopez* and its progeny make clear: "The Constitution requires a distinction between what is truly national and what is truly local." *Morrison*, 529 U.S. at 617–18. And these constitutional limits on the

commerce power are essential to securing limited government and maintaining federalism, including in criminal law. "Under our federal system, the 'States possess primary authority for defining and enforcing the criminal law.' . . . When Congress criminalizes conduct already denounced as criminal by the States, it effects a 'change in the sensitive relation between federal and state criminal jurisdiction.'" *Lopez*, 514 U.S. at 561 n.3 (citations omitted). "That means . . . Congress has no power to enact a comprehensive criminal code." *United States v. Bonner*, 159 F.4th 338, 340 (5th Cir. 2025) (Willett, J., concurring).

## II. This Court's § 922(g)(1) precedent is irreconcilable with the *Lopez* framework.

Yet—despite *Lopez*, *Morrison*, and *NFIB*—this Court's precedent holds that *Scarborough v. United States*, 431 U.S. 563 (1977), which concerned § 922(g)(1)'s predecessor statute, forecloses Commerce Clause challenges entirely. That error requires en banc correction.

This Court's continued "reliance on *Scarborough*" when analyzing § 922(g) Commerce Clause challenges is "erroneous for at least two reasons." *United States v. Seekins*, 52 F.4th 988, 991 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc). "First, the Court's holding in *Scarborough* was statutory, not constitutional." *Id.* (citations

omitted). "Second, *Scarborough* pre-dates *Lopez*, where the Court cabined the constitutional power of the federal government under the Commerce Clause." *Id.*; *see also United States v. Kuban*, 94 F.3d 971, 977 (5th Cir. 1996) (DeMoss, J., dissenting in part) ("*Lopez* [was] a fundamental and landmark restatement and redefinition of the powers of Congress under the Commerce Clause."),

Section 922(g)(1) makes it unlawful for people with felony convictions to "possess in or affecting commerce, any firearm or ammunition." In *Scarborough*, Court held that "proof that the possessed firearm previously traveled in interstate commerce is sufficient to satisfy the *statutorily required nexus* between the possession of a firearm by a convicted felon and commerce." 431 U.S. at 564 (emphasis added). As the Court explained, "Congress intended to require [no] more than the minimal nexus that the firearm have been, at some time, in interstate commerce," *id.* at 575, "with little concern for when the nexus with commerce occurred," *id.* at 577. This Circuit's pattern jury instructions likewise require merely proof that "before the defendant possessed the firearm, it had traveled at some time from one state to another" to satisfy

the statutory element that the firearm "affected" interstate commerce. § 2.43(D), Fifth Circuit Pattern Jury Instructions, at 218 (2024).

In *Rawls*, this Court rejected a post-*Lopez* Commerce Clause challenge to § 922(g)(1), believing that *Scarborough* "carrie[d] a strong enough implication of constitutionality to now bind us, as an inferior court, on that issue." *United States v. Rawls*, 85 F.3d 240, 243 (5th Cir. 1996) (Garwood, J., specially concurring). As a result, *Rawls* simply did not apply the *Lopez* framework at all.[4]

This was error that requires en banc correction. Importantly, *Scarborough* said nothing about the Constitution: "No party alleged that the statute exceeded Congress' authority, and the Court did not hold that the statute was constitutional." *Alderman*, 131 S. Ct. at 701 (Thomas, J., dissenting); *see Bonner*, 159 F.4th at 342 (Willett, J., concurring) ("Yet a decision like *Scarborough*—in which the Commerce Clause 'was not at issue, and was not so much as mentioned in the opinion'—is 'scant authority' on the meaning of that Clause.") (citations omitted). Thus,

---

[4] Interestingly, the full panel specially concurred to add that, "[i]f the matter were *res nova,* one might well wonder how it could rationally be concluded that mere possession of a firearm in any meaningful way concerns interstate commerce simply because the firearm had, perhaps decades previously before the charged possessor was even born, fortuitously traveled in interstate commerce." *Id.*

*Rawls* should not have treated *Scarborough* as binding on the constitutional question, especially at the expense of applying the on-point *Lopez* decision. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

Moreover, *Scarborough* is irreconcilable with the Supreme Court's modern Commerce Clause jurisprudence. *See Alderman*, 131 S. Ct. at 702 (Thomas, J., dissenting) ("*Scarborough* . . . cannot be reconciled with *Lopez*."); *Bonner*, 159 F.4th at 342 (Willett, J., concurring) ("In concluding otherwise, we have strayed from the Supreme Court's considered interpretations of the Commerce Clause in *Lopez*, *Morrison*, and *NFIB*[.]"). *Rawls's* erroneous holding means no less than "the nullification of . . . recent Commerce Clause jurisprudence," which "threatens the proper limits on Congress' commerce power and may allow Congress to exercise police powers that our Constitution reserves to the States." *Alderman*, 131 S. Ct. at 700 (Thomas, J., dissenting).

