No. 25-30324

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,
v.

CURTIS SQUIRE,
*Defendant-Appellant*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:24-CR-41-1

**APPELLANT'S EN BANC BRIEF**


CLAUDE J. KELLY
Federal Public Defender
Eastern District of Louisiana

CELIA C. RHOADS
Assistant Federal Public Defender

STEVEN E. SPIRES
Research and Writing Attorney
Office of the Federal Public Defender
500 Poydras Street, Suite 318
Hale Boggs Federal Building
New Orleans, Louisiana 70130
(504) 589-7930
steven_spires@fd.org

## CERTIFICATE OF INTERESTED PERSONS

*United States v. Curtis Squire*
No. 25-30324

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. *Defendant-Appellant:* Curtis Squire.

2. *Counsel for Defendant-Appellant:* Federal Public Defender Claude J. Kelly; Research and Writing Attorney Steven E. Spires; Assistant Federal Public Defender Celia C. Rhoads.

3. *Former Counsel for Defendant-Appellant:* Assistant Federal Public Defender Annalisa Miron.

4. *Counsel for Plaintiff-Appellee:* United States Attorney David I. Courcelle; Assistant United States Attorneys Kevin G. Boitmann, Patrick Stevens Barr, Sarah Dawkins, and Megan Roberts.

5. *Former Counsel for Plaintiff-Appellee*: Acting United States Attorney Michael Simpson.

*/s/ Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney
Dated: September 3, 2026.

## STATEMENT REGARDING ORAL ARGUMENT

This case has been tentatively scheduled for oral argument for the week of January 18, 2027.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS .......................................ii

STATEMENT REGARDING ORAL ARGUMENT ................................ iii

TABLE OF CONTENTS .........................................................................iv

TABLE OF AUTHORITIES....................................................................vi

STATEMENT OF JURISDICTION.......................................................... 1

STATEMENT OF THE ISSUES............................................................... 2

INTRODUCTION..................................................................................... 3

STATEMENT OF THE CASE ................................................................. 4

I. Legal Background. ................................................................... 4

A. The Commerce Power and Its Limits. ............................ 4

B. The Federal Prohibition on Felons Possessing Firearms. ..................................................................... 13

II. Factual and Procedural Background. .................................... 18

SUMMARY OF THE ARGUMENT ........................................................22

ARGUMENT ...........................................................................................25

I. Regulation of Mr. Squire's firearm possession falls outside the scope of Congress's commerce power. ................ 25

A. Under *Lopez* and *Morrison*, § 922(g)(1)'s possession prohibition is unconstitutional, both on its face and as applied in this case. ............................. 25

B. This Court's precedent misapplies *Scarborough* and is irreconcilable with the *Lopez* framework. ........ 36

II. Alternatively, this Court may apply the canon of constitutional avoidance and construe § 922(g)(1)'s commerce element to conform with *Lopez*. ........................... 39

III. The question before this Court is important but narrow—limited in both its legal and practical impact. ...... 46

A. The legal impact of this case is limited. ...................... 47

B. The day-to-day realities of § 922(g)(1)'s enforcement illustrate the limited practical impact of a holding for Mr. Squire. ......................................... 49

CONCLUSION ........................................................................ 59

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**CASES**

*Alderman v. United States*, 131 S. Ct. 700 (2011) .................. 6, 36, 37, 38
*Bond v. United States*, 572 U.S. 844 (2014) ............................................. 5
*Crowell v. Benson*, 285 U.S. 22 (1932) .................................................. 40
*Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985) ......... 58
*Gibbs v. Babbitt*, 214 F.3d 483 (4th Cir. 2000) ....................................... 13
*Gonzales v. Raich*, 545 U.S. 1 (2005) ............................................... 11, 30
*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) ........................................ 44
*Hewitt v. United States*, 606 U.S. 419 (2025) ................................... 43, 46
*Hoffman v. Hunt*, 126 F.3d 575 (4th Cir. 1997) ....................................... 30
*Jones v. United States*, 529 U.S. 848 (2000) ........................................... 39
*McCulloch v. Maryland*, 4 Wheat. 316 (1819) ........................................... 4
*N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) ................ 29
*Nat'l Fed'n of Indep. Bus. (NFIB) v. Sebelius*, 567 U.S. 519 (2012) .. 4, 12, 30
*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477 (1989) . 40
*Ross v. Blake*, 578 U.S. 632 (2016) .......................................................... 44
*Russello v. United States*, 464 U.S. 16 (1983) .......................................... 45
*Screws v. United States*, 325 U.S. 91 (1945) ............................................. 5
*United States v. Alderman*, 565 F.3d 641 (9th Cir. 2009) ....................... 36
*United States v. Bass*, 404 U.S. 336 (1971) ..................................... passim
*United States v. Bishop*, 66 F.3d 569 (3d Cir. 1995) ............................... 34
*United States v. Bonner*, 159 F.4th 338 (5th Cir. 2025) ................. passim
*United States v. Fitzhugh*, 984 F.2d 143 (5th Cir. 1993) ............ 18, 28, 40
*United States v. Hemani*, 146 S. Ct. 1677 (2026) .................................. 32
*United States v. Hill*, 927 F.3d 188 (4th Cir. 2019) ................................ 36
*United States v. Holston*, 343 F.3d 83 (2d Cir. 2003) ............................. 35
*United States v. Kuban*, 94 F.3d 971 (5th Cir. 1996) ..................... passim
*United States v. Patton*, 451 F.3d 615 (10th Cir. 2006) .................. passim
*United States v. Pierson*, 139 F.3d 501 (5th Cir. 1998) .......................... 26
*United States v. Rawls*, 85 F.3d 240 (5th Cir. 1996) ............ 18, 35, 38, 39
*United States v. Rodia*, 194 F.3d 465 (3d Cir. 1999) .................. 30, 34, 35
*United States v. Seekins*, 2022 WL 3644185 (5th Cir. Aug. 24, 2022) (unpublished) ............................................................................. 20
*United States v. Seekins*, 52 F.4th 988 (5th Cir. 2022) ........ 27, 29, 36, 38

*United States v. Singletary*, 268 F.3d 196 (3d Cir. 2001) ........ 14
*United States v. Squire*, 177 F.4th 614 (5th Cir. 2026) ........ 21
*United States v. Squire*, 182 F.4th 481 (5th Cir. 2026) ........ 46, 49, 50
*United States v. Williamson*, 170 F.4th 435 (5th Cir. 2026) ........ 29
*United States v. Wilson*, 503 U.S. 329 (1992) ........ 44
*Wickard v. Filburn*, 317 U.S. 111 (1942) ........ 8
*Zadvydas v. Davis*, 533 U.S. 678 (2001) ........ 40

**STATUTES**

18 U.S.C. § 3231 ........ 1
18 U.S.C. § 3742 ........ 1
18 U.S.C. § 922(g)(1) ........ passim
18 U.S.C. App. § 1201 (repealed 1986) ........ 15, 31
18 U.S.C. App. § 1202(a) (repealed 1986) ........ 14, 15, 40, 41
28 U.S.C. § 1291 ........ 1
La. R.S. § 14:95.1 ........ 50
Miss. Code § 97-37-5(1) ........ 50
Tex. Penal Code § 46.04(a) ........ 50

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Art. I, § 8 ........ 4

**OTHER AUTHORITIES**

5TH CIR. PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) § 2.43D (2024 ed.) ........ 28
David E. Patton, *Criminal Justice Reform and Guns: The Irresistible Movement Meets the Immovable Object*, 69 EMORY L.J. 1011 (2020). 51, 57
Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 259 (6th ed. 2019) ........ 6
Jacob D. Charles & Brandon L. Garrett, *The Trajectory of Federal Gun Crimes*, 170 U. PA. L. REV. 637 (2022) ........ 51, 56, 57
Jonathan Abel, *Going Federal, Staying Stateside: Felons, Firearms, and the "Federalization" of Crime*, 73 AM. U. L. REV. 585 (2024) .. 51, 56, 57
Margaret Love & Beth Johnson, *Restoration of Firearm Rights after Conviction: A National Survey and Recommendations for Reform*, Collateral Consequences Resource Ctr. (Dec. 2025) ........ 14, 50

Pub. L. No. 75-850, 52 Stat. 1250 (1938) .............................................. 14
Pub. L. No. 90-351, tit. VII, 82 Stat. 197 (1968) ..................................... 14
Pub. L. No. 99-308, 100 Stat. 449 (1986) ............................................... 18
The Federalist No. 45 (C. Rossiter ed. 1961) ............................................ 4
U.S. Sentencing Comm'n, "Quick Facts: 18 U.S.C. § 922(g) Firearm
Offenses" (FY 2025) ................................................................... 51, 52
Webster's Third New International Dictionary (1966) .......................... 12

## STATEMENT OF JURISDICTION

This appeal is from the final judgment in a criminal case. Judgment was imposed on May 20, 2025. ROA.198, 200. Mr. Squire filed a timely notice of appeal on May 23, 2025. ROA.207. The district court had jurisdiction over this criminal proceeding under 18 U.S.C. § 3231. This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

1. Whether 18 U.S.C. § 922(g)(1)'s prohibition on the possession of a firearm by a felon exceeds Congress's authority under the Commerce Clause, either facially or as applied to the purely intrastate possession of a firearm in this case.

2. Whether, as a matter of constitutional avoidance, this Court should overturn its precedent holding that 18 U.S.C. § 922(g)(1)'s "in or affecting commerce" element is satisfied whenever a person possesses a firearm that previously crossed state lines.

## INTRODUCTION

Appellant Curtis Squire was arrested by the New Orleans Police Department (NOPD) for possessing a firearm in his home—a violation of Louisiana law due to his prior felony convictions. ROA.315. Mr. Squire was initially charged in state court for that offense. ROA.321. But his case was moved to federal court when the U.S. Attorney's Office for the Eastern District of Louisiana obtained an indictment charging him with violating 18 U.S.C. § 922(g)(1), the federal statute prohibiting the same conduct. ROA.36. The sole alleged connection to interstate commerce in Mr. Squire's case was that the firearm he possessed in his home was manufactured in another state and, thus, at some unknown time in the past, had traveled across state lines into Louisiana. ROA.167. Under binding Circuit precedent, that was enough for the federal government, acting pursuant to its commerce power, to prosecute Mr. Squire for a federal crime.

