No. 25-30324

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

CURTIS SQUIRE,

*Defendant-Appellant*

On Appeal from the United States District Court
for the Eastern District of Louisiana, 2:24-cv-41-1
Hon. Wendy Baldwin Vitter

**BRIEF OF FIREARMS POLICY COALITION, INC. AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT AND REVERSAL**

Bradley A. Benbrook
*Counsel of Record*
Stephen M. Duvernay
Jamie G. McWilliam
BENBROOK LAW GROUP, P.C.
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com

*Counsel for Amicus Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

No. 25-30324

*United States of America v. Curtis Squire*

The undersigned counsel of record certifies that under Fifth Circuit Rule 29.2, which requires "a supplemental statement of interested parties, if necessary to fully disclose all those with an interest in the amicus brief," the following listed persons and entities have an interest in this amicus brief, as described in the fourth sentence of Fifth Circuit Rule 28.2.1. See 5th Cir. Rule 29.2; 5th Cir. Rule 28.2.1; *see also* 5th Cir. Rule 26.1.1. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal:

1) Amicus Curiae:

   Firearms Policy Coalition, Inc., a nonprofit corporation, has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

2) Counsel for Amicus Curiae:

   BENBROOK LAW GROUP, P.C.
   Bradley A. Benbrook
   Stephen M. Duvernay
   Jamie G. McWilliam

/s/ Bradley A. Benbrook
Bradley A. Benbrook

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ........................ i
TABLE OF CONTENTS ........................................................................... ii
TABLE OF AUTHORITIES ...................................................................... ii
STATEMENT OF INTEREST ................................................................... iv
SUMMARY OF ARGUMENT ..................................................................... 1
ARGUMENT ............................................................................................ 4
I. The Federal Government Has No General Police Power To Impose An Arms Ban ........................................................................................................ 4
II. Article I Does Not Confer Authority To Ban Possession Of Arms By Private Citizens ................................................................................................... 8
A. The Militia Organizing Clause Is An Important Clue That Congress Has No Implied Power To Disarm The Citizenry ................................ 8
B. The Commerce Clause Does Not Authorize Congress To Enact Criminal Laws Banning Mere Possession Of Arms .......................... 10
1. *Lopez* And *Morrison* Foreclose Any Argument That § 922(g)(1) Is A Valid Exercise Of The Commerce Clause Power ........................................................................... 11
2. Section 922(g)(1)'s Inclusion Of A "Jurisdictional Hook" Does Not Salvage The Law As A Proper Exercise Of The Commerce Clause Power ......................................................... 15
III. The Court Should Recognize The Original Public Meaning Of The Commerce Clause ........................................................................... 21
CONCLUSION ........................................................................................ 24
CERTIFICATE OF SERVICE .................................................................. 25
CERTIFICATE OF COMPLIANCE ........................................................... 26

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Biden*,
70 F.4th 817 (5th Cir. 2023) ........ 8, 9, 10

*Abood v. Detroit Bd. of Educ.*,
431 U.S. 209 (1977) ........ 17

*Alderman v. United States*,
562 U.S. 1163, 131 S. Ct. 700 (2011) ........ 3, 15, 17, 18

*Gonzales v. Raich*,
545 U.S. 1 (2005) ........ 13, 14

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
585 U.S. 878 (2018) ........ 17

*Jones v. United States*,
529 U.S. 848 (2000) ........ 3, 20, 21

*Machinists v. Street*,
367 U.S. 740 (1961) ........ 17

*New York v. United States*,
505 U.S. 144 (1992) ........ 4

*Railway Employees v. Hanson*,
351 U.S. 225 (1956) ........ 17

*Scarborough v. United States*,
431 U.S. 563 (1977) ........ 3, 15, 16

*United States v. Alderman*,
565 F.3d 641 (9th Cir. 2009) ........ 16

*United States v. Hemani*,
146 S. Ct. 1677 (2026) ........ vi, 14

*United States v. Kuban*,
94 F.3d 971 (5th Cir. 1996) ........ 20

*United States v. Lopez*,
514 U.S. 549 (1995) ........ passim

*United States v. Morrison*,
529 U.S. 598 (2000) ........ passim

*United States v. Patton*,
451 F.3d 615 (10th Cir. 2006) ........ 16, 18

*United States v. Rawls*,
85 F.3d 240 (5th Cir. 1996) ........ 16

*United States v. Scarborough*,
539 F.2d 331 (4th Cir. 1976) .......... 15

*Wickard v. Filburn*,
317 U.S. 111 (1942) .......... 12

**Statutes**

18 U.S.C. § 922(g)(1) .......... 1

42 U.S.C. § 13981 .......... 7

Act of May 8, 1792, § 1, 1 Stat. at 271 .......... 9

Gun Control Act of 1968, Pub. L. 90-618, Title I, § 101 (Oct. 22, 1968), 82 Stat. 1213 .......... 14