Indeed, this Court's treatment of *Scarborough* grants the federal government near unlimited power to regulate the affairs of American citizens—which *Lopez* made clear is not constitutionally tolerated. *Id.* at 702-03 ("[T]he lower courts' reading of *Scarborough*, by trumping the *Lopez* framework, could very well remove any limit on the commerce power."). This is not hyperbole. In *Alderman*, for example, "[t]he Government actually conceded . . . that Congress could ban possession of french fries that have been offered for sale in interstate commerce." *Id.* at 703. "If it's enough that some object (or component of an object) at some unknown (and perhaps unknowable) point in time traveled across state lines to confer federal jurisdiction, it's hard to imagine anything that would remain outside the federal government's commerce power." *Seekins*, 52 F.4th at 990 (Ho, J., dissenting). "After all, it's hard to imagine any physical item that has not traveled across state lines at *some* point in its existence, either in whole or in part." *Id.* (emphasis original). "That is no limit at all." *Id.* at 989.[5]

---

[5] Numerous members of the Supreme Court, this Court, and other Circuits have acknowledged the constitutional problem. *See, e.g., Alderman*, 131 S. Ct. 700 (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari); *Bonner*, 159 F.4th at 342–43 (Willett, J., joined by Duncan, J., concurring); *Seekins*, 52 F.4th at 991 (Ho, J., joined by Smith and Engelhardt, JJ., dissenting from denial of rehearing en banc); *Kuban*, 94 F.3d at 977 (DeMoss, J., dissenting in part); *see also United*

## III. Under the *Lopez* framework, § 922(g)(1) violates the Commerce Clause.

Under *Lopez* and its progeny, "it is difficult to see how § 922(g)(1) honors the principle of enumerated powers." *Bonner*, 159 F.4th at 341 (Willett, J., concurring). Indeed, a person—like Mr. Squire—who merely possesses a firearm in his own home "is not 'active in the [firearm] market' in any pertinent sense." *See NFIB*, 567 U.S. at 556. Far from it. Simple firearm possession, including Mr. Squire's possession in his own home, is not an economic activity—it is noneconomic. *See Lopez*, 514 U.S. at 551, 561, 567. That means Congress cannot regulate firearm possession under an "aggregate effect" on commerce theory. *Morrison*, 529 U.S. at 617; *Bonner*, 159 F.4th at 342 (Willett, J., concurring) ("At best, § 922(g)(1) can meet the substantial-effects test only by aggregating the impact of all firearm possession by felons. Yet aggregation is ordinarily appropriate only when the underlying activity is economic— and firearm possession is not."); *GDF Realty Invs. v. Norton*, 326 F.3d

---

States v. Hill, 927 F.3d 188, 215 n. 10 (4th Cir. 2019) (Agee, J., dissenting); *United States v. Alderman*, 565 F.3d 641, 648–650 (9th Cir. 2009) (Paez, J., dissenting); *United States v. Patton*, 451 F.3d 615, 636 (10th Cir. 2006) (acknowledging the "considerable tension").

622, 630 (5th Cir. 2003) ("[T]he key question for purposes of aggregation is whether the nature of the regulated activity is economic.").

Simply put, "[t]he mere fact that a felon"—like Mr. Squire— "possesses a firearm which was transported in interstate commerce years before the current possession cannot rationally be determined to have a 'substantial impact on interstate commerce' as of the time of current possession." *Kuban*, 94 F.3d at 978 (DeMoss, J., dissenting in part). In other words, § 922(g)(1) does not actually regulate activities that substantially affect interstate commerce but instead regulates "individuals as such"—here, felons—in violation of the Commerce Clause and at the expense of the States and federalism. *See NFIB*, 567 U.S. at 557; *Morrison*, 529 U.S. at 617-19; *Lopez*, 514 U.S. at 561 n.3.

Consider this very case. According to the factual basis, "[a]ll of the events" of this case "occurred within the Eastern District of Louisiana." ROA.166. The only connection to commerce was that the firearm and ammunition that Mr. Squire possessed in his own home happened to have been "manufactured outside the state" and had—at some unknown point prior to Mr. Squire possessing them—"traveled in interstate commerce." ROA.167. That's it.

Certainly, "[t]here's no record evidence that his possession of these items [had] any impact on any other state." *Seekins*, 52 F.4th at 990 (Ho, J., dissenting). Nor is there "record evidence of any commercial transaction of any kind involving the [firearm or ammunition]—or even that [they] traveled across state lines at any particular moment in time." *Id.* In fact, "[i]t's hard to imagine a more local crime than this." *Id.*; *see also United States v. Bass*, 404 U.S. 336, 349-50 (1971) (explaining that regulation of firearm possession is "traditionally local").

## IV. The en banc Court should correct this significant and recurring constitutional error.

This Court should take this case en banc to reverse *Rawls* and finally apply the *Lopez* framework to § 922(g)(1). *Scarborough* presents no obstacle, because it did not address the statute's constitutionality under the Commerce Clause. En banc rehearing is necessary to bring this Court's caselaw into conformity with the Supreme Court's modern Commerce Clause precedents and, ultimately, with the Constitution itself. As Judge Ho has put it: "[C]ircuit precedent dramatically expands the reach of the federal government under the Commerce Clause. No Supreme Court precedent requires it. And no proper reading of the

Commerce Clause permits it." *Seekins*, <u>52 F.4th at 992</u> (Ho, J., dissenting). This Court should correct that circuit precedent now.

## CONCLUSION

For the foregoing reasons, rehearing en banc is warranted.

Respectfully submitted,

CLAUDE J. KELLY
Federal Public Defender
Eastern District of Louisiana

*/s/ Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney
500 Poydras Street, Suite 318
Hale Boggs Federal Building
New Orleans, Louisiana 70130
Telephone: (504) 589-7930
Email: steven_spires@fd.org

# CERTIFICATE OF SERVICE

The undersigned certifies that on June 16, 2026, the foregoing Appellant's Brief was filed with the Clerk of Court via the electronic filing system, which will send an electronic Notice of Docket Activity to the following Filing Users:

Kevin G. Boitmann, kevin.boitmann@usdoj.gov,
Patrick Stevens Barr, patrick.barr@usdoj.gov,
Sarah Dawkins, sarah.dawkins@usdoj.gov,
Megan Roberts, megan.roberts@usdoj.gov,
  Assistant United States Attorneys.