That precedent has not been revisited for decades, despite serious doubt about § 922(g)(1)'s validity under modern Commerce Clause jurisprudence. Most significantly, in *United States* v. *Lopez*, 514 U.S. 549 (1995), the Supreme Court established clear limits on the scope of

Congress's power to regulate activities that "affect" interstate commerce. The Supreme Court emphasized that local crime control is the province of the States, and that the commerce power therefore cannot be exercised akin to a general police power. Under *Lopez* and its progeny, the federal felon-in-possession statute is unconstitutional, both on its face and as applied to Mr. Squire. This case is an opportunity for the en banc Court to correct course and hold that § 922(g)(1)'s possession prohibition exceeds the scope of Congress's power to regulate interstate commerce.

## STATEMENT OF THE CASE

### I. Legal Background.

#### *A. The Commerce Power and Its Limits.*

"The Constitution creates a Federal Government of enumerated powers." *Lopez*, 514 U.S. at 552 (citing U.S. Const. Art. I, § 8). "And the Federal Government 'can exercise only the powers granted to it.'" *Nat'l Fed'n of Indep. Bus. (NFIB) v. Sebelius*, 567 U.S. 519, 534–35 (2012) (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 405 (1819)). Those powers "are few and defined," while the powers intended "to remain in the State governments are numerous and indefinite." *Lopez*, 514 U.S. at 552 (quoting The Federalist No. 45, pp. 292–293 (C. Rossiter ed. 1961)).

Thus, while "[t]he States have broad authority to enact legislation for the public good—what [courts] have often called a 'police power,'" *Bond v. United States*, 572 U.S. 844, 854 (2014) (citation omitted)—the Constitution deliberately "withhold[s] from Congress a plenary police power that would authorize enactment of every type of legislation," *Lopez*, 514 U.S. at 566. And there is "no better example of the police power, which the Founders denied the National Government and reposed in the States," than the power to regulate crime and protect public safety. *United States v. Morrison*, 529 U.S. 598, 618 (2000). Accordingly, "the States possess primary authority for defining and enforcing the criminal law," *Lopez*, 514 U.S. at 561 n.3 (cleaned up), and "Congress has no power to enact a comprehensive criminal code," *United States v. Bonner*, 159 F.4th 338, 340 (5th Cir. 2025) (Willett, J., concurring). Congress can only enact federal criminal laws "within the scope of [its] delegated powers." *Screws v. United States*, 325 U.S. 91, 109 (1945) (plurality opinion).

Among the federal government's limited powers, Article I, § 8 of the Constitution provides that "Congress shall have power" to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." For nearly a century, "the [Supreme] Court's

Commerce Clause decisions dealt but rarely with the extent of Congress' power." *Lopez,* 514 U.S. at 553. As the national economy modernized, the Court struggled to delineate the contours of Congress's authority. *See id.* at 554–55. The New Deal, however, "ushered in an era of Commerce Clause jurisprudence that greatly expanded the previously defined authority of Congress under that Clause." *Id.* at 556.

"From 1937 until 1995, not one federal law was declared unconstitutional as exceeding the scope of Congress's commerce power," and "it [was] difficult to imagine anything that Congress could not regulate under the commerce clause so long as it was not violating another constitutional provision." Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 259, 276 (6th ed. 2019). During this era, the judiciary's view of the commerce power was "expansive, and indeed almost unlimited." *Id.* at 259.

In 1995, however, the Supreme Court in *Lopez* made clear that the commerce power was subject to meaningful and judicially-enforceable limits, "reaffirming [the] Court's commitment to proper constitutional limits on Congress' commerce power." *Alderman v. United States*, 131 S. Ct. 700, 703 (2011) (Thomas, J., dissenting from denial of certiorari).

Surveying Commerce Clause jurisprudence, *Lopez* authoritatively "identified three broad categories of activity that Congress may regulate under its commerce power." *Lopez*, 514 U.S. at 558.

*First*, the Court held, Congress may regulate the "use of the channels of interstate commerce." *Id.* "Under this category, Congress regulates not conduct *related to* interstate commerce but rather interstate commerce itself[.]" *United States v. Patton*, 451 F.3d 615, 621 (10th Cir. 2006) (emphasis in original). "[T]his category is confined to statutes that regulate interstate transportation itself, not manufacture before shipment or use after shipment." *Id.*

*Second,* Congress may regulate "instrumentalities of interstate commerce, or persons or things in interstate commerce." *Lopez*, 514 U.S. at 558. "The 'instrumentalities' are the means of interstate commerce, such as ships and railroads, and the 'persons or things in interstate commerce' are the persons or things transported by the instrumentalities among the states." *Patton*, 451 F.3d at 621. "Regulation under this category may extend to intrastate activities that threaten these instrumentalities." *Id.* at 622. "[T]his category involve[s] things actually being moved in interstate commerce, not all people and things that have

ever moved across state lines." *Id.*

*Third*, and relevant here, Congress may regulate "activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558–59. This third category requires "an analysis of whether the *regulated activity* 'substantially affects' interstate commerce." *Id.* at 559 (emphasis added). And, importantly, the regulated activity must be *economic*. *See id*. at 560 ("[T]he pattern is clear. Where *economic activity* substantially affects interstate commerce, legislation regulating that activity will be sustained." (emphasis added)).

Applying this framework, *Lopez* struck down a federal law that prohibited possession of a firearm in a school zone. *Id.* at 551. Analyzing the law under the third commerce power category, the Court explained: "[P]ossession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at 567. "Even . . . the most far reaching example of Commerce Clause authority over intrastate activity," the Court observed, "involved economic activity in a way that the possession of a gun in a school zone does not." *Id.* at 560 (citing *Wickard v. Filburn*, 317 U.S. 111 (1942)).

The Court rejected the government's argument that gun possession "substantially affect[s] interstate commerce" because "the costs of violent crime are substantial" and because "violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe." *Id.* at 563–64. Under the government's theory, the Court explained, "it is difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign." *Id.* at 564.

Five years later, in *Morrison*, the Court struck down another federal law for exceeding Congress's commerce authority under the third *Lopez* category—namely, a statute providing a federal civil remedy for victims of gender-motivated violence. 529 U.S. at 601–02. The Court stressed that its prior decisions sustaining regulation of intrastate activity under the substantial-effects test had uniformly turned on the "economic" nature of the regulated activity. *Id.* at 610–11; *see also id.* at 613 ("[T]hus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity *only where that activity is economic in nature*." (emphasis added)).

And the Court held that the law at issue in *Morrison* exceeded

Congress's commerce power notwithstanding Congressional findings that purported to support the commerce link. As the Court explained, those congressional findings were insufficient because they "rel[ied] so heavily on a method of reasoning"—i.e., a "costs of crime" rationale—that *Lopez* "already rejected as unworkable if we are to maintain the Constitution's enumeration of powers." *Id.* at 612, 615. "If accepted, [such] reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption." *Id.* at 615

Thus, the Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617. The Court affirmed that the "regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Id.* at 618. Importantly, "[t]he Constitution requires a distinction between what is truly national and what is truly local." *Id.* at 617–18 (citations omitted). In so holding, the Court "preserve[d] one of the few principles

that has been consistent since the [Commerce] Clause was adopted." *Id.* at 618.

The Supreme Court again applied the *Lopez* framework in *Gonzales v. Raich*, 545 U.S. 1 (2005), which involved a challenge to Congress' power to regulate scheduled drugs in the Controlled Substances Act ("CSA"). In *Raich*, the plaintiffs were California residents who cultivated and consumed marijuana for medicinal purposes entirely within the State, where those activities were legal under state law. *Id.* at 5–8. They conceded that the CSA was "well within Congress' commerce power" as a general matter, but sought an injunction preventing its enforcement against them, on the ground that their individual conduct was intrastate. *Id.* at 15.

The Court rejected that challenge, holding that Congress could properly prohibit the intrastate cultivation and possession of marijuana as part of its authority to regulate the entire market for scheduled drugs: "Unlike those at issue in *Lopez* and *Morrison,* the activities regulated by the CSA are quintessentially economic." *Id.* at 25. "Economics," the Court explained, "refers to 'the production, distribution, and consumption of commodities.'" *Id.* at 25–26 (quoting Webster's Third New

International Dictionary 720 (1966)). Thus, unlike the laws in *Lopez* and *Morrison* (which regulated gun possession and gender-based violence, respectively), the CSA was sustainable under *Lopez* category three. *See id.* at 25–26, 32–33.

Most recently, five members of the Supreme Court recognized that Congress could not properly rely on its Commerce Clause power to require that individuals purchase health insurance. *See NFIB*, 567 U.S. at 548–558 (Opinion of Roberts, C.J.); *id.* at 649–660 (Scalia, J., dissenting). In *NFIB*, Chief Justice Roberts reaffirmed that even at their most "expansive," the Court's Commerce Clause cases "uniformly" describe the commerce power as reaching "existing commercial activity"—not the individuals who engage in it. *Id.* at 551–52. Accordingly, while Congress can regulate individuals' activity when they are "engaged in commerce," it cannot regulate "individuals as such." *Id.* at 557. "Any police power to regulate individuals as such, as opposed to their activities, remains vested in the States." *Id.* Nor can Congress rely on past or anticipated future engagement in commerce: "An individual who bought a car two years ago and may buy another in the future," for example, "is not, 'active in the car market' in any pertinent sense." *Id.* at

556. Rather, there must be meaningful "proximity and degree of connection" between the regulation and "commercial activity." *Id.* at 558.

Together, the Supreme Court's modern Commerce Clause cases "reestablish that the commerce power contains 'judicially enforceable outer limits.'" *Gibbs v. Babbitt*, 214 F.3d 483, 490 (4th Cir. 2000) (quoting *Lopez*, 514 U.S. at 566). And failure to enforce those limits "would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States," "at the expense of the Constitution's system of enumerated powers." *Lopez*, 514 U.S. at 566–67.