La. Acts 1975, No. 492, § 2 .......... 5

La. R.S. § 14:95.1 .......... 5

La. Rev. Stat. § 14:95.1(A)(1), (C) .......... 5

N.J. Stat. Ann. § 2C:39-7 .......... 5

R.I. Gen. Laws § 11-47-5(a) .......... 5

Vt. Stat. Ann. tit. 13, § 4017(a) .......... 5

**Other Authorities**

1 Samuel Johnson, A Dictionary of the English Language (4th ed. 1783) .......... 22

1 Samuel Johnson, A Dictionary of the English Language (6th ed. 1785) .......... 9

3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION, AS RECOMMENDED BY THE GENERAL CONVENTION AT PHILADELPHIA IN 1787 (Jonathan Elliot ed., 2d. ed. 1836) .......... 9

Randy Barnett, *New Evidence of the Original Meaning of the Commerce Clause*, 55 ARK. L. REV. 847 (2003) .......... 23

Randy Barnett, *The Original Meaning of the Commerce Clause*,
68 U. CHI. L. REV. 101 (2001) .......... 23

Hon. Edwin Meese, *Federalism in Law Enforcement*, 2 Federalist Soc'y Crim. L. & Proc. Prac. Grp. Newsl. (May 1, 1998) .......... 6

Newton, *Felons, Firearms, and Federalism: Reconsidering* Scarborough *in Light of* Lopez, 3 J. APP. PRAC. & PROCESS 671 (2001) .......... 19

President's Message to the Congress Transmitting Proposed Legislation to Amend the Gun-Free School Zones Act of 1990 (May 10, 1995) .......... 19

THE FEDERALIST NO. 17 .......... 7, 22

THE FEDERALIST NO. 21 .......... 22

THE FEDERALIST NO. 29 .......... 9

THE FEDERALIST NO. 45 .......... 4

*Which states prohibit people with felony convictions from having firearms?*, Everytown Research & Policy, https://perma.cc/Y52N-VL5E .......... 5

**Constitutional Provisions**

U.S. CONST., Art. I, § 8, cl. 16 .......... 2, 8

U.S. CONST., Art. I, § 8, cl. 3 .......... 1, 10, 21

## STATEMENT OF INTEREST[1]

Firearms Policy Coalition, Inc. ("FPC") is a nonprofit membership organization. FPC works to create a world of maximal human liberty and freedom and to promote and protect individual liberty, private property, and economic freedoms. It seeks to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

FPC filed an amicus brief in *United States v. Hemani*, 146 S. Ct. 1677 (2026), where it argued that Congress lacked the Article I authority to enact the federal ban on possession of firearms by users of marijuana, 18 U.S.C. § 922(g)(3). Justice Thomas concurred to explain why "§ 922(g)(3) appears to exceed Congress's enumerated power to regulate interstate commerce," 146 S. Ct. at 1694 (Thomas, J. concurring), and he cited FPC's brief in his opinion, *id*. at 1696 n.* & 1697.

[1] The parties consent to the filing of this brief. Fed. R. App. P. 29(a)(2). No party's counsel authored this brief in whole or part; no party, counsel for a party, or any person other than amicus curiae or their counsel made a monetary contribution toward the preparation and submission of this brief.

## SUMMARY OF ARGUMENT

Curtis Squire was not engaged in interstate commerce in February 2024 when New Orleans police officers found a handgun in his home. The government does not contend that Squire engaged in *any* sort of interstate commerce involving his handgun. Rather, it asserts only that his gun "traveled" across the Louisiana State line at some unknown time before he possessed it. On the strength of this historical fact, the United States prosecuted him under 18 U.S.C. § 922(g)(1)'s lifetime ban on possession by felons. The government asserts that § 922(g)(1) is a valid exercise of Congress' Article I power to "regulate Commerce … among the several States." U.S. CONST., Art. I, § 8, cl. 3. This assertion of power is mistaken. Here, as with the ban on firearm possession within 1,000 feet of a school in *United States v. Lopez*, 514 U.S. 549 (1995), Congress lacks the constitutional authority to ban the simple possession of a firearm by a felon.

The Supreme Court has repeatedly stressed the Founding principle—inherent in the delegation of limited and enumerated powers by the People and the States to the federal government—that Congress does not have a police power to legislate on any subject it wishes. Here, Louisiana has chosen to exercise *its* police power to ban possession of firearms by persons convicted of a "crime of violence." La. Rev. Stat. § 14:95.1(A)(1). Other States have their own versions of similar such laws.

Significant federalism concerns arise when the federal government intrudes on state criminal law enforcement through the enactment of overlapping criminal laws.

Since Congress has no free-floating police power, every exercise of congressional authority must be authorized by an enumerated power in the Constitution. Congress cannot locate any such power to disarm citizens for wholly intrastate possession of firearms in Article I. Start with the Militia Organizing Clause, U.S. CONST., Art. I, § 8, cl. 16. The Organizing Clause gives Congress the "Power To … provide for organizing [and] *arming* … the Militia," not to *disarm* would-be members of the militia. *Id.* (emphasis added). The Organizing Clause thus stands with the Second Amendment as important structural counterweights to the assertion of boundless authority to disarm citizens under the Commerce Clause.