"The court's electronic Notice of Docket Activity constitutes service of the filed document on all Filing Users." 5TH CIR. R. 25.2.5.

/s/Steven E. Spires
STEVEN E. SPIRES
Research and Writing Attorney

# CERTIFICATE OF COMPLIANCE

The undersigned certifies that:

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 40(d)(3) because this brief contains 3,536 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, 14-point font for text and 12-point font for footnotes.

3.  This brief complies with the privacy redaction requirement of Fed. R. App. P. 25(a)(5), 5th Cir. R. 25.2.13, and Fed. R. Crim. P. 49.1, because it has been redacted of personal data identifiers.

4.  This electronic submission is an exact copy of the paper document, in compliance with 5th Cir. R. 25.2.1.

5.  This brief is free of viruses because it has been scanned for viruses with the most recent version of Symantec Endpoint Protection, in compliance with 5th Cir. ECF Filing Standard A(6).

*/s/ Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney
Dated: June 16, 2026

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 2, 2026

Lyle W. Cayce
Clerk

No. 25-30324

_____

United States of America,

*Plaintiff—Appellee*,

*versus*

Curtis Squire,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:24-CR-41-1

_____

Before Clement, Southwick, and Engelhardt, *Circuit Judges*.

Edith Brown Clement, *Circuit Judge*:

This case presents a novel question about whether the Second Amendment protects a convicted drug trafficker from being dispossessed of a firearm inside his home based on our Nation's historical tradition of firearm regulation. Curtis Squire was indicted for possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Squire moved to dismiss the indictment, raising several constitutional challenges, including that § 922(g)(1) is unconstitutional as applied to him—regardless of his felon status—because it is inconsistent with our history and tradition under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States*

*v. Rahimi*, 602 U.S. 680 (2024), which he says supports, rather than proscribes, his right to possess a firearm inside his home. The district court denied his motion, and Squire pleaded guilty and was sentenced. Because our historical tradition supports disarming drug traffickers based on their dangerousness, we AFFIRM the judgment of conviction and sentence.

I

On February 15, 2024, a shooting occurred in New Orleans. Ten days later, officers with the New Orleans Police Department ("NOPD") searched Squire's home pursuant to a search warrant alleging his involvement. In executing the warrant, NOPD officers found a handgun inside Squire's home. Tests confirmed that the firearm kept inside the home was not linked to the shooting, so the state charges related to the shooting were dismissed.

On March 8, 2024, Squire was charged in a single-count federal indictment with possessing a firearm and ammunition after being convicted of a felony offense in violation of 18 U.S.C. § 922(g)(1). The indictment alleged that Squire had prior felony convictions in two state cases. In one case, he had prior felony convictions for a conspiracy and substantive count of possession with the intent to distribute heroin, a conspiracy and substantive count of possession of a firearm with a controlled dangerous substance, a conspiracy and substantive count of obstruction of justice, and a conspiracy count to possess stolen things. In another case, he had convictions for simple burglary and unauthorized use of a motor vehicle.

Squire moved to dismiss the indictment. He brought numerous constitutional challenges, including one under the Second Amendment that disarmament of a citizen in his home, regardless of his felon status, is "inconsistent" with *Bruen*. The district court denied his motion.

Squire pleaded guilty to the charge without the benefit of a plea agreement and did not waive his right to appeal. The district court sentenced Squire to fifty-two months of imprisonment, followed by three years of supervised release. Squire timely appealed.

## II

"On appeal, we review a district court's denial of a motion to dismiss an indictment de novo." *United States v. Mitchell*, 160 F.4th 169, 175 (5th Cir. 2025), *petition for cert. filed*, No. 25-935 (U.S. Feb. 5, 2026). We review preserved constitutional challenges de novo. *United States v. Morgan*, 147 F.4th 522, 526 (5th Cir. 2025). Because Squire raised his constitutional challenges in the district court, they are subject to de novo review. *Id.* at 527.

## III

Squire brings four constitutional challenges, three of which fail on arrival.[1] His as-applied challenge to § 922(g)(1) is our main event.

## A

We start with the constitutional text. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. This fundamental right, which pre-existed the Bill of

---

[1] Squire argues that § 922(g)(1) is facially unconstitutional, unconstitutionally vague, and exceeds Congress's power under the Commerce Clause. His facial challenge and Commerce Clause challenge are foreclosed. *See United States v. Diaz*, 116 F.4th 458, 462, 471–72 (5th Cir. 2024), *cert. denied*, 145 S. Ct. 2822 (2025). Squire's vagueness challenge also fails because even though he argues that § 922(g)(1) is generally vague, he does not contend that § 922(g)(1) is specifically vague in *his* case. *See United States v. Clark*, 582 F.3d 607, 614 (5th Cir. 2009); *United States v. Branson*, 139 F.4th 475, 478 (5th Cir. 2025), *cert. denied*, No. 25-5565, 2026 WL 135762 (U.S. Jan. 20, 2026).

Rights, remains "necessary to our system of ordered liberty." *Rahimi*, 602 U.S. at 690 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010)). In 2008, the Supreme Court recognized that the Second Amendment codified that natural right "to use arms in defense of hearth and home." *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). In that same landmark decision, the Supreme Court emphasized that, while vital to our scheme of ordered liberty, this right is "not unlimited." *Id.* at 626. Indeed, the Court in *Heller* noted, "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are "presumptively lawful." *Id.* at 626–27 & n.26.