*B. The Federal Prohibition on Felons Possessing Firearms.*

Within this broader legal context sits Mr. Squire's statute of conviction: 18 U.S.C. § 922(g)(1), which makes it a federal crime for a felon to possess any firearm that has ever crossed state lines. In addition to similar felon-in-possession laws in place in all fifty states, the federal government imposes its own prohibition, which "create[s] three crimes for convicted felons: (1) 'to ship or transport in interstate or foreign commerce any firearm or ammunition'; (2) 'to possess in or affecting commerce, any firearm or ammunition'; and (3) 'to receive any firearm or

ammunition which has been shipped or transported in interstate or foreign commerce.'" *United States v. Singletary*, 268 F.3d 196, 199 (3d Cir. 2001) (cleaned up).[1]

The "ship or transport" and "receive" prohibitions were originally enacted in the Federal Firearms Act of 1938. Pub. L. No. 75-850, 52 Stat. 1250 (1938). But a prohibition on "possession" was not added until 1968, through "a last-minute Senate amendment" to the Omnibus Crime Control and Safe Streets Act ("OCCA"). *United States v. Bass*, 404 U.S. 336, 344 (1971); *see* Pub. L. No. 90-351, tit. VII, 82 Stat. 197, 236 (1968). The provision—contained in § 1202(a) of Title VII of the OCCA—"was hastily passed, with little discussion, no hearings and no report," and "never received committee consideration or study in the House either." *Id.* & n.11. Congressional findings enacted within the law were broad and focused on general crime control, asserting that the possession of firearms by prohibited persons was "a threat to the safety of the

---

[1] *See also* Margaret Love & Beth Johnson, *Restoration of Firearm Rights after Conviction: A National Survey and Recommendations for Reform*, Collateral Consequences Resource Ctr. (Dec. 2025), *available* https://ccresourcecenter.org/wp-content/uploads/2026/01/Restoration-of-Firearm-Rights-After-Conviction-Report-Dec.-2025-1.pdf (surveying felon-in-possession laws across the country and explaining that "[r]estrictions on firearm possession following criminal conviction are embedded in the legal code of every state and territory, as well as in federal law.").

President," a "threat to the exercise of free speech" and "religion," and a "threat" to the existence of the government itself. *See id.* at n.14 (quoting 18 U.S.C. App. § 1201 (repealed 1986)).

Despite the law's explicit crime-control purpose, Congress relied on its commerce power to enact the statute and accordingly included an interstate-commerce element reaching anyone with a prior felony conviction "who receives, possesses, or transports *in commerce or affecting commerce* . . . any firearm." 18 U.S.C. App. § 1202(a) (repealed 1986) (emphasis added). With respect to the commerce connection, the law's congressional findings asserted only that felons possessing firearms constituted "a burden on" and "threat affecting" "commerce," offering that reasoning as the "constitutional basis for [Congress's] power to act." *Bass*, 404 U.S. at 345 n.14. The Supreme Court would later observe that "Congress was not particularly concerned with the impact on commerce except as a means to insure [the provision's] constitutionality." *Scarborough v. United States*, 431 U.S. 563, 575 n.11 (1977). Instead, the actual purpose of the law was to suppress crime in an area where Congress felt the states were falling short: "State gun control laws," at the time, "were found 'inadequate to bar possession of firearms from

those most likely to use them for unlawful purposes' . . . ." *Id.* (quoting 114 Cong. Rec. 14774 (1968)).

In the 1970s, well before the Supreme Court's modern Commerce Clause decisions, the Court decided two cases concerning Title VII's felon-in-possession ban. Both involved statutory, rather than constitutional, challenges. First, in *United States v. Bass*, the Court examined the "textual question" of whether "the clause 'in commerce or affecting commerce'" applied to mere possession of firearms or only to transport offenses. 404 U.S. at 339. The government took a maximalist position that no connection to commerce was required at all for mere possession offenses. *Id.* at 338. The Court observed that the government's reading "would mark a major inroad into a domain traditionally left to the States," "render[] traditionally local criminal conduct a matter for federal enforcement," and "involve a substantial extension of federal police resources." *Id.* at 339, 350. The Court therefore rejected that interpretation, reading the law to mean that proof of the statute's interstate commerce element was required in each case, regardless of whether the offense involved transport or mere possession of firearms. *Id.* at 350

A few years later, in *Scarborough v. United States*, the Supreme Court addressed what the government must prove to satisfy the statute's interstate commerce element. 431 U.S. at 564. Examining the law's limited legislative history and findings—which evidenced Congress's intent for that law to apply broadly to mere possession offenses—the Court concluded that "Congress intended to require [no] more than the minimal nexus that the firearm have been, at some time, in interstate commerce," "with little concern for when the nexus with commerce occurred." *Id.* at 575, 577. Based on that conclusion, the Court determined that the statute required only "proof that the possessed firearm previously traveled in interstate commerce" at some point in time, which alone was "sufficient to satisfy the statutorily required nexus between the possession of a firearm by a convicted felon and commerce." *Id.* at 564. The litigant in *Scarborough* did not raise, nor did the Court address, the question of whether Congress had exceeded its authority under the Commerce Clause by enacting such a law.

Following *Bass* and *Scarborough*, Congress amended various firearm-related laws in 1986 as part of the Firearms' Owners Protection Act, resulting in the current felon-in-possession law: 18 U.S.C.

§ 922(g)(1). *See* Pub. L. No. 99-308, 100 Stat. 449 (1986). In doing so, Congress made no additional relevant findings about felons. *See id.* § 1(b). Much like its predecessor statute, § 922(g)(1) contains a broad jurisdictional element purporting to tie the prohibition to interstate commerce by prohibiting felons from possessing "in or affecting commerce, any firearm or ammunition."

This Court has held that *Scarborough* governs the meaning of the commerce element in § 922(g)(1) as well. *United States v. Fitzhugh*, 984 F.2d 143, 145–46 (5th Cir. 1993). As a result, the law as currently interpreted regulates the mere possession of any firearm that has ever crossed state lines. This Court has gone further still, treating *Scarborough* as resolving not only the statutory question, but the constitutional one as well—foreclosing any challenge to the law as exceeding Congress's Commerce Clause authority. *See e.g.*, *United States v. Rawls*, 85 F.3d 240 (5th Cir. 1996).

## II. Factual and Procedural Background.

Mr. Squire's case began like most federal felon-in-possession cases in the Eastern District of Louisiana: as a local law enforcement investigation. *See* discussion *infra* Section III.B. In February 2024,

NOPD was investigating a shooting, and Mr. Squire was accused of being involved. ROA.302–03. As his Presentence Report later recognized, he was wrongfully accused. ROA.315 n.1. But before that information came to light, NOPD sought and obtained a search warrant for Mr. Squire's home. Upon searching the residence, police found no evidence linking Mr. Squire to the shooting, but they did discover an unrelated firearm and ammunition in his home. ROA.315. All charges related to the shooting were later dismissed, ROA.315 n.1, but, due to his prior felony convictions, Mr. Squire was charged in state court with violating Louisiana's law prohibiting the possession of firearms by felons.[2]

On March 4, 2024, a federal prosecutor sought a writ of habeas corpus ad prosequendum directing the Orleans Parish Sheriff to deliver Mr. Squire to federal custody. ROA.21. A few days later, the federal government obtained an indictment charging Mr. Squire for the same conduct charged in the state: unlawfully possessing a firearm as a convicted felon. ROA.36. The indictment against Mr. Squire alleged broadly that he "did knowingly possess a firearm . . . and ammunition,

[2] *See* Orleans Parish Crim. Case No. M-610093 (Feb. 26, 2024); *see also* La. R.S. § 14:95.1.

said firearm and ammunition having been in and affecting interstate commerce." ROA.36–37. Mr. Squire moved to dismiss his indictment on the ground that § 922(g)(1) violates the Commerce Clause, recognizing that the challenge was foreclosed by this Court's precedent. ROA.69–94. The government responded, noting that, under this Court's caselaw: "There is no additional requirement that, to apply the law constitutionally, the Government must prove some economic activity beyond the interstate movement of the weapon." ROA.112 (quoting *United States v. Seekins*, 2022 WL 3644185, at *2 (5th Cir. Aug. 24, 2022) (unpublished)).

The district court denied the motion, ROA.144, and Mr. Squire pleaded guilty to the single § 922(g)(1) count, ROA.165. Notably, the government-authored factual basis submitted in support of his plea made clear that all events related to the crime "occurred within the Eastern District of Louisiana" and further specified that the firearm was in Mr. Squire's home. ROA.166. The government's only proffered evidence connecting the offense to interstate commerce was that sometime "prior to [Mr. Squire's] possession," the firearm and ammunition "traveled in

interstate commerce" and "were manufactured outside the state." ROA.167.

The district court accepted Mr. Squire's plea and imposed a within-Guidelines sentence of 52 months, followed by three years of supervised release. ROA.200–06. Mr. Squire appealed, ROA.207–08, and a panel of this Court affirmed, noting that Commerce Clause challenges are foreclosed. *See United States v. Squire*, 177 F.4th 614 (5th Cir.), *reh'g en banc granted, opinion vacated*, 182 F.4th 481 (5th Cir. 2026). Mr. Squire filed a petition for rehearing en banc, which this Court granted. Mr. Squire now asks this Court to revisit and correct its precedent.

## SUMMARY OF THE ARGUMENT

18 U.S.C. § 922(g)(1) exceeds Congress's authority under the Commerce Clause, both facially and as applied to Curtis Squire's purely intrastate possession of a firearm. The federal government lacks a general police power, and the authority granted by the Commerce Clause does not extend to policing non-economic, purely local firearm possession based solely on the attenuated rationale that the firearm crossed a state line in the past.

The felon-in-possession prohibition—as it has been construed by this Court—is inconsistent with the well-established limits on the commerce power that the Supreme Court reaffirmed in *Lopez*. Mr. Squire's firearm possession, in his own home, was non-economic conduct; it had no substantial effect on interstate commerce; and Congress's rationale for criminalizing this conduct was crime control, not regulating commerce. Moreover, the statute's jurisdictional element—as construed by this Court—is insufficient to cure the statute's constitutional defects, as it fails to ensure that the regulated conduct falls within the scope of federal commerce authority.

*Lopez* and its progeny dictate this result. Yet, this Court has erroneously relied instead on *Scarborough* to uphold § 922(g)(1)'s constitutionality. But Circuit precedent misreads that case, which answered the *statutory* question of what Congress intended to regulate in § 922(g)(1)'s predecessor statute, not whether it was *constitutional* to do so. Sitting en banc, this Court should correct its precedent, apply *Lopez*, and hold that § 922(g)(1)'s possession prohibition is unconstitutional, both on its face and as applied to Mr. Squire.

Alternatively, as this Court revisits its precedent, it could apply the canon of constitutional avoidance to construe § 922(g)(1)'s commerce element as excluding purely intrastate firearm possessions that have no present connection to commerce. That interpretation is the better reading of the statute's plain text, applying the ordinary canons of statutory construction. And the predecessor statute examined in *Scarborough* was meaningfully different from the present law, such that the Supreme Court's interpretation in that case does not control. Section 922(g)(1), properly construed, does not reach Mr. Squire's conduct at all.