And *Lopez* and *United States v. Morrison*, 529 U.S. 598 (2000), foreclose any argument that the Commerce Clause authorized Congress to enact § 922(g)(1). Among other things, § 922(g)(1): (1) does not regulate economic activity; (2) cannot be transformed into the regulation of interstate commerce by "aggregating" the effects of all the violence the law hopes to avoid; and (3) does not regulate any smaller part of a comprehensive economic program.

The only question under the Commerce Clause, then, is whether the addition of a once-traveled-in-interstate-commerce jurisdictional element can salvage this law. But a requirement that can be satisfied by virtually every single firearm in the

Nation does not make this legislation any less of an attempted exercise of a police power than the law in *Lopez*. As Justice Thomas explained in *Alderman v. United States*, 562 U.S. 1163, 131 S. Ct. 700, 702 (2011) (Thomas, J., dissenting from denial of cert.), courts have improperly applied *Scarborough v. United States*, 431 U.S. 563 (1977), to allow the "mere identification of a jurisdictional hook" in a statute to undermine the constitutional principle recognized in *Lopez.*

While § 922(g)(1) cannot be justified under the permissive "substantial effects on interstate commerce" line of cases culminating in *Lopez*, *Morrison*, and *Jones v. United States*, 529 U.S. 848, 854–57 (2000), it also falls far outside the scope of the original public meaning of the Commerce Clause. As Justice Thomas and scholars have explained, the Constitution uses the term "Commerce … among the several States" to mean "selling, buying, and bartering, as well as transporting for these purposes" across state lines. *Lopez*, 514 U.S. at 585 (Thomas, J., concurring). It manifestly did not mean to cover, as it has been allowed to cover, all "productive activities such as manufacturing and agriculture," not to mention countless other activities purported to have a "substantial effect" on interstate commerce. *Id*. at 586. This Court should recognize that proper meaning of "Commerce" here.

The Court should reverse Squire's conviction.

## ARGUMENT

### I. The Federal Government Has No General Police Power To Impose An Arms Ban.

The Constitution "withhold[s] from Congress a plenary police power that would authorize enactment of every type of legislation." *Lopez*, 514 U.S. at 566. Madison stressed that "[t]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." THE FEDERALIST NO. 45, at 292 (James Madison) (Clinton Rossiter ed., 1961).

"[T]he principle that 'the Constitution created a Federal Government of limited powers,' while reserving a generalized police power to the States, is deeply ingrained in our constitutional history." *Morrison*, 529 U.S. at 618 n.8 (quoting *New York v. United States*, 505 U.S. 144, 155 (1992)) (cleaned up). Because Congress has no police power to address whatever societal problem it wishes, "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." *Morrison*, 529 U.S. at 607.

Banning possession of firearms by individuals thought to be too dangerous to trust with a firearm is a classic exercise of the police power.[2] And it is one that

[2] Any blanket ban will typically raise *separate* Second Amendment concerns. Indeed, *amicus* disputes that § 922(g)(1)'s blanket ban to all felons is consistent with the Second Amendment.

Louisiana has exercised since 1975. La. Acts 1975, No. 492, § 2; *see* La. R.S. § 14:95.1. Unlike Congress, however, Louisiana did not decide to forbid the lifetime possession of firearms by any person convicted of any felony. Rather, Louisiana has chosen a more measured approach: It outlaws the possession of a firearm by those convicted of "a crime of violence" within the prior ten years. La. Rev. Stat. § 14:95.1(A)(1), (C).

Firearm rights opponent Everytown for Gun Safety reports that 39 States have laws that, like § 922(g)(1), prohibit persons convicted of felonies from possessing firearms. *Which states prohibit people with felony convictions from having firearms?*, Everytown Research & Policy, https://perma.cc/Y52N-VL5E. The remaining eleven States, like Louisiana, have enacted more targeted prohibitions. Even the notorious *Bruen* resister State of New Jersey, for example, does not impose a blanket ban on possession by all felons, but instead prohibits possession for a lengthy list of violent crimes and firearm offenses. *See* N.J. Stat. Ann. § 2C:39-7. Vermont's approach, likewise, is to state generally that "[a] person shall not possess a firearm if the person has been convicted of a violent crime," Vt. Stat. Ann. tit. 13, § 4017(a), and then to specify the list of which crimes constitute "violent crime[s]." *Id.* (d)(3). *See also*, *e.g.*, R.I. Gen. Laws § 11-47-5(a) (prohibiting possession by persons "convicted in this state or elsewhere of a crime of violence" and "fugitive[s] from justice").