To evaluate the constitutional limits of firearms regulations under the Second Amendment, we employ a two-step analytical method based on text, history, and tradition. *Bruen*, 597 U.S. at 17; *United States v. Diaz*, 116 F.4th at 466–67. "*First*, does the 'plain text' of the Second Amendment cover an individual's conduct?" *Mitchell*, 160 F.4th at 177 (quoting *Bruen*, 597 U.S. at 17). If yes, then "the Constitution presumptively protects that conduct" and we move to the next step. *Id.* (quoting *Bruen*, 597 U.S. at 17). "*Second*, is the regulation 'consistent with this Nation's historical tradition of firearm regulation' such that its application is constitutionally justified?" *Id.* (quoting *Bruen*, 597 U.S. at 17). If yes, then "a court can conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (cleaned up).

The second step is where history and tradition come to life. Two "metrics" are key: "why" and "how" a regulation burdens the right. *Bruen*, 597 U.S. at 29. The *why* question instructs "that 'if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations.'" *Mitchell*, 160 F.4th at 177 (quoting *Rahimi*, 606 U.S. at 692). And the *how* question counsels that "a law . . . may not be compatible with the right if it regulates arms-bearing

4

[to an extent] beyond what was done at the founding, even when a law regulates arms-bearing for a permissible reason." *Id.* (cleaned up).

Showing us that a challenged law comports with the Nation's historical tradition of firearm regulation is a "heavy burden" placed on the government. *Id.* To carry its heavy burden, the government must locate "historical precursors" and "well-established and representative historical analogue[s]," *Bruen*, 597 U.S. at 30, to establish that the law is "'relevantly similar' to laws that our tradition is understood to permit," *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). "Because this test requires digging into our Nation's history and tradition," *Mitchell*, 160 F.4th at 177, we must rely on a blend of "analogical reasoning and sound judgment" to assess whether a "conceptual fit exists between the old law and the new," *United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024). "[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 597 U.S. at 30. While "courts should not uphold every modern law that remotely resembles a historical analogue," the government, at the same time, need not identify a "dead ringer" or a "historical *twin*" for a law "to pass constitutional muster." *Id.* (cleaned up).

In the aftermath of *Bruen* and *Rahimi*, the Supreme Court has not yet clarified or explained the operation and effect of § 922(g)(1). "An entrenched circuit split has now emerged about its proper application." *Mitchell*, 160 F.4th at 178–79 & nn.2–3 (collecting cases). For our part, we have recognized that § 922(g)(1) might be unconstitutional as applied to at least *some* felons. *Id.* at 195. To date, *Diaz* has been the "primary catalyst" in shaping our post-*Bruen* analysis of § 922(g)(1). *United States v. Hembree*, 165 F.4th 909, 912 (5th Cir. 2026), *petition for cert. filed*, No. 25-1219 (U.S. Apr. 24, 2026). *Diaz* has made two contributions to our evolving jurisprudence:

*First*, it defined the relevant scope of inquiry for an as-applied challenge to § 922(g)(1): a court may consider only crimes punishable by a term of imprisonment exceeding one year for predicate offenses. *Second*, it left the door open for § 922(g)(1) to be unconstitutional as applied to some felons.

*Mitchell*, 160 F.4th at 179. Notably, in *Diaz*, we stressed that "[s]imply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny." 116 F.4th at 469. More is required.

Under *Diaz*'s felony-by-felony approach, we have drawn principled distinctions based on history and tradition. We have concluded that when it comes to non-violent felony offenses, § 922(g)(1) may be unconstitutional as applied to certain defendants. *See, e.g.*, *Mitchell*, 160 F.4th at 194 (marijuana possession without evidence of present intoxication); *United States v. Cockerham*, 162 F.4th 500, 504 (5th Cir. 2025) (failure to pay child support), *petition for cert. filed*, No. 25-1029 (U.S. Feb. 27, 2026). By contrast, we have concluded that predicate offenses involving a dangerous or violent crime justify disarmament under § 922(g)(1). *See, e.g.*, *United States v. Hernandez*, 159 F.4th 425, 428 (5th Cir. 2025) (per curiam) (assault of a family member); *United States v. Schnur*, 132 F.4th 863, 869–70 (5th Cir. 2025) (aggravated battery); *United States v. Kimble*, 142 F.4th 308, 311–12 (5th Cir. 2025) (drug trafficking), *cert. denied*, No. 25-5747, 2026 WL 135675 (U.S. Jan. 20, 2026).

## B

We now turn to Squire's as-applied challenge. Squire argues that § 922(g)(1) is unconstitutional under the Second Amendment as applied to his possession of a firearm in his home. The essence of his argument is that disarming a person inside his home is antithetical to our historical tradition, which Squire says protects, rather than prohibits, arms possession inside the home. His theory is that the "ancient right" of self-defense, which derives from natural law, has special legal status in English common law and

American law, most notably in the "castle doctrine." Framed as an issue of first impression, Squire argues broadly that there is "no historical tradition that justifies permanently disarming a man in his own home—whether he has a prior felony conviction or not." The government counters this broadside attack on § 922(g)(1), defending its constitutionality on the basis that Squire's challenge to his prior felony convictions is foreclosed by *Diaz*, 116 F.4th at 471–72 (theft), *Schnur*, 132 F.4th at 870–71 (burglary), and *Kimble*, 142 F.4th at 317 (drug-trafficking). The government maintains that Squire's home-based distinction is one without a difference based on our precedent.