Finally, a ruling in Mr. Squire's favor, while important, would have limited legal and practical consequences. First, it would not upend

Commerce Clause jurisprudence. Rather, Mr. Squire asks only that this Court apply existing limits on the commerce power to the felon-in-possession prohibition, which is unconstitutional for the same reasons as the laws at issue in *Lopez* and *Morrison*. Second, as a practical matter, all fifty states already have their own versions of felon-in-possession prohibitions. Thus, the duplicative federal law criminalizes conduct that is already ably policed by local authorities and prosecuted in state courts.

At base, allowing the federal government to prosecute quintessentially local crime using its commerce power offends fundamental principles of enumerated powers and federalism. The Constitution does not grant the federal government the power to regulate local crime. That authority remains vested in the States. This Court's intervention is necessary to preserve that constitutional design.

## ARGUMENT

### I. Regulation of Mr. Squire's firearm possession falls outside the scope of Congress's commerce power.

#### *A. Under* Lopez *and* Morrison*, § 922(g)(1)'s possession prohibition is unconstitutional, both on its face and as applied in this case.*

Section 922(g)(1)'s possession prohibition exceeds Congress's commerce authority, and the law is unconstitutional, both on its face and applied to Mr. Squire. As interpreted by this Court, § 922(g)(1) broadly encompasses the possession of any firearm that at any point crossed a state line, no matter how remote. In Mr. Squire's case, that means the statute reaches his mere possession of a firearm within his own home. "So construed, it is difficult to see how § 922(g)(1) honors the principle of enumerated powers." *Bonner*, 159 F.4th at 341 (Willett, J., concurring). Regulating mere firearm possession—without any requirement of a present effect on commerce—exceeds the outer bounds of the commerce power that the Supreme Court set in *Lopez* and *Morrison*.

Because § 922(g)(1)'s possession prohibition does not fall under *Lopez* categories one and two, the statute can be sustained only if it is a proper exercise of Congress's commerce power pursuant to *Lopez*'s third category, which permits Congress to regulate activities that substantially

affect interstate commerce. *See id.* (Willett, J., concurring) ("Mere possession of a firearm fits uneasily within any of these categories," but "[t]he closest candidate might be 'activities that substantially affect interstate commerce[.]'").[3] Applying *Lopez* and its progeny, however, § 922(g)(1) fails that test.

In fact, this case closely tracks *Lopez*. Like in *Lopez*, the regulated conduct in § 922(g)(1)—firearm possession—is non-economic. *See Lopez*, 514 U.S. at 551, 561, 567; *Patton*, 451 F.3d at 624 ("In *Lopez*, the Court held that possession of firearms, in itself, is not commercial or economic."). That means Congress cannot regulate firearm possession under an "aggregate effect" on commerce theory. *Morrison*, 529 U.S. at 617; *Bonner*, 159 F.4th at 342 (Willett, J., concurring) ("[A]ggregation is ordinarily appropriate only when the underlying activity is economic—and firearm possession is not."). Indeed, the Supreme Court has squarely "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617. That rationale applies equally to the

[3] In *Lopez*, "the Court determined that the intrastate possession of a firearm, without more, could not be regulated as a channel or instrumentality of interstate commerce, or a person or thing in interstate commerce." *See United States v. Pierson*, 139 F.3d 501, 503 (5th Cir. 1998) (citing *Lopez*, 514 U.S. at 559–61).

"[non]-violent criminal conduct" at issue here: mere firearm possession.

There is no serious argument that Mr. Squire's purely intrastate firearm possession, in his own home, affected interstate commerce. According to the factual basis, all events relevant to his felon-in-possession offense "occurred within the Eastern District of Louisiana." ROA.166. The only purported connection to interstate commerce was that the firearm and ammunition that he possessed in his own home happened to have been "manufactured outside the state" and thus had—at some unknown point *prior* to Mr. Squire possessing them—"traveled in interstate commerce." ROA.167. But "[t]here's no record evidence that his possession of these items [had] any impact on any other state." *United States v. Seekins*, 52 F.4th 988, 990 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc). Nor is there "record evidence of any commercial transaction of any kind involving the [firearm or ammunition]—or even that [they] traveled across state lines at any particular moment in time." *Id.* In fact, "[i]t's hard to imagine a more local crime than this." *Id.* Thus, the statute is unconstitutional, at the very least, as applied to Mr. Squire.

Though this Court need go no further to resolve Mr. Squire's case,

§ 922(g)(1)'s possession prohibition is also unconstitutional on its face, at least as construed by this Court. Relying on *Scarborough*, this Court has interpreted § 922(g)(1)'s commerce element, in a possession case, to require only that the firearm crossed state lines at some point—nothing more. *See Fitzhugh*, 984 F.2d at 146; *see also* 5TH CIR. PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) § 2.43D (2024 ed.) (defining commerce element). But "[t]he mere fact that a felon possesses a firearm which was transported in interstate commerce years before the current possession cannot rationally be determined to have a 'substantial impact on interstate commerce' as of the time of current possession." *United States v. Kuban*, 94 F.3d 971, 978 (5th Cir. 1996) (DeMoss, J., dissenting in part).

In *Lopez*, the Supreme Court invalidated entirely 18 U.S.C. § 922(q)(1)(A) because it was not a proper exercise of the Commerce Clause authority—it did not regulate commercial activity, nor require a jurisdictional connection to interstate commerce. 514 U.S. at 551. Here, too, "the link between gun possession and a substantial effect on interstate commerce [is] attenuated" at best. *Morrison*, 529 U.S. at 612 (citing *Lopez*, 514 U.S. at 563–67). Thus, the statute's regulation of mere

firearm possession based solely on the firearm's past movement across state lines—without more—is unconstitutional.

Sustaining the federal regulation at issue here "would effectually obliterate the distinction between what is national and what is local," *Lopez*, 514 U.S. at 557 (quoting *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)), which is a distinction that "[t]he Constitution requires," *Morrison*, 529 U.S. at 617–18. "If it's enough that some object (or component of an object) at some unknown (and perhaps unknowable) point in time traveled across state lines to confer federal jurisdiction, it's hard to imagine anything that would remain outside the federal government's commerce power." *Seekins*, 52 F.4th at 990 (Ho, J., dissenting from denial of rehearing en banc); *see also United States v. Williamson*, 170 F.4th 435, 438 (5th Cir. 2026) (Willett, J., concurring) ("If mere possession sufficed, the Commerce Clause would quietly—but completely—confer the very general police power the Constitution withholds from Congress."). Thus, § 922(g)(1)'s possession prohibition "upsets the federal balance to a degree that renders it an unconstitutional assertion of the commerce power, and [judicial] intervention is required."

*Lopez*, 514 U.S. at 580 (Kennedy, J., concurring).[4]

*Raich*, too, confirms the foregoing analysis. There, the Court drew a constitutional distinction between the regulation of non-economic, criminal conduct—like unlawful firearm possession and gender-motivated violence—and the production, distribution, and consumption of commodities, like marijuana, which are "quintessentially economic" activities. *See Raich*, 545 U.S. at 25 ("Unlike those at issue in *Lopez* and *Morrison,* the activities regulated by the CSA are quintessentially economic."); *see also id.* at 25–26 ("'Economics' refers to the 'production, distribution, and consumption of commodities.'" (citation omitted)). But *Raich* does not stand for "the broad proposition" that "Congress is effectively entitled to regulate any intrastate activity involving a good when there is a larger interstate market for it." *United States v. Rodia*, 194 F.3d 465, 479 (3d Cir. 1999); *see also NFIB*, 567 U.S. at 556 ("An individual who bought a car two years ago and may buy another in the future is not 'active in the car market' in any pertinent sense."). That proposition would destroy the "distinction between what is truly national

[4] *See also Hoffman v. Hunt*, 126 F.3d 575, 586 (4th Cir. 1997) (recognizing that *Lopez*'s holding "was driven by a concern for maintaining a constitutionally appropriate federal-state balance of powers").

and what is truly local." *Morrison*, 529 U.S. at 617–18.

Additionally, § 922(g)(1)'s fatal constitutional defects cannot be remedied by Congressional findings that felons possessing firearms substantially affects interstate commerce. In enacting the statute, Congress primarily asserted that firearm possession by prohibited persons (like felons) threatened the safety of elected officials, the exercise of First Amendment rights, and the existence of the government itself—all findings patently related to civil disorder, not commerce. *See Bass*, 404 U.S. at 345 n.14 (citing 18 U.S.C. App. § 1201 (repealed 1986)). True, Congress also indicated the conduct posed "a burden on commerce or threat affecting the free flow of commerce." *Id.* But, under *Lopez* and *Morrison*, that finding is not a constitutionally legitimate basis for an exercise of the commerce power because it relies on "pil[ing] inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567.[5]

---

[5] Underscoring this point, Senator Long, the sponsor of the felon-in-possession prohibition, explicitly justified the amendment based on the perceived cost of crime:

> 'So Congress simply finds that the possession of these weapons by the wrong kind of people is either a burden on commerce or a threat that affects the free flow of commerce.

The reality is that, in enacting a federal felon-in-possession ban, Congress "was not particularly concerned with the impact on commerce except as a means to insure [the law's] constitutionality." *Scarborough*, 431 U.S. at 575 n.11. Instead, Congress was concerned with federalizing local crime that Congress believed the states were not adequately addressing: "State gun control laws," at the time, "were found 'inadequate to bar possession of firearms from those most likely to use them for unlawful purposes' . . . ." *Id.* (quoting 114 Cong. Rec. 14774 (1968)). Thus, § 922(g)(1) "is what the Government has always said it is: a regulation to further 'public safety' by preventing local gun crime." *United States v. Hemani*, 146 S. Ct. 1677, 1696 n.* (2026) (Thomas, J., concurring).

In this respect, too, this case is just like *Lopez* and *Morrison*, where the Court rejected the same "costs of crime" and "national productivity" arguments because "they would permit Congress to 'regulate not only all violent crime, but all activities that might lead to violent crime,

---

> 'You cannot do business in an area, and you certainly cannot do as much of it and do it as well as you would like, if in order to do business you have to go through a street where there are burglars, murderers, and arsonists armed to the teeth against innocent citizens. So the threat certainly affects the free flow of commerce.' 114 Cong. Rec. 13869.