Federal overreach into the traditional province of State criminal law raises grave federalism concerns. Attorney General Edwin Meese targeted the creeping use of federal police power in a 1997 speech that discussed those threats to federalism:

> Why should there be a bar against the federal government duplicating or taking on the same responsibilities by statute or by practice as local law enforcement? It may be a quaint notion these days, but one of the reasons is the Constitution. [T]he drafters of the Constitution clearly intended the states to bear the responsibility for public safety. Some states may do it well, and some may do it not as well. The Constitution is not a document that is designed necessarily for perfection or even efficiency. Concerns about oppressive use of governmental power motivated the leaders of our country at its founding to make a clear distinction between where the police power was to be rested. As a matter of fact, to reassure the states that the federal government would not usurp state sovereignty, Alexander Hamilton wrote in the Federalist Number 17 that law enforcement would be the responsibility of the states.

Hon. Edwin Meese, *Federalism in Law Enforcement*, 2 Federalist Soc'y Crim. L. & Proc. Prac. Grp. Newsl. (May 1, 1998), https://perma.cc/5N9P-E4CN. Moreover, "[f]ederalizing crime undermines the idea that the states should be free to experiment with their own systems, to be in effect laboratories of government effectiveness." *Id.*; *see also Lopez*, 514 U.S. at 583 (Kennedy, J. concurring) ("The statute … forecloses the States from experimenting and exercising their own judgment in an area to which States lay claim by right of history and expertise, and it does so by regulating an activity beyond the realm of commerce in the ordinary and usual sense of that term.").

To be sure, Hamilton underestimated "the love of power" and "temptation the persons intrusted with the general government could ever feel to divest the States" of their police power. THE FEDERALIST NO. 17, *supra*, at 118 (Alexander Hamilton). He considered it self-evident that "[t]here is one transcendant advantage belonging to the province of the State governments, which alone suffices to place the matter in a clear and satisfactory light,—I mean the ordinary administration of criminal and civil justice." *Id.*

Nevertheless, in *Lopez*, the Court assured that these federalism principles have not been lost to history:

> Under our federal system, the States possess primary authority for defining and enforcing the criminal law. When Congress criminalizes conduct already denounced as criminal by the States, it effects a change in the sensitive relation between federal and state criminal jurisdiction.

*Lopez*, 514 U.S. at 561 n.3 (internal quotation marks and citations omitted).

No amount of argument about how § 922(g)(1) serves important policy interests in "getting violent criminals off the streets" can transform it into a valid exercise of congressional power. A similar motivation to reduce potential violence gave rise to the Violence Against Women Act, which created a federal civil remedy to female victims of a crime of violence motivated by gender. 42 U.S.C. § 13981 ("VAWA"). In *Morrison*, however, the Court emphatically rejected this as a basis for ignoring the lack of an enumerated power to enact the law: "[W]e can think of no better example of the police power, which the Founders denied the National

Government and reposed in the States, than the suppression of violent crime and vindication of its victims." 529 U.S. at 618 ("The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States.").

Given the threat posed to federalism by the improper exercise of a federal police power, any such "change in the sensitive relation between federal and state criminal jurisdiction," *Lopez*, 514 U.S. at 561 n.3, should only be tolerated by the congressional exercise of a power plainly conferred by Article I. Here it is not.

## II. Article I Does Not Confer Authority To Ban Possession Of Arms By Private Citizens.

The government cannot point to an Article I power to justify § 922(g)(1).

### A. The Militia Organizing Clause Is An Important Clue That Congress Has No Implied Power To Disarm The Citizenry.

The only express reference to arms in Article I appears in Section 8, Clause 16, which states that "[t]he Congress shall have Power To … provide for organizing, arming, and disciplining the Militia … ." The government cannot assert that § 922(g)(1) is an exercise of Congress' militia power. By its terms, the Militia Clause directs that Congress shall "provide for … *arming*" the citizens, not *disarming* them. *Id.* (emphasis added); *see*, *e.g*., *Abbott v. Biden*, 70 F.4th 817, 830 (5th Cir. 2023) (Organizing Clause not only "authorizes Congress to furnish weapons and other military equipment," but "it also gives Congress authority to require that the militia

be armed in other ways"). Participating in the militia service could not remotely serve as "the best possible security against" the threat of tyranny if the Organizing Clause gave Congress the power to ban possession of arms. THE FEDERALIST NO. 29, *supra*, at 185 (Alexander Hamilton).

George Mason expressed an Anti-Federalist worry that Congress could "disarm" the militia, but not by literally taking arms away or banning possession; rather, he objected that Congress could "neglect to provide for arming" "in order to have a pretense of establishing a standing army." 3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION, AS RECOMMENDED BY THE GENERAL CONVENTION AT PHILADELPHIA IN 1787, at 379 (Jonathan Elliot ed., 2d. ed. 1836). And, far from disarming citizens, the first Militia Act *required* each and every able-bodied man to "provide himself" with "arms, ammunition and accoutrements" necessary for militia service. Act of May 8, 1792, § 1, 1 Stat. at 271–72.