At first glance, these cases resolve Squire's case. Yet since Squire raises a novel theory that has never been tested before us, we must address Squire's theory with fresh eyes. To do so, we begin with his drug trafficking felonies to assess whether the government's historical analogues support his disarmament under § 922(g)(1).[2]

1

At Step One, the "plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)." *Diaz*, 116 F.4th at 467; *see also Schnur*, 132 F.4th at 867 (convicted felons are "unequivocally" among "the people"). So § 922(g)(1) as applied to Squire presumptively protects him." *Mitchell*, 160 F.4th at 186 (cleaned up); *accord Diaz*, 116 F.4th at 467.

2

At Step Two, the government must show that its historical analogues are "relevantly similar" to § 922(g)(1). *Diaz*, 116 F.4th at 467 (quoting *Bruen* 597 U.S. at29). Its proffered historical laws must share a common "why" and

---

[2] Because Squire's drug trafficking felonies are enough to justify disarmament under § 922(g)(1), we need not address the other historical analogues and arguments.

"how" in that they must both "(1) address a comparable problem (the 'why') and (2) place a comparable burden on the right-holder (the 'how')." *Kimble*, 142 F.4th at 313.

The government draws a historical analogy to § 922(g)(1) as applied to Squire's three drug trafficking felonies by first relying on "going armed" laws. The government also argues that drug trafficking is inherently violent and dangerous. *See Kimble*, 142 F.4th at 314 ("Kimble's record of drug trafficking, the government avers, underscores that he is the sort of dangerous individual that legislatures have long disarmed. We agree."). While *Kimble* was decided after Squire filed his notice of appeal in this case, the government cites *Kimble* in its brief on appeal, which this Court allows in the Second Amendment context. *See United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) (per curiam) (allowing the government to supplement authority on appeal). Because we are not limited to the "history and tradition before us," *Connelly*, 117 F.4th at 282, we may conduct our "own supplemental historical research," which includes examining the historical analogues presented in other cases, *see Mitchell*, 160 F.4th at 191. Thus, we may look to *Connelly*, *Kimble*, and other cases for guidance.

The parties in this case contest *Kimble*'s force. The government argues that *Kimble* controls given Squire's drug-trafficking predicates, which are inherently dangerous and subject to disarmament. Squire argues that *Kimble* is distinguishable because it arose "*outside* the home," and "many discriminatory, class-based disarmament laws included exceptions for keeping arms at home for self-defense." Both parties make good points that demand a second look. On the one hand, *Kimble* is distinguishable because Squire's home-based distinction was not presented or argued before that panel. On the other hand, our historical tradition supports disarming *classes* of people deemed dangerous. *See Kimble*, 142 F.4th at 314–15. The question

before us, then, is whether Congress may disarm a convicted drug trafficker inside his home consistent with our Nation's historical tradition.

Squire identifies a breadth of historical evidence confirming that the Second Amendment right to keep and bear arms is grounded in, and tethered to, our Nation's first principles, such as the natural right to self-preservation. *See* Michael P. O'Shea, *The Right to Defensive Arms After* District of Columbia v. Heller, 111 W. Va. L. Rev. 349, 363–66 (2009) (explaining the underpinnings of the natural right to self-preservation); *see also* David B. Kopel, *The Natural Right of Self-Defense:* Heller's *Lesson for the World*, 59 Syracuse L. Rev. 235, 236 (2008). He taps into that rich historical tradition and argues that the "home" is a special place of significance in the English common law and early American law, culminating in the "castle doctrine." *See* Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 205 n.5 (1983). After establishing this baseline for the core right to self-defense in the home, Squire puts forth other evidence suggesting that Founding-era regulations treated the freedom to keep arms in the home differently than the freedom to bear them in public. This argument takes two forms.

*Form one:* Squire argues that "the history of regulations on *keeping* arms (as distinguished from regulations on *carrying*) is scarce." *See generally* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 714 (2009) (explaining the English common law regulated the carrying of arms in public, but not the keeping of arms for self-defense); *see also* Nelson Lund, *The Second Amendment,* Heller, *and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 & 1358 n.36 (2009) (explaining that *Heller*'s "broad endorsement of bans on firearms possession by all felons is unsupported" by the historical record).

*Form two:* Squire contends that "even discriminatory laws imposing arms restrictions on Catholics who refused to denounce the Pope provided an exception for keeping necessary arms for self-defense." *See* David B. Kopel, *The First Century of Right to Arms Litigation*, 14 Geo. J.L. & Pub. Pol'y 127, 136 n.47 (2016) ("In England, a statute allowed a Catholic to keep firearms with permission from a local justice of the peace for the defence of his House or person." (cleaned up)). Squire presses that class-based discriminatory laws of this kind are like the analogues in *Kimble*, which, in Squire's view, calls *Kimble* into doubt.[3]

We take no issue with Squire's historical exegesis. In fact, like *Heller*, we recognize and affirm the right to self-defense in the home as the "core" of the Second Amendment. 554 U.S. at 628–30; *see Mitchell*, 160 F.4th at 178 (acknowledging Justice Scalia's masterclass attempt to "discover" and "unlock" the original public meaning of the Second Amendment); *see also* Lawrence B. Solum, District of Columbia v. Heller *and Originalism*, 103 Nw. U. L. Rev. 923, 940 (2009) (explaining that "it is hard to imagine finding a clearer example of original public meaning originalism in an actual judicial decision" than *Heller*). Our historical tradition undoubtedly reflects the natural law tradition, which helps anchor and ground this constitutional right. *See* Kopel, *The Natural Right to Self-Defense*, 59 Syracuse L. Rev. at 236.