*Bass*, 404 U.S. at 354 (Blackmun, J., dissenting) (internal citation original).

regardless of how tenuously they relate to interstate commerce.'" *Morrison*, 529 U.S. at 612–13 (quoting *Lopez*, 514 U.S. at 564). As the Court explained, that would be "unworkable if we are to maintain the Constitution's enumeration of powers." *Id.* at 615.

In any event, "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation." *Morrison*, 529 U.S. at 614. "[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Lopez*, 514 U.S. at 557 n. 2 (quotation and citation omitted). "Rather, '[w]hether particular operations affect interstate commerce sufficiently to come under the constitutional power of Congress to regulate them is ultimately a judicial rather than a legislative question, and can be settled finally only by this Court.'" *Morrison*, 529 U.S. at 614 (quoting *Lopez*, 514 U.S. at 557 n. 2). Here, Congress's findings are undoubtedly insufficient. Indeed, they rely on a "method of reasoning" the Supreme Court "already rejected"—twice. *Morrison*, 529 U.S. at 615.

Finally, § 922(g)(1)'s jurisdictional element does not save the statute—at least as that element has been construed by this Court. "A

jurisdictional element . . . refers to a provision in a federal statute that requires the government to establish specific facts justifying the exercise of federal jurisdiction in connection with any individual application of the statute." *Rodia*, 194 F.3d at 471 (citations omitted). "Such a jurisdictional element *may* establish that the enactment is in pursuance of Congress' regulation of interstate commerce." *Morrison*, 529 U.S. at 612 (emphasis added). But "[t]he mere presence of a jurisdictional element . . . does not in and of itself insulate a statute from judicial scrutiny under the Commerce Clause, or render it *per se* constitutional." *United States v. Bishop*, 66 F.3d 569, 585 (3d Cir. 1995), *as amended* (Sept. 29, 1995). In other words, a jurisdictional element "is not . . . a talisman that wards off constitutional challenges." *Patton*, 451 F.3d at 632. "To the contrary, courts must inquire further to determine whether the jurisdictional element has the requisite nexus with interstate commerce." *Bishop*, 66 F.3d at 585. Were the mere presence of *any* jurisdictional-styled element enough, there would be no "*judicially enforceable* outer limits" on the commerce power. *See Lopez*, 514 U.S. at 566 (emphasis added).

Thus, "[a] jurisdictional element is only sufficient to ensure a statute's constitutionality when the element . . . ensures that the

intrastate activity to be regulated falls within one of the three categories of congressional power." *Rodia*, 194 F.3d at 473. Section 922(g)(1)'s jurisdictional element fails that test. This Court has held that § 922(g)(1) requires only that the subject firearm crossed a state line at some point in the past—no matter how remote or attenuated from the prohibited possession. *See, e.g.*, *Rawls*, 85 F.3d at 243. Under this reading, "the interstate component underpinning the jurisdictional element" (past movement of the firearm) "is attenuated from the criminal conduct" regulated by the statute (present-day mere possession), "which occurs entirely locally." *See United States v. Holston*, 343 F.3d 83, 89 (2d Cir. 2003). As a result, § 922(g)(1)'s jurisdictional element is "so sweeping as to be unhelpful in determining whether the activities regulated by the statute have a substantial and non-attenuated effect on interstate commerce." *Patton*, 451 F.3d at 633.

Accordingly, § 922(g)(1) is unconstitutional as applied to Mr. Squire's possession of a firearm in his own home. The provision, as construed by this Court, is also unconstitutional on its face because it regulates gun possession without a requirement that the possession

affect interstate commerce. That regulation exceeds the scope of Congress's commerce power.

### *B. This Court's precedent misapplies* Scarborough *and is irreconcilable with the* Lopez *framework.*

Until now, § 922(g)(1) has been insulated from constitutional scrutiny under the *Lopez* framework by Circuit precedent—namely, *United States v. Rawls*, 85 F.3d 240—erroneously holding that *Scarborough* already resolved § 922(g)(1)'s constitutionality under the Commerce Clause. This Court's precedent is wrong—and has been the subject of immense criticism.[6] Sitting en banc, this Court should now overturn that precedent. This Court's previous reliance on *Scarborough* to resolve constitutional challenges to § 922(g)(1) under the Commerce Clause is "erroneous for at least two reasons." *Seekins*, 52 F.4th at 991 (Ho, J., dissenting from denial of rehearing en banc).

"First, the Court's holding in *Scarborough* was statutory, not

[6] *See, e.g.*, *Alderman*, 131 S. Ct. 700 (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari); *Bonner*, 159 F.4th at 342–43 (Willett, J., joined by Duncan, J., concurring); *Seekins*, 52 F.4th at 991 (Ho, J., joined by Smith and Engelhardt, JJ., dissenting from denial of rehearing en banc); *Kuban*, 94 F.3d at 976-77 (DeMoss, J., dissenting in part); *see also United States v. Hill*, 927 F.3d 188, 215 n. 10 (4th Cir. 2019) (Agee, J., dissenting); *United States v. Alderman*, 565 F.3d 641, 648–650 (9th Cir. 2009) (Paez, J., dissenting); *Patton*, 451 F.3d at 636 (acknowledging the "considerable tension").

constitutional." *Id.* (citations omitted). Accordingly, the Court's analysis was limited to interpreting the *statutory meaning*—not the constitutional validity—of § 922(g)(1)'s predecessor statute. After examining the law's legislative history and structure, the Court determined that Congress intended to criminalize the mere possession of any firearm that had, at any point, moved in interstate commerce (i.e., crossed state lines) and, as a result, determined that the statute's text did not require any proof that the possession had an actual effect (substantial or not) on interstate commerce. *See Scarborough*, 431 U.S. at 564 (holding that "proof that the possessed firearm previously traveled in interstate commerce is sufficient to satisfy the *statutorily required nexus* between the possession of a firearm by a convicted felon and commerce" (emphasis added)).

But *Scarborough* said nothing about the Constitution: "No party alleged that the statute exceeded Congress' authority, and the Court did not hold that the statute was constitutional." *Alderman*, 131 S. Ct. at 701 (Thomas, J., dissenting from denial of certiorari).[7] As a result, *Scarborough* did not involve, nor did the Court address, the question of

---

[7] *See also Bonner*, 159 F.4th at 342 (Willett, J., concurring) ("Yet a decision like *Scarborough*—in which the Commerce Clause 'was not at issue, and was not so much as mentioned in the opinion'—is 'scant authority' on the meaning of that Clause." (citations omitted)).

whether such a broad law was *constitutionally permissible* under enumerated powers' principles, i.e., whether it exceeded Congress's authority under the Commerce Clause. That alone requires setting *Rawls* aside and analyzing the still-unresolved question of whether § 922(g)(1) is in fact a constitutional exercise of congressional authority.

Second, *Rawls* cannot stand because its reading of *Scarborough* places that decision in direct conflict with modern (and now-controlling) Commerce Clause jurisprudence. "*Scarborough* pre-dates *Lopez*, where the Court cabined the constitutional power of the federal government under the Commerce Clause." *Seekins*, 52 F.4th at 991 (Ho, J., dissenting from denial of rehearing en banc). But this Court's treatment of *Scarborough* as interpreting the breadth of the *commerce power* (rather than just the meaning of the statutory text that was before the Court) grants the federal government near unlimited power to regulate the affairs of American citizens—which *Lopez* made clear is not constitutionally tolerable. *Alderman*, 131 S. Ct. at 702–03 (Thomas, J., dissenting from denial of certiorari) ("[T]he lower courts' reading of *Scarborough*, by trumping the *Lopez* framework, could very well remove any limit on the commerce power.").

Thus, this Court should set *Rawls* aside, apply the modern *Lopez* framework to § 922(g)(1), and hold that the statute exceeds Congress's power under the Commerce Clause, at least as applied to Mr. Squire.

## II. Alternatively, this Court may apply the canon of constitutional avoidance and construe § 922(g)(1)'s commerce element to conform with *Lopez*.

If *Scarborough* governs interpretation of § 922(g)(1)'s possession prohibition (as this Court previously has held), then the statute exceeds Congress's authority under the Commerce Clause, both on its face and as applied. Should this Court wish to avoid the constitutional problem, the ordinary rules of statutory construction—including the canon of constitutional avoidance—supply an alternative path forward. *See Jones v. United States*, 529 U.S. 848, 857–58 (2000) (construing federal arson statute, 18 U.S.C. § 844(i), as not reaching arson of a private residence to avoid constructional problem under *Lopez*). Indeed, contrary to this Court's precedent, a narrower construction is not merely plausible; it is the better reading of the statute.

"'[I]t is a cardinal principle' of statutory interpretation . . . that when an Act of Congress raises 'a serious doubt' as to its constitutionality, 'this Court will first ascertain whether a construction of the statute is

fairly possible by which the question may be avoided.'" *Zadvydas v. Davis*, 533 U.S. 678, 589 (2001) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). As explained above, this Court's prior interpretation of § 922(g)(1)'s commerce element renders the law unconstitutional. *See supra* Part I. To avoid that outcome, this Court could instead construe the statute as requiring something more, i.e., that the firearm possession itself have a substantial and present effect on interstate commerce—not merely that the firearm previously moved across state lines at some point in time. So construed, the statute would not reach Mr. Squire's conduct in this case, because such a nexus is absent.

Although this Court previously held that *Scarborough* controls interpretation of § 922(g)(1)'s commerce element, *see Fitzhugh*, 984 F.2d at 145–46, that is not so. As Judge DeMoss observed, *Scarborough* concerned the since repealed § 1202(a), and the Supreme Court has never considered whether the same interpretation governs the current statute, § 922(g)(1). *See Kuban*, 94 F.3d at 976 (DeMoss, J., dissenting in part). Accordingly, *Scarborough* does not "directly control[]" its interpretation. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). This Court, sitting in banc, is therefore free to reconsider its

precedent and correctly construe § 922(g)(1).

The best reading of § 922(g)(1)'s possession provision is that it requires a greater nexus to interstate commerce than its predecessor. There are "critically important" differences "between the current statute (§ 922(g)(1)) under which [Mr. Squire] was indicted and the old statute (18 U.S.C. App. § 1202(a)(1)) which was construed in *Scarborough*." *Kuban*, 94 F.3d at 977 (DeMoss, J., dissenting in part). Section 1202(a) contained three criminal acts and one interstate commerce element, and it employed a single verb tense, i.e., "receives, possesses or transports in commerce or affecting commerce ... any firearm." *See id.* at 976 (quoting § 1202(a)). Section 922(g)(1), by contrast, "is structurally different." *Id.* at 977. It contains the same three acts (possess, receive, and transport/ship), but the language was changed to provide each of those acts with its own jurisdictional nexus.