Nor was the power to "discipline" the militia understood to authorize disarming a citizen for conduct the Congress might believe justifies disarming. As explained in *Abbott*, "the Organizing Clause uses 'discipline' to mean instruction and not punishment." 70 F.4th at 832; *see also* 1 Samuel Johnson, A Dictionary of the English Language 601 (6th ed. 1785) (defining "discipline" first as "Education; instruction; the act of cultivating the mind"). On the other hand, the power to

"govern" the militia "naturally entail[ed] the power to punish," but that federal authority attaches only "after the militia has successfully been called forth." *Abbott*, 70 F.4th at 831–32. In other words, there is no freestanding grant of congressional authority to discipline or punish would-be members of the militia—by disarming them or otherwise—outside the scope of active federal service.

This textual treatment of arms in Article I is important. As a matter of constitutional structure (and basic logic), the very presence of the Organizing Clause's "arming" *requirement*—and the Second Amendment's express prohibitions on disarmament—surely overcomes any argument that Congress has expansive *implied* authority under the Commerce Clause to disarm citizens. The Founders did not establish a federal government to take the People's weapons, and they certainly did not draft the Commerce Clause as a backdoor means of authorizing disarmament.

### B. The Commerce Clause Does Not Authorize Congress To Enact Criminal Laws Banning Mere Possession Of Arms.

The government asserts that § 922(g)(1) is a valid exercise of its Article I power to "regulate Commerce … among the several States." U.S. CONST., Art. I, § 8, cl. 3; *see* Gov't Opp'n to Pet. for Reh'g En Banc at 2, 6–7, *United States v. Squire*, 182 F.4th 481 (5th Cir. 2026). *Lopez* and *Morrison* demonstrate that it is not.

### 1. *Lopez* And *Morrison* Foreclose Any Argument That § 922(g)(1) Is A Valid Exercise Of The Commerce Clause Power.

Criminalizing the intrastate possession of a firearm by a convicted felon is outside of Congress' Commerce Clause power.

a. Section 922(g)(1), just like § 922(q) in *Lopez*, "is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." 514 U.S. at 561. In *Morrison*, the Court explained that "*Lopez*'s review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor." 529 U.S. at 611. That essential connection is absent here; intrastate "possession" of a firearm is indisputably *noneconomic* activity. *Lopez*, 514 U.S. at 560–61.

b. *Lopez* and *Morrison* doom any effort by the government to aggregate the impacts of potential violence by convicted felons to justify congressional action. Congress may not "regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local." *Morrison*, 529 U.S. at 617–18; *see also Lopez*, 514 U.S. at 567 ("The possession of a gun … is in no sense an economic activity that might, through repetition elsewhere, substantially

affect any sort of interstate commerce."). And in both cases the Court highlighted the expansive threat to federalism posed by permitting Congress to regulate criminal activity that has only a tenuous relationship to interstate commerce. *Lopez*, 514 U.S. at 563–64; *Morrison*, 529 U.S. at 612–13.

This ban on simple possession unmoored from any connection to economic activity is an effort by Congress to wield a police power that "completely obliterate[s] the Constitution's distinction between national and local authority." *Morrison*, 529 U.S. at 615; *see Lopez*, 514 U.S. at 563–64. *Morrison* explained that the aggregation theory cannot transform local conduct into activity subject to Congressional regulation. 529 U.S. at 614–19.

c. Finally, Section 922(g)(1), like § 922(q) in *Lopez*, "is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." 514 U.S. at 561. Accordingly, § 922(g)(1) "cannot … be sustained under [the Court's] cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Id.*; *see also id.* at 560 (noting the Agricultural Adjustment Act of 1938 at issue in *Wickard v. Filburn*, 317 U.S. 111, 128 (1942), "perhaps the most far-reaching example of Commerce Clause authority," was at least "designed

to regulate the volume of wheat moving in interstate and foreign commerce in order to avoid surpluses and shortages").

Even granting that the Court found in *Gonzales v. Raich*, 545 U.S. 1 (2005), that Congress has authority under the Commerce Clause to ban possession of controlled substances like marijuana, it does not follow that the Commerce Clause endows Congress with the further power to regulate all noneconomic aspects of the lives of those who possess controlled substances. Indeed, *Raich* grounded its conclusion on the notion that the Controlled Substances Act's regulation of intrastate manufacture and possession of marijuana was "'an essential part of a larger regulation of economic activity'" justifying local regulation by way of the Necessary and Proper Clause. 545 U.S. at 23–25 (quoting *Lopez*, 514 U.S. at 561). By contrast with *Lopez* and *Morrison* (where the challenged criminal statutes did not regulate economic activity), *Raich* explained, "the activities regulated by the CSA are quintessentially economic," and the ban on intrastate possession and consumption of controlled substances "is a rational … means of regulating commerce" in such substances. *Id.* at 25, 26.[3]