---

[3] Squire also argues that *Kimble* misapplied *Connelly*'s history and therefore we should apply *Connelly* based on the rule of orderliness. He argues that *Kimble* cited the Militia Act of 1662 as supporting a tradition of class-based disarmament, *see* 142 F.4th at 315–16, even though *Connelly* held that "the Militia Act, passed to disarm political dissidents and reined in well before the Founding by the English Bill of Rights, almost certainly does not survive the Second Amendment's categorical command," 117 F.4th at 278. To his discredit, Squire leaves out the last part of *Connelly*'s statement—"at least vis-à-vis offering a 'why' comparable to § 922(g)(3)." *Id. Kimble*, by contrast, applied this history to § 922(g)(1), which requires a different analysis. We therefore find no tension.

But Squire's portrait is incomplete.

*First*, history. "History is consistent with common sense: it demonstrates that legislatures have the power to prohibit *dangerous* people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (BARRETT, J., dissenting) (emphasis added); *Kimble*, 142 F.4th at 314–15.[4] Of course, just because Congress labels classes of people dangerous as a policy judgment does not mean that it can constitutionally do so. Courts must not grant "blanket deference," to Congress, *Kimble*, 142 F.4th at 315, because the "shifting benchmark" of felony status "should not define the limits of the Second Amendment," *Diaz*, 116 F.4th at 469. If Congress could escape *Bruen*'s reach by simply classifying a crime as a felony, we would be confined to uncritically rubber-stamping class-based determinations, subjecting disarmament laws to a form of rational-basis, government-always-wins, type of review, *see Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487–88 (1955), which our Second Amendment jurisprudence disallows, *see Heller*, 554 U.S. at 628 n.27. Complete deference to legislative line-drawing for class-based dangerousness distinctions would undermine our role, allowing Congress to "define away a fundamental right." *Williams*, 113 F.4th at 660. History and tradition demand more of us. *See Bruen*, 597 U.S. at 26.

---

[4] *See also Cockerham*, 162 F.4th at 503 (our historical tradition "unquestionably" authorizes the government to "disarm violent criminals"); *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024) ("[G]overnments in England and colonial America long disarmed groups that they deemed to be dangerous."); *United States v. Watson*, 171 F.4th 1012, 1025 (7th Cir. 2026) (holding that § 922(g)(1)'s application to dangerous felons survives constitutional attack because defendant's predicate felony—possession with intent to distribute cocaine —is a "dangerous felony").

Our historical tradition of firearm regulation, as evinced by English laws disarming political and religious dissidents perceived to be dangerous, confirms constitutional disarmament of dangerous classes.[5]

The English Militia Act of 1662 authorized the seizure of arms from those deemed dangerous to public safety; the Act was employed to "disarm dangerous and disaffected persons," a practice that "continued unabated," even after England's Glorious Revolution. Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution: The English Origin of the Right to Keep and Bear Arms*, 95 NOTRE DAME L. REV. 397, 401–405 (2019); *see also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons From Possessing Arms*, 20 WYO. L. REV. 249, 259 (2020) (the Militia Act authorized the King's agents to "seize all arms in the custody or possession of any person . . . judge[d] dangerous to the peace of the kingdom."). The Militia Act's history also shows that it "served as cover for the widespread disarmament of Charles II's and James II's political opponents." *Connelly*, 117 F.4th at 278 (citing Nelson Lund, *The Past and Future of the Individual's Right to Arms*, 31 GA. L. REV. 1, 8 (1996)). The Glorious Revolution eventually "cut back on the power of the Crown to disarm its subjects unilaterally." *Rahimi*, 602 U.S. at 694. To curb that broad power, "Parliament adopted the English Bill of Rights, which guaranteed 'that the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law.'" *Id.* (cleaned up).

---

[5] English history is pertinent because the Second Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." *Heller*, 554 U.S. at 599 (cleaned up). But it is not dispositive because "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 597 U.S. at 34. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them* . . . ." *Heller*, 554 U.S. 634–35 (emphasis added).

That regulatory practice crossed the Atlantic into the American colonies, where state laws barring political dissidents, such as British loyalists, from owning guns existed. Take loyalty oaths as a notable example.

"During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons refusing to swear an oath of allegiance to the state or the United States," as it would help "deal with the potential threat coming from armed citizens who remained loyal to" another sovereign. Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004). In Pennsylvania, for example, "if a person 'refuse[d] or neglect[ed] to take the oath or affirmation' of allegiance to the state, he was *required* to deliver up his arms" to the state's agents, and he was not allowed to carry any arms about his person or keep any arms or ammunition in his "*house or elsewhere.*" *Id.* (emphasis added) (quoting § 5, 1777-1778 Pa. Laws at 126).

In 1776, at the request of the Continental Congress, Massachusetts passed an act that disarmed "such Persons as are notoriously disaffected to the Cause of America, or who refuse to associate to defend by Arms the United American Colonies." *Id.* at 507 (quoting ch. VII, 1775-1776 Mass. Acts at 31). That law required "'every Male Person above sixteen Years of Age' to subscribe to a 'test' of allegiance to the 'United American Colonies,'" which also required affirming the Revolutionary War was "just and necessary" and that they would not assist the British in the war efforts. *Id.* at 507 & n.131. The Founders viewed English loyalists as "political threats to our nascent nation's integrity," *Connelly*, 117 F.4th at 278, that necessarily required arms confiscation for the public good, *see id.* at 277 (collecting state laws barring "those who refused to take an oath of allegiance during the Revolutionary War from owning guns"); *see also Kimble*, 142 F.4th at 316.