Specifically, the statute provides that it shall be unlawful for a felon:

> [1] to **ship or transport** *in* interstate or foreign commerce,
>
> [2] or **possess** *in or affecting* commerce, any firearm or ammunition;
>
> [3] or to **receive** any firearm or ammunition *which has been shipped or transported* in interstate or foreign commerce.

Congress thus revised § 922(g)(1) to treat the jurisdictional nexus for possession offenses differently than the jurisdictional nexus for receipt offenses in two respects.

First, the text attaches the jurisdictional nexus to the *regulated act* (the possession), not to the object (the firearm): The adverbial phrase "in or affecting commerce" modifies the verb "possess," not the noun "any firearm." Thus, the substantial effect on commerce must be linked to the *possession itself*, not the firearm. By contrast, the next clause provides that a prohibited person may not receive a "firearm, *which has been shipped or transported* in interstate or foreign commerce." § 922(g) (emphasis added). Thus, for *receipt* offenses, the jurisdictional nexus attaches to the *firearm* and whether the firearm received by the felon previously traveled in interstate commerce.

Second, the possession offense is phrased in the present tense: The statute uses the verb "possess" and the modifier "in or affecting commerce"—both in the present tense. Thus, the substantial effect on commerce must be *present*, that is, contemporaneous with the possession and not at some attenuated time in the past. Unlike the possession provision, the *receipt* prohibition logically uses the present perfect tense,

meaning, the statute requires that the firearm passed through interstate commerce *in the past*, i.e., before the prohibited person received it.[8]

True, the defendant in *Scarborough* similarly argued that § 922(g)(1)'s precursor statute "proscribes 'only crimes with a present connection to commerce.'" 431 U.S. at 568. Importantly, though, he did so by contrasting differing verb usage in—what was at the time—two entirely different statutes, not the same statutory provision. Specifically, the defendant relied on a comparison between use of the present-tense in the possession provision at issue there (enacted in Title VII of the OCCA), versus use of the present perfect tense for the receipt provision in an entirely different law (the Gun Control Act ("GCA")). *Id.*[9] The Court determined that the two statutes could not be read together to supply meaning to one another because they were enacted separately—the receipt provision was "carefully constructed" and its verb tenses

[8] "The present-perfect tense . . . simultaneously 'involves reference to both past and present." *Hewitt v. United States*, 606 U.S. 419, 427–28 (2025) (citation omitted). It "conveys to a listener that the event in question"—though it occurred in the past—"continues to be true or valid." *Id.* at 429.

[9] The receipt provision was originally enacted as part of *Title IV* of the OCCA, which was not part of the "last-minute amendment" that was *Title VII*. While Title IV's provisions were re-enacted later as part of the GCA, Title VII—with its unique felon-in-possession prohibition—was *not* included in the GCA and therefore remained a separate statute. For clarity, "Title IV" is referred to in the accompanying text as the "GCA."

were "chosen with care," while Title VII's independent possession prohibition was a "last-minute amendment," and its language was "ambiguous at best." *Id.* at 569–70.

That reasoning does not apply to § 922(g)(1). In 1986, Congress repealed both the GCA's and Title VII's provisions and re-enacted them as a single provision, the current § 922(g). And, notably, in the law's new form, Congress included transport, receipt, and possession in one provision, but used different verb tenses and attached the jurisdictional nexus for each offense to different acts or objects. *See United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes."). "When Congress amends legislation, courts must presume it intends the change to have real and substantial effect." *Ross v. Blake*, 578 U.S. 632, 641–42 (2016) (cleaned up).

Applying the rules of statutory construction, the textual differences within this single statutory provision now support a different statutory meaning. "First, the Court will avoid a reading which renders some words altogether redundant." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995). Here, to give effect to *all* of § 922(g)'s terms and avoid redundancy, the phrase "possess in or affecting interstate commerce" must—in contrast

to *Scarborough*'s interpretation of the prior text—require more than the minimal nexus that the firearm traveled in interstate commerce at some point in the past. As Judge DeMoss explained: "If the government is correct that all it takes to get a conviction under § 922(g)(1) is to show that a felon possessed a firearm which *at some time in past history* was shipped in interstate commerce," then the receipt and transport provisions "are rendered surplusage and meaningless." *Kuban*, 94 F.3d at 979 (DeMoss, J., dissenting in part) (emphasis added).

Further, "[w]here Congress includes particular language in one section of a statute but omits it in another," courts "generally presume[] that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). Here, "[i]n putting together § 922(g), Congress could easily have inserted the phrase 'at any time'. . . as it did in § 922(k)," *Kuban*, 94 F.3d at 977 (DeMoss, J., dissenting in part), which refers to a firearm that "has, *at any time*, been shipped or transported in interstate or foreign commerce," 18 U.S.C. § 922(k) (emphasis added). The absence of such language in § 922(g)'s possession prohibition further supports a reading that requires "clear and unambiguous connections with

interstate commerce." *Kuban*, 94 F.3d at 977 (DeMoss, J., dissenting in part); *see also Hewitt*, 606 U.S. at 430 (finding that use of different verb tenses in "adjacent provisions" suggests that the tense "is meaningful").

In sum, *Scarborough* does not control the interpretation of § 922(g)(1). Consistent with *Lopez* and the statute's plain text, this Court should adopt a construction of § 922(g)(1) that avoids serious constitutional doubt and hold that the statute requires that the possession of the firearm have a present substantial effect on interstate commerce. That reading requires reversal of Mr. Squire's conviction, because his purely intrastate and non-economic possession of a firearm in his home did not have a substantial impact on interstate commerce and cannot satisfy the commerce element of § 922(g)(1), as properly construed.

## III. The question before this Court is important but narrow—limited in both its legal and practical impact.

Finally, the dissent to this Court's order granting rehearing en banc raised concerns about the broader impacts that a holding for Mr. Squire might have on Commerce Clause jurisprudence and statutes that rely on that power, as well as the public safety effects of limiting § 922(g)(1). *See United States v. Squire*, 182 F.4th 481, 482 (5th Cir. 2026) (Higginson, J.,

dissenting from the order granting rehearing en banc). Notably, though, both the legal and practical impacts of this case—though important—are limited.

*A. The legal impact of this case is limited.*

First, application of the *Lopez* and *Morrison* frameworks to § 922(g)(1) would not represent a sea change in Commerce Clause jurisprudence. Section 922(g)(1)'s possession prohibition is unconstitutional because firearm possession is not an economic activity and because the statute's jurisdictional element does not require that the regulated act (the possession itself) have any effect on interstate commerce. Upholding a law like this "would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States" and would be inconsistent with the notion of enumerated powers. *Lopez*, 514 U.S. at 567.

That is not the case for other federal laws enacted pursuant to the commerce power. The "three broad categories of activity that Congress may regulate under its commerce power" are broad indeed—and nothing about this case threatens that proposition. *Id.* at 558–59. Of course, regulations pertaining to the channels or instrumentalities of interstate

commerce continue to fit within *Lopez* categories one and two, which are not implicated by this case. And, as to the third commerce category, *Lopez* explicitly re-affirmed that "[w]here economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Id.* at 560. Under this test, *Lopez* noted, "a wide variety of congressional Acts regulating intrastate economic activity" have been upheld, including, for example, "the regulation of intrastate coal mining; intrastate extortionate credit transactions, restaurants utilizing substantial interstate supplies, inns and hotels catering to interstate guests, and production and consumption of homegrown wheat." *Id.* at 559–60 (internal citations omitted). *Lopez* did not threaten those regulations, and neither does this case. Indeed, *Lopez* itself—which, like this case, concerned firearm possession—did not set off a domino effect throughout the U.S. Code.

Nor is this case about whether the federal government has the power to enact *any* gun control measures. Instead, it concerns only whether § 922(g)(1)'s isolated possession provision exceeds the commerce power's reach, at least as applied to Mr. Squire. Mr. Squire is not challenging, for instance, the shipment, transportation, and receipt

provisions of § 922(g)(1).

Thus, this case calls for a scalpel, not a sledgehammer. And judicial willingness to employ that scalpel when appropriate is paramount if the Commerce Clause is to have meaningful limits. Enforcement of these limits is not a denial of the commerce power's broad scope—just a recognition that it is not infinite. *See, e.g.*, *Lopez*, 514 U.S. at 556-57. Of course, if other litigants seek to expand a narrow holding in this case to contract the commerce power beyond what the Constitution compels, this Court can reject those challenges as they arise. But apprehension about contraction at one end of the Commerce Clause spectrum does not justify unmitigated expansion at the other.

### *B. The day-to-day realities of § 922(g)(1)'s enforcement illustrate the limited practical impact of a holding for Mr. Squire.*

The dissent also expressed policy concerns about limiting § 922(g)(1)'s possession prohibition. *Squire*, 182 F.4th at 483. But an examination of day-to-day enforcement of felon-in-possession laws suggests that the frequency with which federal prosecutors charge this provision does not mirror its practical importance.

First, limiting the *federal* prohibition on felons possessing firearms will not render that activity broadly legal in this Circuit or anywhere else.

Louisiana, Mississippi, and Texas all have their own versions of felon-in-possession prohibitions.[10] So do the remaining 47 states and the District Columbia, as well as every U.S. territory.[11] This Court ruling in favor of Mr. Squire would not change that. Thus, the question presented is not whether felons can be criminally prosecuted for possessing firearms, just as the question in *Lopez* was not whether people can be criminally prosecuted for possessing firearms in school zones. The question is whether the commerce power authorizes § 922(g)(1)'s duplicative federal prohibition of this hyper-local, non-economic conduct.[12]

Nor would this Court's recognition of limitations on § 922(g)(1)'s possession prohibition permit felons to travel across state lines to unlawfully purchase and transport firearms in this Circuit. *See Squire*, 182 F.4th at 483. In addition to state laws prohibiting this conduct, § 922(g)(1) independently prohibits felons from shipping or transporting firearms in interstate commerce. Those prohibitions are not at issue here.

The number of § 922(g)(1) cases brought annually may color

---

[10] La. R.S. § 14:95.1; Miss. Code § 97-37-5(1); Tex. Penal Code § 46.04(a).

[11] *See* Love & Johnson, *supra* note 1, at 3, 10.