[3] The *Raich* Court repeatedly stressed the market-based economic effects of local cultivation and consumption of marijuana. *See, e.g.*, 545 U.S. at 19–22 (discussing the impact of homegrown marijuana on the interstate market and analogizing case to *Wickard*); *id.* at 26 (explaining that "[t]he CSA is a statute that regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market"); *id.* at 30 (observing "that the California exemptions [permitting medical use of marijuana] will have a significant

But here, § 922(g)(1) was not enacted as part of a broader program to regulate commerce. Rather, it was enacted as part of the Gun Control Act of 1968, the express purpose of which is "to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence." Pub. L. 90-618, Title I, § 101 (Oct. 22, 1968), 82 Stat. 1213; *Hemani*, 146 S. Ct. at 1696 n.* (Thomas, J., concurring) ("Section 922(g) is what the Government has always said it is: a regulation to further 'public safety' by preventing local gun crime.") (citing Gun Control Act). The goal of § 922(g)(1) is simply and only the restriction of firearm possession one person at a time as a generic (and overlapping) crime-fighting measure; there is no greater *economic* program that depends on these individual disarmaments. Thus, as with *Lopez* and *Morrison*, § 922(g)(1)'s firearm prohibition "[falls] outside Congress' commerce power in its entirety." *Raich*, 545 U.S. at 23. Section 922(g)(1) is not any part—let alone an "essential part"—of a broader Congressional effort to regulate economic activity.

Instead, the lone basis for asserting Commerce Clause authority is that the gun itself traveled in interstate commerce, which, as explained in the following section, is not a sufficient basis to bless a purported exercise of the commerce authority.

---

impact on both the supply and demand sides of the market for marijuana is not just 'plausible' …, it is readily apparent").

### 2. Section 922(g)(1)'s Inclusion Of A "Jurisdictional Hook" Does Not Salvage The Law As A Proper Exercise Of The Commerce Clause Power.

Section 922(g)(1)'s nominal inclusion of a jurisdictional element to the crime—prohibiting the possession of a firearm "in or affecting commerce"—does not suffice to transform the statute into a proper exercise of Commerce Clause authority.

a. The lower courts' indulgence of this unauthorized exercise of power has resulted from a misreading of *Scarborough v. United States*, and that misreading is overdue for correction. *Scarborough* involved a federal statute making it a crime for a felon to receive, possess, or transport any firearm "in commerce or affecting commerce." 431 U.S. at 564 (quoting 18 U.S.C. § 1202(a) (1970 ed.)). But *Scarborough* is a "statutory interpretation opinion" not a constitutional holding. *Alderman*, 562 U.S. 1163, 131 S. Ct. at 700 (Thomas, J., dissenting from denial of cert.). As such, it bears no weight when it comes to determining the scope of the Commerce Clause power.

The issues in *Scarborough* illustrate its limits. A year after pleading guilty to a felony narcotics charge, Scarborough was arrested with nearly 300 doses of LSD. *United States v. Scarborough*, 539 F.2d 331, 332 (4th Cir. 1976). A search also turned up four firearms, and Scarborough was convicted of "possessing" the guns under the felon-in-possession statute. *Id.* at 332–33; *Scarborough*, 431 U.S. at 564–

65. The Supreme Court granted certiorari to resolve a circuit split over whether the government was required to prove a connection between a defendant's "possession" of a firearm and interstate commerce, or if the government could establish a statutory violation by proving only that the firearm had "previously traveled" in interstate commerce. *Id.* at 566–67. *Scarborough* thus resolved a limited question of *statutory* interpretation: "[W]hether proof that the possessed firearm previously traveled in interstate commerce is sufficient to satisfy the statutorily required nexus between the possession of a firearm by a convicted felon and commerce." *Id.* at 564. The Court did not consider whether the statute's jurisdictional hook rendered the law a proper exercise of the commerce power as a *constitutional* matter.

Despite this, some lower courts have acknowledged that while *Scarborough* only resolved a statutory question, the Court must have "assumed" or "implicitly" acknowledged the constitutionality of the statute. *See, e.g.*, *United States v. Patton*, 451 F.3d 615, 634 (10th Cir. 2006) (*Scarborough* "assumed that Congress could constitutionally regulate the possession of firearms solely because they had previously moved across state lines"); *United States v. Alderman*, 565 F.3d 641, 645 (9th Cir. 2009) ("[A]lthough the [*Scarborough*] Court did not address the statute from a constitutional perspective, it implicitly assumed the constitutionality of the 'in commerce' requirement."); *United States v. Rawls*, 85 F.3d 240, 243 (5th Cir. 1996) (Garwood, J., joined by Wiener and Garza, JJ., specially concurring)

(explaining that although "*Scarborough* addresses only questions of statutory construction, and does not expressly purport to resolve any constitutional issue," the Court's opinion "carr[ies] a strong enough implication of constitutionality" to bind lower courts).