Laws disarming religious minorities, particularly Catholics, were also prevalent. The rationale was that religious minorities must be disarmed "on the basis of allegiance, not on the basis of faith." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 157 (2007) (discussing Virginia's 1756 law disarming "all those refusing the test of allegiance," and that those "willing to swear undivided allegiance to the sovereign" were allowed to keep their arms); *see also Kanter*, 919 F.3d at 457 (BARRETT, J., dissenting) (relying on historical support explaining that Catholics were generally associated with the "distrusted inhabitants," so colonies responded with arms confiscation measures to prevent "social upheavals" and "rebellion" (cleaned up)). These discriminatory laws were the product of a "perceived threat" that Catholics posed to the public order, which "was as political as it was religious, if not even more so." *Connelly*, 117 F.4th at 278; *see also* Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 DREXEL L. REV. 1, 35–46 (2024) (explaining the perception of disloyalty); *see also Connelly*, 117 F.4th at 277 (collecting state statutes disarming religious minorities).

In *Connelly*, we recognized that the "undeniable throughline" of these two historical analogues was that "Founding-era governments took guns away from those perceived to be dangerous." 117 F.4th at 278. *Connelly* involved a *Bruen* challenge to § 922(g)(3) by a defendant who was a non-violent, marijuana-smoking gunowner. *Id.* at 272. There, we reasoned that our historical tradition of disarming British loyalists or religious minorities did not address a problem comparable to § 922(g)(3). *Id.* at 278. Because marijuana users were not analogous to "a class of political traitors, as English loyalists were perceived to be," or "like Catholics and other religious dissenters who were seen as potential insurrectionists," we concluded that

14

our historical tradition—as applied to a *non-violent*, marijuana smoking gunowner under § 922(g)(3)—did not support the disarmament. *Id.*

*Kimble* picked up where *Connelly* left off and concluded that the historical analogues for political dissidents and religious minorities provided a "closer fit for drug traffickers than for occasional drug users." 142 F.4th at 316. In that case, Kimble had been convicted of two drug-trafficking felonies, and after serving his time for each offense, he was found in possession of a handgun and charged and convicted under § 922(g)(1). *Id.* at 309. On appeal, the "novel question" was "whether a predicate drug-trafficking felony also justifies permanent disarmament under (g)(1) even after the defendant has served his full sentence." *Id.* at 312. We examined the analogues from *Connelly* and concluded that "Founding-era governments took guns away from those perceived to be dangerous," which was consistent with § 922(g)(1)'s "rationale for disarming Kimble," *Id.* at 316 (quoting *Connelly*, 117 F.4th at 278). Unlike in *Connelly*, where we rejected those analogues for a marijuana user—as there was no historical evidence that such a user was "dangerous" for reasons comparable to political dissidents or religious minorities—we embraced them in *Kimble* because drug-trafficking felony predicates involved "intrinsic violence of the drug trade." *Id.* at 312.

Squire rightly observes that the historical record places a special premium on the right to self-defense inside the home. We take no issue with that historical observation, which accords with the original meaning of the Second Amendment. *See Heller*, 554 U.S. at 592. But our historical tradition was not *limited* to public carry regulations. While some laws exempted possession inside the home, other ones did not. *Compare* Kopel, *The First Century of Right to Arms Litigation*, 14 Geo. J.L. & Pub. Pol'y at 136 & n.47 (English law providing home carve-out for Catholics), *with* Cornell & DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. at 506 (Pennsylvania loyalty oath law imposing

categorical prohibition). And those are simply historical prohibitions applied to British loyalists and religious minorities. History shows us those legislative prohibitions on firearm possession "were not limited to religious minorities and political dissenters." *Zherka v. Bondi*, 140 F.4th 68, 87 (2d Cir. 2025).

Laws in various colonies, for example, "prohibited Native Americans, people of African descent, and mixed-race people from owning firearms." *Id.* at 87 & n.45 (collecting laws). In 1723, Virginia passed a law that prohibited blacks, mixed-raced people, and Native Americans from "keep[ing], or carry[ing] any gun, powder, shot, or any club, or other weapon whatsoever, offensive or defensive." *Id.* at 87 (citation omitted) (alterations in original). As for Native Americans, war and violent conflict with the colonists were common, so colonial legislatures attempted to restrict Native Americans' ability to possess arms and use them against colonial subjects. *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55, 57 (2017). These firearm regulations were borne out of an "overarching concern for public safety." *Id.* at 58. Several colonies, too, "punished with death citizens caught providing arms to Native Americans." *Williams*, 113 F.4th at 652–53 & n.9 (discussing historical laws).

And that is just a preview of the Second Amendment's pre-ratification history. "Post-enactment history also provides color to the right our Framers secured." *Id.* at 656; *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (SCALIA, J., dissenting) (relying on post-enactment history to evaluate the "widespread and longstanding traditions of our people"). States also continued to ban black people from owning any firearms. *Zherka*, 140 F.4th at 88 n.50 (collecting examples of race-based laws). "Black people in Mississippi were prohibited from owning guns with no exceptions." *Id.* at 88.

Granted, these repugnant laws classifying people as dangerous simply on the basis of their race or religion are wrong and unconstitutional under the

Fourteenth Amendment. *See Williams*, 113 F.4th at 656 ("Classifying people as dangerous simply because of their race or religion was wrong from the beginning and unconstitutional from 1868."). Nevertheless, these laws give us a glimpse into how early Americans understood their right to bear arms, how the legislature could determine classes of people to be dangerous, and the scope of their disarmament.