[12] Notably, in *Lopez*, state authorities initially arrested and charged the defendant under Texas's own law prohibiting firearm possession on school premises, only to dismiss the charge after federal prosecutors brought the same charge under the redundant federal law. 514 U.S. at 551.

practical concerns about limiting its reach. True, that offense represents "a significant part of the federal docket." Jacob D. Charles & Brandon L. Garrett, *The Trajectory of Federal Gun Crimes*, 170 U. PA. L. REV. 637 (2022).[13] But this was not always the case: Felon-in-possession cases represented "a negligible slice of the federal criminal docket in the 1980s," with the share growing steadily in the decades since. Jonathan Abel, *Going Federal, Staying Stateside: Felons, Firearms, and the "Federalization" of Crime*, 73 AM. U. L. REV. 585, 587 (2024).[14]

In the Eastern District of Louisiana, this trend is particularly

---

[13] According to Sentencing Commission data, in fiscal year 2025, 12.1% of federal defendants were sentenced for a firearm-related offense—behind only immigration (37.7%) and drug offenses (24.5%). *See* U.S. Sentencing Comm'n, "Interactive Data Analyzer" (FY 2025), *available* https://ida.ussc.gov/analytics/saw.dll?Dashboard. Almost all of those offenses involved § 922(g), and almost all § 922(g) offenses (about 89%) were based on a prior felony conviction. *See* U.S. Sentencing Comm'n, "Quick Facts: 18 U.S.C. § 922(g) Firearm Offenses" (FY 2025), *available* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Section_922g_FY25.pdf; *see also* Charles & Garrett, *supra*, at 676–77 ("Despite the welter of different firearms statutes . . ., what particularly stands out is that the most common charge, accounting for nearly two-thirds of cases, is the bread and butter felon-in-possession statute. Indeed, for the past decade, just two charges—922(g) (possession by prohibited persons) and 924(c) (furtherance of violent/drug trafficking crimes)—alone have accounted for more than 80% of all federal firearm charges[.]").

[14] *See also* Charles & Garrett, *supra*, at 675-76; David E. Patton, *Criminal Justice Reform and Guns: The Irresistible Movement Meets the Immovable Object*, 69 EMORY L.J. 1011 (2020) ("Three decades ago, federal prosecutors began to fundamentally change the nature of their work. They shifted focus from crimes with obvious interstate connections to crimes that were once thought of as purely local.").

pronounced, with § 922(g) prosecutions comprising 33% of criminal cases—the fifth highest share in the country.[15] But a closer look at those prosecutions reveals key features suggesting that these number are not necessarily indicative of the statute's importance.

In 2024—the year that Mr. Squire was indicted—approximately 86 defendants in the Eastern District of Louisiana were charged with § 922(g)(1) violations.[16] Notably, in most of those cases (approximately 60%), the § 922(g)(1) charge was ancillary to other charges, meaning, those defendants still could have been charged in federal court absent § 922(g)(1). Most commonly, those defendants were charged with non-violent drug distribution offenses, as well as for violating 18 U.S.C. § 924(c), the separate federal statute that criminalizes (and harshly punishes) possessing a firearm in furtherance of drug trafficking.[17] A

---

[15] *See* U.S. Sentencing Comm'n, "Quick Facts," *supra* note 13, at 1.

[16] PACER's "Reports" function returns 78 cases involving and 87 total defendants charged with violating 18 U.S.C. § 922(g) in the Eastern District of Louisiana between January 1, 2024, and December 31, 2024. Three of those defendants were charged with § 922 subdivisions other than (g)(1) and are therefore excluded from this discussion. A separate, manual search of all § 922(g)(1) cases revealed that two such defendants appear to be erroneously excluded from PACER's search results but are included in the numbers discussed herein. *See United States v. Troy Stukes* & *United States v. Roderick Hall*, 24-cr-012 (Jan. 25, 2024). That indicates the total number of § 922(g)(1) defendants charged in 2024 was 86.

[17] *See, e.g.*, *United States v. Byron Williams*, 24-cr-006 (E.D. La. Jan. 11, 2024); *United States v. Troy Stukes*, 24-cr-012 (E.D. La. Jan. 25, 2024); *United States v. Rydell Lewis*, 24-cr-019 (E.D. La. Feb. 2, 2024); *United States v. Percy Depron*, 24-cr-

handful were also charged with crimes of violence.[18] Those statutes remain available to federal prosecutors, regardless of this case's outcome.

By contrast, Mr. Squire falls within the remaining, approximately 40% of § 922(g)(1) defendants in the Eastern District of Louisiana: Those charged with merely possessing a firearm and nothing more.[19] Notably,

---

025 (E.D. La. Feb. 8, 2024); *United States v. Terrell Kelley*, 24-cr-034 (E.D. La. Feb. 23, 2024); *United States v. Mali Williams*, 24-cr-043 (E.D. La. Mar. 8, 2024); *United States v. Odine Dominick*, 24-cr-044 (E.D. La. Mar. 8, 2024); *United States v. David Foster*, 24-cr-063 (E.D. La. Mar. 22, 2024); *United States v. Jenard Walton*, 24-cr-066 (E.D. La. Mar. 28, 2024); *United States v. Kindell Walker*, 24-cr-085 (E.D. La. Apr. 11, 2024)); *United States v. Donte Williams*, 24-cr-103 (E.D. La. May 3, 2024); *United States v. Terry Reed*, 24-cr-113 (E.D. La. May 9, 2024); *United States v. Spencer Howard*, 24-cr-118 (E.D. La. May 17, 2024); *United States v. Shane Bolden*, 24-cr-122 (E.D. La. May 23, 2024); *United States v. Johnnie Hagans*, 24-cr-131 (E.D. La. May 30, 2024); *United States v. Charles Ray Keys*, 24-cr-137 (E.D. La. Jun. 14, 2024); *United States v. Abe Jyles*, 24-cr-139 (E.D. La. Jun. 14, 2024); *United States v. Brandon Turner*, 24-cr-140 (E.D. La. Jun 14, 2024); *United States v. Darick Wallace*, 24-cr-146 (E.D. La. Jun. 21, 2024); *United States v. Kawaiishh Brown*, 24-cr-156 (E.D. La. Jun. 28, 2024); *United States v. Yaswanta Lawson*, 24-cr-159 (E.D. La. Jul. 11, 2024); *United States v. DJohn Bryant*, 24-cr-168 (E.D. La. Jul. 19. 2024); *United States v. Romalis Williams*, 24-cr-170 (E.D. La. Jul. 26, 2024); *United States v. Javonta Doleman*, 24-cr-243 (E.D. La. Nov. 1, 2024); *United States v. Kernelius Alford*, 24-cr-245 (E.D. La. Nov. 15, 2024); *United States v. Darnell Doucet*, 24-cr-252 (E.D. La. Dec. 5, 2024); *United States v. Earl Henry, Jr.*, 24-cr-224 (E.D. La. Oct. 4, 2024); *United States v. Jordan Hollerman*, 24-cr-229 (E.D. La. Oct. 10, 2024); *United States v. Melcolm Dolliole*, 24-cr-215 (E.D. La. Sept. 26, 2024); *United States v. Daniel Kelly*, 24-cr-202 (E.D. La. Aug. 29, 2024).

[18] *See, e.g.*, *United States v. Jovante Matthews*, 24-cr-114 (E.D. La. May 9, 2024); *United States v. Richard Carr*, 24-cr-180 (E.D. La. Aug. 8, 2024); *United States v. Mederick Scott*, 24-cr-049 (E.D. La. Mar. 14, 2024).

[19] PACER indicates that there were approximately 32 such defendants in 2024 (out of the approximately 86 defendants total). *See United States v. Finney Riley*, 24-cr-004 (E.D. La. Jan. 11, 2024); *United States v. Darron Blue*, 24-cr-008 (E.D. La. Jan. 19, 2024); *United States v. Roderick Hall*, 24-cr-012 (E.D. La. Jan. 25, 2024); *United States v. Kevin Laday*, 24-cr-012 (E.D. La. Jan. 25, 2024); *United States v. Jamaur Johnson*, 24-cr-012 (E.D. La. Jan. 25, 2024); *United States v. Miguel Keelen*, 24-cr-038 (E.D. La. Mar. 8, 2024); *United States v. Curtis Squire*, 24-cr-041 (E.D. La. Mar.

the vast majority of these stand-alone § 922(g)(1) cases share a common characteristic: They began as *state* investigations and arrests. Referred to in the district as "federal adoption," most stand-alone § 922(g)(1) cases were first charged in state court before federal prosecutors moved them to federal court to charge the same crime.[20] There was nothing uniquely federal about those offenses. To the contrary, these were state crimes,

---

8, 2024); *United States v. Paul Wilson*, 24-cr-042 (E.D. La. Mar. 8, 2024); *United States v. Elijah Martin*, 24-cr-054 (E.D. La. Mar. 22, 2024); *United States v. Kenneth Jackson*, 24-cr-066 (E.D. La. Mar. 28, 2024); *United States v. Leo Tate*, 24-cr-066 (E.D. La. Apr. 25, 2024); *United States v. Brian Ward*, 24-cr-068 (E.D. La. Mar. 28, 2024); *United States v. LaMichael Jackson*, 24-cr-076 (E.D. La. Apr. 5, 2024); *United States v. John Jones*, 24-cr-077 (E.D. La. Apr. 5, 2024); *United States v. Travis Jordan*, 24-cr-083 (E.D. La. Apr. 11, 2024); *United States v. Kevin Sturgis*, 24-cr-086 (E.D. La. Apr. 11, 2024); *United States v. Kyle Conerly*, 24-cr-086 (E.D. La. Apr. 11, 2024); *United States v. Julius Aguillard*, 24-cr-090 (E.D. La. Apr. 19, 2024); *United States v. Michael Celestine*, 24-cr-092 (E.D. La. Apr. 19, 2024); *United States v. Clifton Hill*, 24-cr-097 (E.D. La. Apr. 25, 2024); *United States v. Darnell Lee*, 24-cr-111 (E.D. La. May 9, 2024); *United States v. Jarrett Hall*, 24-cr-120 (E.D. La. May 23, 2024); *United States v. Wardell Fletcher*, 24-cr-130 (E.D. La. May 30, 2024); *United States v. Anthony Kenner*, 24-cr-147 (E.D. La. Jun. 21, 2024); *United States v. Denzel Lee*, 24-cr-167 (E.D. La. Jul. 19, 2024); *United States v. Teddy Allen*, 24-cr-175 (E.D. La. Aug. 1, 2024); *United States v. Shaquille Jackson*, 24-cr-178 (E.D. La. Aug. 1, 2024); *United States v. Otravious Romel Harris, Sr.*, 24-cr-187 (E.D. La. Aug. 14, 2024); *United States v. Darren Foley*, 24-cr-198 (E.D. La. Aug. 23, 2024); *United States v. Phillip Jenkins*, 24-cr-203 (E.D. La. Aug. 29, 2024); *United States v. Johnny Wells*, 24-cr-206 (E.D. La. Sept. 6, 2024); *United States v. Darryl Davis*, 24-cr-237 (E.D. La. Oct. 24, 2024).