Attributing a constitutional halo to *Scarborough*'s limited holding repeats the notorious analytical mistake made in *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977). In *Abood*, the Court justified compulsory withholding of union dues under the First Amendment based on statutory holdings finding only that Congress had the statutory authority under the Railway Labor Act to compel such withholding. *Id.* at 226 (discussing *Railway Employees v. Hanson*, 351 U.S. 225 (1956), and *Machinists v. Street*, 367 U.S. 740 (1961)). The Court corrected this egregious error in *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 918 (2018), and stressed that "*Abood* went wrong at the start" by relying on statutory construction cases to justify its constitutional holding. The same mistreatment of *Scarborough* (decided the same Term as *Abood*) must stop.

b. Moreover, even if *Scarborough* somehow could be properly interpreted to bear on the scope of the Commerce Clause, it "cannot be reconciled with *Lopez* because it reduces the constitutional analysis to the mere identification of a jurisdictional hook." *Alderman,* 562 U.S. 1163, 131 S. Ct. at 702 (Thomas, J., dissenting from denial of cert.). As such, using *Scarborough* to justify a federal

prosecution whenever a firearm has ever crossed state lines nullifies the essential holding of *Lopez*: it "could very well remove any limit on the commerce power" by "permit[ting] Congress to regulate or ban possession of any item that has ever been offered for sale or crossed state lines." *Id*. at 703.

*Lopez* did not even mention *Scarborough*, and it did not need to since § 922(q) did not include a jurisdictional element. And while *Lopez* observed that § 922(q)'s lack of a jurisdictional element was one of several reasons showing why § 922(q) was not authorized by the Commerce Clause, 514 U.S. at 561, it never said that adding such an element, by itself, would automatically suffice to establish that § 922(q) was a valid exercise of the Commerce Clause power. Nor could it: "A jurisdictional hook is not … a talisman that wards off constitutional challenges." *Patton*, 451 F.3d at 632.

Indeed, the surrounding language in *Lopez* demonstrates that, even if the statute had a jurisdictional requirement, the actual circumstances of future applications would still matter: Such a requirement "would ensure, through case-by-case inquiry, that the firearm possession in question *affects* interstate commerce." 514 U.S. at 561 (emphasis added); *see also Patton*, 451 F.3d at 632 (noting the "ultimate inquiry is whether the prohibited activity has a substantial effect on interstate commerce").

And it cannot be the case that mere possession of a gun that once crossed state lines would suffice, given *Lopez*'s additional statement that a jurisdictional requirement "might limit [the statute's] reach to a *discrete set* of firearm possessions that additionally have *an explicit connection with or effect on* interstate commerce." 514 U.S. at 562 (emphasis added). No such "discrete set" of a greater whole, in fact, exists if crossing state lines once is all it takes: The government has proffered testimony that 95% of all guns in the United States have crossed state lines. Newton, *Felons, Firearms, and Federalism: Reconsidering* Scarborough *in Light of* Lopez, 3 J. APP. PRAC. & PROCESS 671, 682 & n.53 (2001). Indeed, President Clinton inadvertently exposed the charade when he proposed the post-*Lopez* amendment to the Gun-Free School Zones Act: He announced that the Attorney General had assured him that adding this new jurisdictional element "would have little, if any, impact on the ability of prosecutors to charge this offense, for the vast majority of firearms have 'moved in … commerce' before reaching their eventual possessor." President's Message to the Congress Transmitting Proposed Legislation to Amend the Gun-Free School Zones Act of 1990 (May 10, 1995).

c. All of this theory risks missing the forest for the trees when it comes to § 922(g)(1): It is nearly impossible to conceive how mere possession of a single gun by an individual could *ever* affect interstate commerce, substantially or otherwise. All the more so considering the noneconomic act of possession cannot be aggregated

with others' possessions to conjure up a "substantial effect" on interstate commerce. *Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 615–18. The fact that the gun may have crossed state lines long before the § 922(g)(1) defendant ever gained possession of it only underscores the fiction that this statute has anything to do with "commerce." *See*, *e.g.*, *United States v. Kuban*, 94 F.3d 971, 977–78 (5th Cir. 1996) (DeMoss, J., dissenting) ("[T]he precise holding in *Scarborough* is in fundamental and irreconcilable conflict with the rationale [in] *Lopez*[.] … The mere fact that a felon possesses a firearm which was transported in interstate commerce years before the current possession cannot rationally be determined to have a substantial impact on interstate commerce as of the time of current possession.") (quotation marks omitted).

The Supreme Court has been wary long after *Scarborough* of using expansive jurisdictional hooks to extend congressional authority beyond proper constitutional limits. Most notably, in *Jones v. United States*, the Court held that the federal arson statute (covering property "used in … any activity affecting … commerce") did not reach a private residence that had been torched by a Molotov cocktail in a family dispute. 529 U.S. at 854–57. The federal government claimed jurisdiction because the home was "used" to secure a home loan and home insurance from out-of-state businesses, and the owner "used" the home to receive natural gas from out-of-state sources. *Id.* at 855. The Court rejected this gambit: If the statute applied to every

building that "bears some … trace of interstate commerce," then "hardly a building in the land would fall outside the federal statute's domain." *Id.* at 857. Moreover, "grave and doubtful constitutional questions arise" under *Lopez* where a statute "render[s] … 'traditionally local criminal conduct' … 'a matter for federal enforcement.'" *Id.* at 857, 858 (citations omitted). These same risks exist here.