Moreover, while some historical laws imposed narrower burdens than those imposed by § 922(g)(1), felon status alone does not necessarily entail permanent disarmament. 18 U.S.C. § 925(c) provides that a person may apply to the Attorney General for relief from firearm dispossession, and the Attorney General may grant such relief if the applicant shows he "will not be likely to act in a manner dangerous to public safety" and the "granting of the relief would not be contrary to the public interest." While this procedure was basically disbanded after Congress prohibited the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") from using funds to evaluate applications, *see United States v. Bean*, 537 U.S. 71, 74–75 (2002), the current Attorney General has rescinded the delegation of authority to the ATF and restarted the § 925(c) process, *Withdrawing the Attorney General's Delegation of Authority*, 90 Fed. Reg. 13080-01 (Mar. 20, 2025). While Squire did not apply for relief under § 925(c), other felons may do so.

On a more fundamental level, *Bruen* does not require identical burdens or feature-for-feature congruence between historical and modern regulations for a law to be constitutional. Such historical precision is incompatible with *Bruen*'s command to examine a tradition of firearm regulation. *Bruen* instead requires laws to be "relevantly similar." 597 U.S. at 29. Historical analogues, not historical twins, remain the touchstone.

*Second*, precedent. Our cases confirm that, consistent with our firearm regulatory tradition, "the right secured by the Second Amendment is not

unlimited." *Heller*, 554 U.S. at 626. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Indeed, *Heller* noted that no part of the "opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* Of course, *Heller* did not settle the question before us. Nor does its dictum "supplant" our "historical inquiry." *Diaz*, 116 F.4th at 465–66. But it is a helpful clue. While *Heller* held that the Second Amendment protects a right inside the home, it also endorsed the view that Congress can impose some categorical bans on the possession of firearms, consistent with the right's original public meaning. In a post-*Heller* world, we have done just that. *See, e.g.*, *Kimble*, 142 F.4th at 318.

America's experiment with self-government reveals two animating historical traditions: one that emphasizes the centrality of the individual right to keep and bear arms, especially inside the home, and another that empowers the government to protect the common good through disarmament of people it deems dangerous. Therein lies the tension.

But tension does not imply exclusivity. In America, rights have always existed alongside regulations. The Second Amendment protects the individual right to keep and bear arms, but our historical firearm tradition also allows legislatures to disarm dangerous people, including inside their homes.

*Kimble* did not resolve this tension, but it placed § 922(g)(1)'s application to dangerous offenders, such as drug traffickers, within a tradition subject to categorical disarmament. *Id. Kimble* concluded that, based on our historical disarmament regimes targeting political dissidents and religious minorities, § 922(g)(1) may be applied to drug traffickers under *Bruen*'s "how" and "why" framework. Like *Kimble*, those regimes are analogous to § 922(g)(1)'s application to Squire, even when accounting for his home-

18

based distinction, because our historical tradition was not limited to public carry regulations but allowed broad disarmament of classes of people deemed dangerous. Thus, Squire's conviction accords with the Second Amendment.

\*　　\*　　\*

Squire raises a novel theory. Yet the home-based distinction he attempts to draw within our Nation's historical tradition is mugged by the reality that our historical laws support his disarmament, even in the special confines of his home. While the Constitution safeguards the core right to keep and bear arms inside the home, *see Heller*, 554 U.S. at 625–28, it does not dislocate the government's regulatory power to "strip certain groups of" this right, *Diaz*, 116 F.4th at 466. "Congress is entitled to make categorical judgments," *Vidal v. Elster*, 602 U.S. 286, 319 (2024) (BARRETT, J., concurring in part), including a values-based policy judgment that convicted drug traffickers, such as Squire—whose conviction involved an "inherently dangerous activity," *Kimble*, 142 F.4th at 317—may be disarmed under § 922(g)(1) consistent with our historical tradition. That conclusion does not rest upon an "individualized assessment" that Squire is "dangerous," based on some amorphous understanding of the word. *See id.* at 318; *see also Mitchell*, 160 F.4th at 187 ("*Rahimi* did not sweepingly proclaim that 'dangerousness' is the new standard for Second Amendment challenges."). Nor does it reflect a freewheeling judicial balancing of rights and safety. *See Bruen*, 597 U.S. at 26 (explaining the "Constitution demands" that courts jettison "interest balancing" in favor of history and tradition). Instead, Squire's dangerousness is premised solely on his drug trafficking offense, which places him in "a *class of dangerous felons* that our regulatory tradition permits legislatures to disarm." *Kimble*, 142 F.4th at 318 (emphasis added).

Our judicial role "requires us to interpret the meaning of the Constitution by examining its text and our Nation's historical tradition of

19

firearm regulation under *Bruen*, while also adhering to our circuit precedent in this rapidly developing area of law." *Mitchell*, 160 F.4th at 194. In so doing, we conclude that § 922(g)(1) as applied to drug traffickers permits arms dispossession based on dangerousness, not location. Accordingly, we hold that Squire may be constitutionally disarmed under § 922(g)(1) in this case.

## IV

Today's holding is narrow. We conclude only that § 922(g)(1), as applied to a convicted drug trafficker possessing a firearm inside his home, is consistent with this Nation's historical tradition of firearm regulation under *Bruen*. We do not decide whether the Second Amendment allows Congress to disarm individuals in the home based on convictions lacking a relevantly similar historical analogue to dangerousness, violence, or threats to public order. Accordingly, we AFFIRM the judgment of conviction and sentence.