[20] *See, e.g.*, Orleans Parish Crim. Case Nos. C-560206 (Darron Blue), C-560792 (Miguel Keelen), M-610093 (Curtis Squire), C-561100 (Brian Ward), M-609543 (LaMichael Jackson), M-609914 (Travis Jordan), C-561061 & M-603124 (Julius Augillard); C-559340 (Michael Celestine), C-560748 (Clifton Hill), C-560643 (Darnell Lee), C-562438 (Wardell Fletcher), C-562235 (Denzel Lee), C-562428 (Teddy Allen), C-555267 & C-562512 (Darren Foley), M-613067 (Phillip Jenkins), C-552778 (Johnny Wells); Jefferson Parish Crim. Case Nos. 24-02386 (Shaquille Jackson), 24-00453 (John Jones); St. Charles Parish Crim. Case No. 2024-CR-000078 (Anthony Kenner).

state investigations, and state prosecutions at their inception—cases that would have existed regardless of duplicative federal jurisdiction.

Court filings reflect this reality, describing local law enforcement policing local criminal conduct.[21] Not surprisingly given the nature of the offense itself, stand-alone felon-in-possession cases commonly begin as run-of-the-mill traffic or *Terry* stops conducted by state law enforcement during routine patrols—the heartland of local police work. Or, as in Mr. Squire's case, the offense is discovered through search warrants secured in state court and executed by local police investigating another local crime. A small number of state felon-in-possession cases are then

[21] *See, e.g.*, *Finney Riley*, 24-cr-004, Dkt. 22 (St. Tammany Parish Sheriff's Office search warrant obtained as part of state investigation of shooting); *Darron Blue*, 24-cr-008, Dkt. 23 (NOPD search warrant obtained as part of state investigation of shooting); *Miguel Keelen*, 24-cr-038, Dkt. 29 (NOPD real-time crime camera surveillance and *Terry* stop); *Brian Ward*, 24-cr-068, Dkt. 28 (NOPD search incident to arrest for fighting in the French Quarter); *LaMichael Jackson*, 24-cr-076, Dkt. 28 (NOPD officers on patrol); *Travis Jordan*, 24-cr-083, Dkt. 26 (NOPD response to 911 call about man making threats at local bar); *Julius Augillard*, 24-cr-090, Dkt. 30 (New Orleans Housing Authority police search incident to arrest for trespassing during routine building check); *Clifton Hill*, 24-cr-097, Dkt. 66 (NOPD *Terry* stop during patrol of Bourbon Street); *Darnell Lee*, 24-cr-111, Dkt. 24 (same); *Jarrett Hall*, 24-cr-120, Dkt. 50 (Plaquemines Parish Sheriff's Office traffic stop for window tint violation and crossing onto shoulder); *Wardell Fletcher*, 24-cr-130, Dkt. 28 (NOPD search warrant obtained as part of state shooting investigation); *Denzel Lee*, 24-cr-167, Dkt. 54 (NOPD *Terry* stop by officers on patrol at a Cinco de Mayo block party); *Teddy Allen*, 24-cr-175, Dkt. 52 (NOPD traffic stop for expired registration); *Otravious Romel Harris, Sr.*, 24-cr-187, Dkt. 21 (Washington Parish Sheriff's Office traffic stop for crossing fog line).

adopted by federal prosecutors.[22] After federal adoption, any proceedings that already occurred in state court must begin anew.

In other words, it is not just the federal government's *jurisdiction* that is duplicative in this context. Many of the prosecutions themselves are as well. And the reality in the Eastern District of Louisiana suggests that, not only is the State of Louisiana perfectly capable of investigating and enforcing its own felon-in-possession statute, Louisiana is already doing the work anyway. Indeed, in 2024 (the same year federal prosecutors charged approximately 86 felon-in-possession cases), the NOPD alone—just one of many state law enforcement agencies operating across the 13 parishes in the Eastern District of Louisiana—made at least 414 arrests for illegal firearm possession and seized 2,204 firearms during the course of its investigations.[23] In other words: States, with

---

[22] *See* Charles & Garrett, *supra*, at 694 (describing federal adoption as occurring "sporadically and haphazardly," with prosecutors having "nearly unlimited discretion to choose which gun cases to take federal, resulting in a system of wide disparity"); Abel, *supra*, at 654 (in one case study, finding that only 4% of eligible state firearm cases were adopted).

[23] *See* "NOPD Announces Preliminary Crime Statistics for December 22-28, 2024," New Orleans Police Dept. (Dec. 30, 2024), *available* https://nopdnews.com/post/december-2024/nopd-announces-preliminary-crime-statistics-fo-(3); "NOPD Announces Preliminary Crime Statistics for December 29, 2024-January 4, 2025," New Orleans Police Dept. (Jan 6, 2025), *available* https://nopdnews.com/post/january-2025/nopd-announces-preliminary-crime-statistics-for-de.

their robust police power, are the ones actually discovering, investigating, and charging felon-in-possession offenses—not the federal government—further underscoring that this is a fundamentally local crime.

The Eastern District of Louisiana is not alone in its heavy reliance on state felon-in-possession cases. Researchers have noted a recent "'explosion' of cases with state-court origins," most prominently, felon-in-possession prosecutions.[24] As one scholar put it, "no offense captures the federalization story better than the crime of being a felon in possession of a firearm"—a development that has been the subject of immense criticism.[25] And, as criminal justice scholars and researchers have pointed out, there is good reason to question the efficacy of this practice.[26]

---

[24] Abel, *supra*, at 587 (quoting Wayne R. LaFave et al., CRIMINAL PROCEDURE § 1.2(d) (4th ed. 2015)). For example, discovery in a Northern District of California felon-in-possession case showed that, of the 244 felon-in-possession cases filed in that district in a two-year period, 60% started out in state court. *Id.* at 596; *see also* Charles & Garrett, *supra*, at 679.

[25] Abel, *supra*, at 587; *id.* at 588–89, 597–600 (collecting criticisms); Charles & Garrett, *supra*, at 694-97 (same); Patton, *supra* note 14, at 1021–1032 (same).

[26] *See, e.g.*, Abel, *supra*, 585–86 (noting that "claims about the superiority of federal prosecutions (compared to state ones) are rarely substantiated by data about actual state court prosecutions" and criticizing the "fixation on all things federal"); *see also* Charles & Garrett, *supra*, at 682 (observing that "[r]esearch on the effectiveness of" federal firearm adoption programs "has been decidedly mixed"); *id.* at 703 ("[F]rom a policy perspective, federal gun crime does not achieve a federal, systematic, non-discriminatory, and collaborative effort to address the deep American problem of gun violence.").

Of course, the Constitution is agnostic as to whether it is good or bad public policy for the federal government to duplicate state criminal law in this manner. The constitutional question is only whether the federal felon-in-possession prohibition falls within the commerce power or exceeds it. But the realities of § 922(g)(1) enforcement undercut the notion that recognizing the statute's constitutional limits will open the floodgates to felons possessing firearms—either as a legal or practical matter.

Moreover, the localized nature of felon-in-possession enforcement—and the fact that each state independently regulates this conduct in the manner it sees fit—highlights the serious federalism concerns implicated here. The activity regulated by § 922(g)(1) falls squarely within the broad police power that the Constitution reserves for the states—not the federal government. "[T]he States occupy a special position in our constitutional system," and "the scope of Congress' authority under the Commerce Clause must reflect that position." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 556 (1985). "When Congress criminalizes conduct already denounced as criminal by the States, it effects a 'change in the sensitive relation between federal and state criminal jurisdiction.'"

*Lopez*, 514 U.S. at 561 n.3 (citations omitted).

Faithful adherence to limits on the federal government's enumerated powers, including the Commerce Clause, is necessary to preserve that constitutional balance.

## CONCLUSION

For the foregoing reasons, this Court should hold that 18 U.S.C. § 922(g)(1) exceeds Congress's authority under the Commerce Clause, either on its face or as applied to Mr. Squire. Alternatively, this Court should hold that § 922(g)(1)'s jurisdictional element does not reach Mr. Squire's possession of a firearm in this case. On either ground, Mr. Squire's conviction must be reversed.

Respectfully submitted,

CLAUDE J. KELLY
Federal Public Defender
Eastern District of Louisiana

CELIA C. RHOADS
Assistant Federal Public Defender

*/s/ Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney
500 Poydras Street, Suite 318
Hale Boggs Federal Building
New Orleans, Louisiana 70130
(504) 589-7930
steven_spires@fd.org

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 3, 2026, the foregoing Appellant's Brief was filed with the Clerk of Court via the electronic filing system, which will send an electronic Notice of Docket Activity to the following Filing Users:

Kevin G. Boitmann, kevin.boitmann@usdoj.gov,
Patrick Stevens Barr, patrick.barr@usdoj.gov,
Sarah Dawkins, sarah.dawkins@usdoj.gov,
Megan Roberts, megan.roberts@usdoj.gov,
Assistant United States Attorneys.

"The court's electronic Notice of Docket Activity constitutes service of the filed document on all Filing Users." 5TH CIR. R. 25.2.5.

*/s/Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,307 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, 14-point font for text and 12-point font for footnotes.

This brief complies with the privacy redaction requirement of Fed. R. App. P. 25(a)(5), 5th Cir. R. 25.2.13, and Fed. R. Crim. P. 49.1, because it has been redacted of personal data identifiers.

This electronic submission is an exact copy of the paper document, in compliance with 5th Cir. R. 25.2.1.

This brief is free of viruses because it has been scanned for viruses with the most recent version of Symantec Endpoint Protection, in compliance with 5th Cir. ECF Filing Standard A(6).

*/s/ Steven E. Spires*
STEVEN E. SPIRES
Research and Writing Attorney
Dated: September 3, 2026