* * *

If any possession of any gun that has ever crossed a state line suffices to bring § 922(g)(1) within the commerce power, then *Lopez* has been gutted and § 922(g)(1) operates as an exercise of the police power. *Scarborough* has been misapplied to achieve those very results for too long. Order needs to be restored to Commerce Clause doctrine.

## III. The Court Should Recognize The Original Public Meaning Of The Commerce Clause.

As Justice Thomas explained in *Lopez*, the Court has strayed from the original public meaning of the Commerce Clause by accepting that "Congress may regulate not only 'Commerce … among the several States,' U.S. CONST., Art. I, § 8, cl. 3, but also anything that has a 'substantial effect' on such commerce. This test, if taken to its logical extreme, would give Congress a 'police power' over all aspects of American life." *Lopez*, 514 U.S. at 584 (Thomas, J., concurring).

At the Founding, "commerce" had a limited and distinct meaning: It referred to "trade," in the sense of "selling, buying, and bartering, as well as transporting for

these purposes." *Id.* at 585 (citing, *e.g.*, 1 Samuel Johnson, A Dictionary of the English Language 361 (4th ed. 1783) (defining commerce as "Intercour[s]e; exchange of one thing for another; interchange of any thing; trade; traffick")). It manifestly did not refer to or include manufacturing or agriculture, as the Founders used the word "commerce" in "contradistinction" to those "productive activities." *Id*. at 586. For example, whereas regulation of "[c]ommerce" was "lodged in the national" government, Hamilton assured that "the supervision of agriculture and of other concerns of a similar nature, all those things, in short, which are proper to be provided for by local legislation, can never be desirable cares of a general jurisdiction." THE FEDERALIST NO. 17, *supra*, at 118 (Alexander Hamilton); *see also* THE FEDERALIST NO. 21, *supra*, at 141 (Alexander Hamilton) ("The wealth of nations depends on an infinite variety of causes[, including] climate, the nature of the productions, the nature of the government, the genius of the citizens, … the state of commerce, of arts, of industry … .").

By slowly expanding the definition of "commerce" to reach all such economically "productive activities" (like manufacturing and agriculture), the Court has "interject[ed] a modern sense of commerce into the Constitution." *Lopez*, 514 U.S. at 586–87 (Thomas, J., concurring). This expansion, Justice Thomas explained, "generates significant textual and structural problems." *Id*. at 587. It makes no sense to say, for example, that Congress can regulate "manufacturing among the several

States" or "manufacturing with a foreign nation," because "commerce encompasses traffic" rather than activity that "takes place at a discrete site." *Id*. And by compounding this interpretive error with the "substantial effects" test, the "Commerce Clause has virtually no limits" now. *Morrison*, 529 U.S. at 627 (Thomas, J., concurring).

Professor Barnett has conducted exhaustive reviews of original sources to confirm Justice Thomas' position. In *The Original Meaning of the Commerce Clause*, 68 U. CHI. L. REV. 101 (2001), Barnett surveyed Founding Era sources and analyzed every use of the word "commerce" in the drafting and ratification process and found that it was uniformly meant to convey a narrow meaning, consistent with Justice Thomas' concurrence in *Lopez* (*i.e.*, commerce in the sense of "trade or exchange of goods," as opposed to any "gainful activity"). *Id.* at 111–25. In *New Evidence of the Original Meaning of the Commerce Clause*, 55 ARK. L. REV. 847 (2003), Barnett extended his research to every mention of the word "commerce" in the Pennsylvania Gazette between 1728 and 1800, which only fortified his original findings. In his analysis of nearly 1,600 uses of the word, Barnett concluded "that outside as well as inside the process of drafting and ratifying the Constitution, the normal, conventional, and commonplace public meaning of commerce … was 'trade and exchange,' as well as transportation for this purpose." *Id.* at 862.

The Court should include in its analysis a discussion of this original meaning of "commerce" to (hopefully) set the stage for the Supreme Court to endorse a return to that meaning.

## CONCLUSION

The Court should reverse Squire's conviction.

Respectfully submitted,

/s/ Bradley A. Benbrook
Bradley A. Benbrook
*Counsel of Record*
Stephen M. Duvernay
Jamie G. McWilliam
BENBROOK LAW GROUP, P.C.

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 5th Cir. R. 25.2.5, I hereby certify that on September 10, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

/s/Bradley A. Benbrook
Bradley A. Benbrook

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limits permitted by Fed. R. App. P. 29(a)(5) and 32(a)(7) because this brief contains 5,756 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

3. Additionally, I certify that (1) any required redactions have been made in compliance with 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of Avast Security virus detector and is free of viruses.

Dated: September 10, 2026

s/Bradley A. Benbrook_
Bradley A. Benbrook