**Case No. 25-30324**

# In The United States Court of Appeals
# For The Fifth Circuit

---

**UNITED STATES OF AMERICA,**
**Plaintiff - Appellee**

**v.**

**CURTIS SQUIRE,**
**Defendant - Appellant**

---

**Appeal From The United States District Court**
**For The Eastern District Of Louisiana**
**Honorable Wendy B. Vitter, District Judge**
**Criminal Docket No. 24-41, Section "D"**

---

## EN BANC BRIEF OF APPELLEE, THE UNITED STATES OF AMERICA

---


**DAVID I. COURCELLE**
**UNITED STATES ATTORNEY**
**EASTERN DISTRICT OF LOUISIANA**

**KEVIN G. BOITMANN, Chief of Appeals**
**MEGAN R. ROBERTS**
**PATRICK BARR**
**JASON W. BURGE**
**PETER J. VESICH**
**Assistant U.S. Attorneys**
**650 Poydras Street, Suite 1600**
**New Orleans, Louisiana 70130**
**(504) 680-3109**
**Attorneys for the United States of America**


**November 2, 2026**

## STATEMENT REGARDING ORAL ARGUMENT

The Court has tentatively scheduled this matter for oral argument during the week of January 18, 2027. Oral argument would benefit the Court.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ........................................... ii

TABLE OF CONTENTS ........................................................................... iii

TABLE OF AUTHORITIES ........................................................................ v

STATEMENT OF JURISDICTION ............................................................. 1

STATEMENT OF THE ISSUE ................................................................... 1

INTRODUCTION ..................................................................................... 1

STATEMENT OF THE CASE ................................................................... 2

SUMMARY OF ARGUMENT ................................................................... 4

ARGUMENT ............................................................................................ 7

I. The Supreme Court has held that 18 U.S.C. § 922(g)(1) is a valid exercise of Congress's Commerce Clause authority. ..................................... 7
   - A. The Supreme Court authoritatively construed the statute's commerce element in *Scarborough*. .................................................. 7
   - B. Neither *Lopez* nor *Morrison* called § 922(g)(1) into question, as this Court and other circuits have unanimously recognized. ............. 11
   - C. Only the Supreme Court has the prerogative to overrule *Scarborough*. ......................................................................... 14

II. Section 922(g)(1) is valid under the Supreme Court's current Commerce Clause precedent. ......................................................... 16
   - A. Congress has broad authority under the Commerce and Necessary and Proper Clauses ........................................................ 16
   - B. Section 922(g)(1) is an integral part of Congress's comprehensive regulation of the interstate firearms market. ............. 20
     1. Congress has comprehensively regulated the interstate firearms market. ................................................................. 21
     2. Firearm possession by felons substantially affects the interstate firearms market. ...................................................... 24
     3. Section 922(g)(1) is necessary and proper to Congress's regulation of the firearms market. ........................................... 29
   - D. Squire misreads *Lopez* and *Morrison* ............................................... 33
   - E. Section 922(g)(1) does not upset the federal-state balance ................ 37

F. A holding that § 922(g)(1)’s “possession” prohibition exceeds Congress’s authority would not be narrow. ........................................40
III. Construing § 922(g)(1) more narrowly than *Scarborough* is neither necessary nor appropriate. .........................................................................42

CONCLUSION ...........................................................................................45

CERTIFICATE OF SERVICE AND ECF COMPLIANCE ...................................46

CERTIFICATE OF COMPLIANCE .......................................................47

**TABLE OF AUTHORITIES**

**Cases**

*Alderman v. United States*, 131 S. Ct. 700 (2011)....................................................15

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015)........................43

*Collette v. United States*, 145 S. Ct. 2853 (2025)....................................................15

*Corley v. United States*, 556 U.S. 303 (2009)..........................................................44

*Dean v. United States*, 145 S. Ct. 2859 (2025).........................................................15

*Dominguez v. United States*, 145 S. Ct. 2857 (2025) ..............................................15

*Fraternal Order of Police v. United States*, 173 F.3d 898 (D.C. Cir. 1999)...........14

*Freeman v. United States*, 146 S. Ct. 129 (2025) ....................................................15

*Gibbons v. Ogden*, 22 U.S. 1 (1824)................................................................. 16, 17

*Gonzales v. Raich*, 545 U.S. 1 (2005)............................................................. passim

*Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964)........................17

*Hemphill v. United States*, 145 S. Ct. 2855 (2025)..................................................15

*Hensley v. United States*, 146 S. Ct. 2714 (2026)....................................................15

*Hibbs v. Winn*, 542 U.S. 88 (2004)...........................................................................44

*Jones v. United States*, 529 U.S. 848 (1999) ............................................................10

*Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122 (2023)................................................14

*Martinez v. United States*, 146 S. Ct. 127 (2025) ....................................................15

*Mason v. United States*, 146 S. Ct. 140 (2025).........................................................15

*McCulloch v. Maryland*, 17 U.S. 316 (1819) ................................................... 19, 20

*N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) ......................... 38, 39

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ..................... 13, 17, 20

*Navegar, Inc. v. United States*, 192 F.3d 1050 (D.C. Cir. 1999)............... 20, 34, 39

*Riddick v. United States*, 145 S. Ct. 2859 (2025) ....................................................15

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477 (1989) .................14

*Scarborough v. United States*, 431 U.S. 563 (1977) ...................................... passim

*Shapiro v. United States*, 335 U.S. 1 (1948)...........................................................43

*United States v. Sherbandy*, 865 F.2d 996 (9th Cir. 1988).......................................42

*United States v. Alcantar*, 733 F.3d 143 (5th Cir. 2013)..........................................13

*United States v. Bass*, 404 U.S. 336 (1971)............................................... 2, 8, 9, 37

*United States v. Chesney*, 86 F.3d 564 (6th Cir. 1996) ............................. 31, 34, 38

*United States v. Comstock*, 560 U.S. 126 (2010).....................................................19

*United States v. Darby*, 312 U.S. 100 (1941) ................................................... 17, 40

*United States v. DeLeon*, 170 F.3d 494 (5th Cir. 1999) ............................................1

*United States v. Dickey*, 102 F.3d 157 (5th Cir. 1996)...............................................1

*United States v. Dorris*, 236 F.3d 582 (10th Cir. 2000) .................................. 11, 35

*United States v. Ervin*, 131 F.4th 253 (4th Cir. 2025)................................. 8, 43, 44

*United States v. Fitzhugh*, 984 F.2d 143 (5th Cir. 1993).........................................42

*United States v. Gallimore*, 247 F.3d 134 (4th Cir. 2001).......................................13

*United States v. Gillies*, 851 F.2d 492 (1st Cir. 1988).............................................43

*United States v. Griffith*, 928 F.3d 855 (10th Cir. 2019).........................................14

*United States v. Hemani*, 608 U.S. 772 (2026).........................................................14

*United States v. Henry*, 429 F.3d 603 (6th Cir. 2005)..............................................13

*United States v. Joos*, 638 F.3d 581 (8th Cir. 2011).................................................13

*United States v. Kebodeaux*, 570 U.S. 387 (2013) ..................................................20

*United States v. Kirk*, 70 F.3d 791 (5th Cir. 1995)....................................................37

*United States v. Langley*, 62 F.3d 602 (4th Cir. 1995)....................................................8

*United States v. Lemons*, 302 F.3d 769 (7th Cir. 2002)....................................................11

*United States v. Lewis*, 100 F.3d 49 (7th Cir. 1996).................................................... 38, 39

*United States v. Lopez*, 2 F.3d 1342 (5th Cir. 1993) .................................................... 8, 23, 24

*United States v. Lopez*, 514 U.S. 549 (1995).................................................... passim

*United States v. Luna*, 165 F.3d 316 (5th Cir. 1999)....................................................12

*United States v. McBee*, 295 F. App'x 796 (6th Cir. 2008)....................................................14

*United States v. Mitchell*, 299 F.3d 632 (7th Cir. 2002)....................................................13

*United States v. Morrison*, 529 U.S. 598 (2000) .................................................... passim

*United States v. Nelson*, 458 F.2d 556 (5th Cir. 1972)....................................................23

*United States v. Palozie*, 166 F.3d 502 (2d Cir. 1999) .................................................... 42, 43

*United States v. Patton*, 451 F.3d 615 (10th Cir. 2006) ....................................................15

*United States v. Peters*, 403 F.3d 1263 (11th Cir. 2005)....................................................37

*United States v. Pierson*, 139 F.3d 501 (5th Cir. 1998).................................................... 12, 34

*United States v. Rahimi*, 602 U.S. 680 (2024)....................................................15

*United States v. Rawls*, 85 F.3d 240 (5th Cir. 1996) .................................................... 13, 15

*United States v. Rose*, 522 F.3d 710 (6th Cir. 2008) ....................................................30

*United States v. Rousseau*, 257 F.3d 925 (9th Cir. 2001)....................................................13

*United States v. Santiago*, 238 F.3d 213 (2d Cir. 2001)....................................................13

*United States v. Singletary*, 268 F.3d 196 (3d Cir. 2001).................................................... 13, 44

*United States v. Torres-Colon*, 790 F.3d 26 (1st Cir. 2015)....................................................13

*United States v. Vereen*, 920 F.3d 1300 (11th Cir. 2019)....................................................14

*United States v. Wrightwood Dairy Co.*, 315 U.S. 110 (1942) ................. 16, 17, 20

*Wickard v. Filburn*, 317 U.S. 111 (1942) ........................................................ 17, 40

*York v. United States*, 146 S. Ct. 144 (2025) .........................................................15

**Statutes**

18 U.S.C. § 842(i) ..........................................................................................41

18 U.S.C. § 922(a) ...................................................................................... 22, 24

18 U.S.C. § 922(d)(1).......................................................................................29

18 U.S.C. § 922(g)(1)................................................................................ passim

18 U.S.C. § 922(q) ..........................................................................................11

18 U.S.C. § 1715 .............................................................................................21

18 U.S.C. § 1951(a) .........................................................................................41

18 U.S.C. § 2252(a)(4)(B) ...............................................................................41

18 U.S.C. § 3231 ...............................................................................................1

28 U.S.C. § 1291 ...............................................................................................1

42 U.S.C. § 13981 ...........................................................................................12

La. Rev. Stat. § 14:95.1....................................................................................39

**Acts of Congress**

52 Cong. Ch. 159, 27 Stat. 116 (1892) ..................................................................21

Act of May 22, 1794, 1 Stat. 369.......................................................................21

Firearm Owners' Protection Act of 1986, Pub. L. No. 99-308, 100 Stat. 449 ........24

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 ................................23

National Firearms Act of 1934, 73 Cong. Ch. 757, 48 Stat. 1236................... 21, 22

Omnibus Crime Control and Safe Streets Act of 1968,
Pub. L. No. 90-351, 82 Stat. 197 .................................................................. 22, 36

Protection of Lawful Commerce in Arms Act of 2005,
Pub. L. No. 109-92, 119 Stat. 2095 ....................................................................24

**Other Authorities**

ATF, Annual Firearms Manufacturing and Export Report Year 2024 Final,
https://www.atf.gov/media/29786/download.....................................................25

ATF, 2 National Firearms Commerce and Trafficking Assessment, Part III: Crime Guns Recovered and Traced Within the United States and Its Territories, (https://www.atf.gov/media/15426/download) ............................................ 26, 39

ATF, 2 National Firearms Commerce and Trafficking Assessment, Part V: Firearm Thefts, (https://www.atf.gov/media/15416/download).......................................27

Bureau of Justice Statistics, *Survey of Inmates in State and Federal Correctional Facilities: Firearm Use by Offenders*, November 2001, https://bjs.ojp.gov/content/pub/pdf/fuo.pdf ........................................................26

Philip J. Cook & Rosanna Smart, *Illegal Firearms Markets: Transaction Patterns, Evolving Sources, and Importance in Criminal Misuse*, PNAS 2026, Vol. 123, No. 33, (Oct. 23, 2025) (https://doi.org/10.1073/pnas.2509754122) ........... 27, 39

FBI, National Instant Criminal Background Check System (NICS) Section 2024 Operational Report, https://www.fbi.gov/file-repository/2024-nics-operational-report.pdf/view ....................................................................................28

H.R. Rep. No. 90-1577, *reprinted in* 1968 U.S.C.C.A.N. 4410..............................36

Illinois Criminal Justice Information Authority, *Examining the Recidivism of Firearm Offenders Using State Criminal History and Mortality Data*, https://researchhub.icjia-api.cloud/uploads/Firearm_study_report_073118-191011T20091765.pdf.........................................................................26

Alisa B. Klein, *Right Diagnosis, Wrong Cure: Reconceptualizing the Commerce Clause Basis for the Federal Prohibition on Felon Firearm* Possession, 104 Tex. L. Rev. Online 225 (2026)...................................................................30

Margaret Love & Beth Johnson, *Restoration of Firearm Rights after Conviction: A National Survey and Recommendations for Reform, Collateral Consequences Resource Ctr.* (Dec. 2025) (https://ccresourcecenter.org/wp-content/uploads/2026/01/Restoration-of-Firearm-Rights-After-Conviction-Report-Dec.-2025-1.pdf) .......... 38

National Shooting Sports Foundation, 2025 Firearm & Ammunition Industry Economic Impact Report, https://www.nssf.org/wp-content/uploads/2025/04/2025-NSSF-Firearm-Ammunition-Industry-Economic-Impact-report.pdf .......... 25

Orchid Advisors, *Top 30 Largest USA Firearm Manufacturers of 2024*, May 27, 2026, https://orchidadvisors.com/top-30-largest-usa-firearm-manufacturers-of-2024 .......... 25

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* .......... 44

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1291. The district court had jurisdiction under 18 U.S.C. § 3231. This is an appeal from a final judgment of the United States District Court for the Eastern District of Louisiana in a criminal case.

## STATEMENT OF THE ISSUE

Whether 18 U.S.C. § 922(g)(1)'s prohibition on a felon's possession of a firearm "in or affecting commerce" is a valid exercise of congressional authority under the Commerce and Necessary and Proper Clauses.

## INTRODUCTION

More than 25 years ago, this Court stated that "the constitutionality of § 922(g)(1) is not open to question" under the Commerce Clause. *United States v. DeLeon*, 170 F.3d 494, 499 (5th Cir. 1999). The Court has long "held that [it is] bound by the Supreme Court's decision in *Scarborough v. United States*" to uphold that provision. *United States v. Dickey*, 102 F.3d 157, 163 (5th Cir. 1996). Since those decisions, the Supreme Court has issued no intervening decision calling into question § 922(g)(1)'s validity. And ten other courts of appeals have unanimously agreed with this Court that § 922(g)(1) is within Congress's power.

This Court should reject Squire's invitation to disregard *Scarborough*, create a split with every other circuit to consider the issue, and be the first federal appellate court to hold that § 922(g)(1) is invalid. As explained below,

*Scarborough* necessarily resolved the constitutional issue, not just a statutory one. And it is the Supreme Court's prerogative to overrule its own precedent. Even if this Court were to consider the issue afresh, § 922(g)(1)'s prohibition on firearm possession "in or affecting commerce" is valid under current Supreme Court precedent. Unlike the invalidated provisions in *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), the felon-in-possession prohibition contains an express jurisdictional element and is an integral part of Congress's broader regulation of interstate commerce in firearms. And although § 922(g)(1) applies to purely intrastate possession, "[p]rohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." *Gonzales v. Raich*, 545 U.S. 1, 26 (2005). This Court should uphold the statute and affirm Squire's conviction.

## **STATEMENT OF THE CASE**

Section 922(g)(1) makes it illegal for felons "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." To establish a violation of the statute, long-standing precedent requires the government to prove that the relevant firearm or ammunition previously crossed state lines. *See United States v. Bass*,

404 U.S. 336, 350 (1971) (interpreting § 922(g)(1)'s predecessor); *Scarborough v. United States*, 431 U.S. 563, 567–68, 575 (1977) (same). Although some jurists and academics have questioned whether this precedent applies with equal force following the Supreme Court's more recent Commerce Clause jurisprudence, the courts of appeals have uniformly adhered to that precedent and held that § 922(g)(1)'s prohibition against felons possessing a firearm that has previously moved in interstate commerce falls within Congress's Commerce Clause authority.

Against this backdrop, a grand jury charged Curtis Squire with being a felon in possession of a firearm, in violation of § 922(g)(1). ROA.36–38. Law enforcement executed a search warrant at Squire's Louisiana residence and found a loaded Glock model 23C .40 caliber pistol with a high-capacity magazine containing 20 live rounds that was hidden under the oven. ROA.166. Squire, whose criminal history included prior convictions for burglary, unauthorized use of a vehicle, distribution of heroin, possession of a firearm with controlled substances, obstruction of justice, and related conspiracy offenses, *see* ROA.167, was barred under § 922(g)(1) from possessing firearms and ammunition.

Squire moved to dismiss the indictment, arguing that § 922(g)(1) exceeds Congress's authority under the Commerce Clause but conceding that his argument

was foreclosed. ROA.66, 69, 89–92.[1] The district court denied the motion, ROA.144–56, and Squire pleaded guilty. ROA.165; *see* ROA.166–68. In the factual basis in support of his plea, Squire admitted that "prior to his possession of the firearm and ammunition, both traveled in interstate commerce." ROA.167.[2]

On appeal, Squire primarily advanced Second Amendment and vagueness challenges to § 922(g)(1). Doc. 33, pp. 13–59. He also raised "to preserve for further review that 18 U.S.C. § 922(g)(1) exceeds Congress's authority to regulate interstate and foreign commerce and that his factual basis failed to establish the requisite interstate commerce nexus to support a valid conviction." Doc. 33, p. 60.

After a panel of this Court affirmed Squire's conviction on Second Amendment grounds, *see* Doc. 70-1, p. 20, Squire petitioned for rehearing en banc to address § 922(g)(1)'s constitutionality under the Commerce Clause. Doc. 75, p. iii. The Court decided to rehear the matter en banc. Doc. 89, pp. 1–2.

## SUMMARY OF ARGUMENT

Squire's Commerce Clause challenge is foreclosed by *Scarborough*. There, the Supreme Court interpreted § 922(g)(1)'s predecessor statute to require proof

---

[1] Squire also argued that § 922(g)(1) violates the Second Amendment, ROA.66, 69, 71–88, but that claim is not before the Court.

[2] Squire's factual basis also stated that, if called at trial, an expert would testify that the gun and ammunition recovered from Squire's residence were manufactured outside the state of Louisiana. ROA.167.

only that the firearm moved in interstate commerce at some point. In doing so, it rejected the defendant's argument that such a link to interstate commerce would be insufficient to justify the statute under the Commerce Clause. Although *Scarborough* is in one sense a case of statutory interpretation, lower courts have correctly understood it to necessarily uphold § 922(g)(1) under the Commerce Clause.

The Supreme Court's more recent decisions in *Lopez* and *Morrison* have not called *Scarborough* into question. Those decisions struck down provisions that, unlike § 922(g)(1), required no nexus to interstate commerce and were not part of a broader regulation of an interstate market. Every court of appeals with criminal jurisdiction has relied on *Scarborough* to uphold § 922(g)(1) or a similar provision. And only the Supreme Court has the prerogative to overrule *Scarborough*'s on-point holding. This Court should not do so.

Even taking a fresh look under modern Commerce Clause precedent, § 922(g)(1) is constitutional. Congress has authority under the Commerce and Necessary and Proper Clauses to regulate even intrastate activity that has a substantial effect on interstate commerce. And Congress could rationally conclude that even intrastate possession of firearms by felons substantially affects the interstate firearms market.

Congress has comprehensively regulated the interstate firearms market through the Gun Control Act of 1968. One part of that Act prohibits firearm possession by felons, who create a significant amount of market demand for firearms. Even with state and federal prohibitions in place, felons often obtain and possess firearms. And firearms often move interstate before being used in crimes. Because the interstate firearms market for felons is difficult to regulate directly, Congress has sought to remove felons from the market entirely by prohibiting them from possessing firearms.

Section 922(g)(1) is much like the prohibition on intrastate marijuana cultivation that the Supreme Court upheld in *Raich*, which held that "Congress can regulate purely intrastate activity that is not itself 'commercial' . . . if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." 545 U.S. at 18. Like the Controlled Substances Act, the Gun Control Act comprehensively regulates a fungible commodity—firearms. And Congress can similarly regulate even the intrastate possession of firearms by felons. Section 922(g)(1) is therefore unlike the provisions at issue in *Lopez* and *Morrison*, which were not part of a broader regulation of the interstate market, contained no jurisdictional element, and had only an attenuated connection to interstate commerce.

Squire's remaining arguments lack merit. Section 922(g)(1) does not raise federalism concerns, as it applies only to possession of firearms with a proven connection to interstate commerce, and state felon-in-possession laws can neither vindicate Congress's interest in regulating the interstate firearms market nor limit Congress's constitutional authority. A decision invalidating § 922(g)(1) would not be narrow, as it would call into question any number of other statutory provisions. And there is no basis for interpreting § 922(g)(1)'s jurisdictional element narrowly, as the enactment history shows Congress intended to carry forward *Scarborough*'s broad interpretation of the same element in a prior statute. This Court should reject Squire's arguments and affirm.

## ARGUMENT

### I. The Supreme Court has held that 18 U.S.C. § 922(g)(1) is a valid exercise of Congress's Commerce Clause authority.

Squire's Commerce Clause challenge is foreclosed by Supreme Court precedent, which this Court is obligated to follow. That is enough to resolve this case.

#### A. The Supreme Court authoritatively construed the statute's commerce element in *Scarborough*.

Section 922(g)(1) makes it unlawful for anyone "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce[] any firearm or ammunition." 18 U.S.C.

§ 922(g).[3] The current statutory provision "is the result of a 1986 'consolidation' of three separate provisions" targeting the possession, receipt, and transport of firearms by felons. *United States v. Ervin*, 131 F.4th 253, 258 (4th Cir. 2025) (quoting *United States v. Langley*, 62 F.3d 602, 604 (4th Cir. 1995)).[4]

In *Bass*, the Supreme Court interpreted one of those predecessor statutes, 18 U.S.C. § App. 1202(a), which applied to any person within specified categories (including felons) who "receives, possesses, or transports in commerce or affecting commerce . . . any firearm." 404 U.S. at 337 (quoting 18 U.S.C. § App. 1202(a) (1970)). The Court held that the statute's "in commerce or affecting commerce" requirement applied to the receipt and possession offenses, as well as to the transportation offense, and that the government must prove a case-specific connection to interstate commerce for all three. *Id.* at 347–50.

*Bass* interpreted the statute in that manner based on the rule of lenity and because a federal prohibition on the mere receipt or possession of a firearm with no identifiable link to interstate commerce would "effect a significant change in the

---

[3] The provision also makes it unlawful for such a person "to ship or transport in interstate or foreign commerce . . . any firearm or ammunition" and to "receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S. C. § 922(g). Squire challenges only the statute's possession clause, *see* Squire En Banc Br. 2, 4, 25, so the transportation and receipt provisions are not before the Court.

[4] *United States v. Lopez*, 2 F.3d 1342 (5th Cir. 1993), *aff'd* 514 U.S. 549 (1995), includes a detailed history of federal firearms legislation.

sensitive relation between federal and state criminal jurisdiction." *Id*. at 349. The Court accordingly interpreted the statute to require proof that the firearm a defendant was charged with receiving had itself "previously traveled in interstate commerce." *Id.* at 350. That requirement, the Court explained, would "preserve[] as an element" of the offense "a requirement suited to federal criminal jurisdiction" in a manner "consistent with . . . the sensitive relation between federal and state criminal jurisdiction." *Id.* at 351.

In *Scarborough*, the Court resolved any remaining doubt about the proof required for possession offenses under former § 1202(a). The specific question there was whether a conviction under that provision could be sustained based on proof that the firearm possessed had previously traveled in interstate commerce. 431 U.S. at 564. Arguing against the backdrop of *Bass*, *Scarborough* contended, *inter alia*, that "little [would] remain[] of federalism" if his conviction could be sustained on that basis; he maintained that such a "tangential link to interstate commerce" was insufficient to justify the exercise of Congress's "[C]ommerce [C]lause" authority to "overtake an important aspect of state criminal law." Pet. Br. 23, *Scarborough*, *supra*, 1976 WL 181630. In response, the government argued that Congress possessed "power . . . under the Commerce Clause to prohibit felons from possessing firearms that have moved in commerce" and had exercised that

power in the felon-in-possession statute. U.S. Br. 10, *Scarborough*, *supra*, 1977 WL 189765.

The Court in *Scarborough* sided with the government, holding that former Section 1202(a)'s jurisdictional element is satisfied with proof that the relevant firearm had previously traveled in interstate commerce. 431 U.S. at 568, 575. In so doing, the Court rejected Scarborough's argument that "the possessor must be engaging in commerce" "at the time of the [possession] offense," *id*. at 568–69, because Congress's use of the phrase "affecting commerce" demonstrated its intent to assert "its full Commerce Clause power." *Id*. at 571 (citations omitted). That intent, the Court determined, was best honored by requiring "the minimal nexus that the firearm have been, at some time, in interstate commerce." *Id*. at 575; *see id*. at 577.

Contrary to Squire's contention, *see* Squire En Banc Br. 37–38, *Scarborough* necessarily resolved the constitutionality of a felon-in-possession law that is satisfied with proof that the firearm has previously moved in interstate commerce. Any other conclusion would mean that the Court in *Scarborough* acted in contravention of the very canon of construction that Squire touts, *see* Squire En Banc Br. 39–40, *i.e.*, that statutes must be construed to avoid constitutional doubts. *See Jones v. United States*, 529 U.S. 848, 857–58 (1999). In particular, it would mean that the Court turned away a possible construction of the statute's commerce

element that would have rendered it constitutional, in favor of an interpretation that, in Squire's view, places its constitutionality in grave doubt. Courts have sensibly declined to read *Scarborough* in that manner, *see United States v. Lemons*, 302 F.3d 769, 771 (7th Cir. 2002), understanding it instead to establish the constitutionality of § 922(g)(1) and its predecessor. *See United States v. Dorris*, 236 F.3d 582, 584 (10th Cir. 2000).

### B. Neither *Lopez* nor *Morrison* called § 922(g)(1) into question, as this Court and other circuits have unanimously recognized.

In *Lopez*, the Supreme Court invalidated a federal prohibition on possessing a firearm in a school zone in 18 U.S.C. § 922(q) (1994), which "by its terms ha[d] nothing to do with 'commerce' . . . however broadly one might define th[at] term[]." 514 U.S. at 561. The Court explained, *inter alia*, that § 922(q) did not require the government to show in each individual case that the prohibited conduct was connected to interstate commerce. *Id.* The Court thus specifically distinguished § 922(q) from the felon-in-possession statute at issue in *Bass* and *Scarborough*, which contained a "jurisdictional element [that] would ensure, through case-by-case inquiry, that the firearm possession in question affect[ed] interstate commerce." *Id.* at 561–62 (discussing former § 1202(a)); *see Lemons*, 302 F.3d at 772.

In *Morrison*, the Court concluded that Congress's creation of a private cause of action for gender-motivated violence under the Violence Against Women Act of

1994, 42 U.S.C. § 13981, exceeded Congress's Commerce Clause power. 529 U.S. at 605–06, 627. The Court reasoned that, like the statute "at issue in *Lopez*, § 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce." *Id.* at 613. A jurisdictional element requiring proof of a specific connection to commerce, *Morrison* explained, "may establish that the enactment is in pursuance of Congress' regulation of interstate commerce." *Id.* at 612.

Neither *Lopez* nor *Morrison* casts doubt on *Scarborough*'s continuing force or the constitutionality of § 922(g)(1) as applied to firearms that have previously moved in interstate commerce. Section 922(g)(1), unlike the provisions at issue in *Lopez* and *Morrison*, requires proof of a nexus to interstate commerce in each case. *See Raich*, 545 U.S. at 23 (distinguishing *Lopez* on the ground that it addressed the constitutionality of a statute that "did not contain any requirement that the possession of a gun have any connection to past interstate activity or a predictable impact on future commercial activity"). That element limits the reach of § 922(g)(1) to "a discrete set of firearm possessions" that "have an explicit connection with or effect on interstate commerce." *Lopez*, 514 U.S. at 562. Indeed, this Court has long recognized that the omission of this jurisdictional element was "[c]entral to the *Lopez* Court's holding[.]" *United States v. Pierson*, 139 F.3d 501, 503 (5th Cir. 1998); *see also United States v. Luna*, 165 F.3d 316, 321 (5th Cir.

1999) ("Unlike the statute at issue in *Lopez*, § 922(g)(1) expressly requires some nexus to interstate commerce[.]").

In *United States v. Rawls*, 85 F.3d 240, 242–43 (5th Cir. 1996), this Court considered *Lopez*'s effect on the constitutionality of § 922(g)(1). This Court joined all the "[o]ther circuits addressing the issue since *Lopez*" and held that "neither the holding in *Lopez* nor the reasons given therefor constitutionally invalidate § 922(g)(1)." *Rawls*, 85 F.3d at 242 (collecting cases). As members of this Court recognized, "[n]othing in *Lopez* expressly purports to question *Scarborough*, and indeed it is not even cited in *Lopez*." *Id.* at 243 (Garwood, Weiner, Garza, JJ., concurring); *see also United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013) (similarly rejecting claim that *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012), overruled precedent upholding § 922(g)(1)).

Consistent with *Bass* and *Scarborough*, every numbered circuit has held that § 922(g)(1)'s felon-in-possession ban falls within Congress's Commerce Clause authority. *See United States v. Torres-Colon*, 790 F.3d 26, 34 (1st Cir. 2015); *United States v. Santiago*, 238 F.3d 213, 216 (2d Cir. 2001); *United States v. Singletary*, 268 F.3d 196, 205 (3d Cir. 2001); *United States v. Gallimore*, 247 F.3d 134, 138 (4th Cir. 2001); *Alcantar*, 733 F.3d at 145–46; *United States v. Henry*, 429 F.3d 603, 619–20 (6th Cir. 2005); *United States v. Mitchell*, 299 F.3d 632, 634 (7th Cir. 2002); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011); *United*

*States v. Rousseau*, 257 F.3d 925, 932 (9th Cir. 2001); *United States v. Griffith*, 928 F.3d 855, 865 (10th Cir. 2019); *United States v. Vereen*, 920 F.3d 1300, 1317 (11th Cir. 2019). And the D.C. Circuit reached the same conclusion with respect to § 922(g)(9), relying in part on *Bass*. *Fraternal Order of Police v. United States*, 173 F.3d 898, 908 (D.C. Cir. 1999). "These cases—and many others—affirm the constitutionality of the felon-in-possession statute and the continuing authority of *Scarborough*." *United States v. McBee*, 295 F. App'x 796, 798 (6th Cir. 2008) (collecting cases).

### C. Only the Supreme Court has the prerogative to overrule *Scarborough*.

Absent a clear holding from the Supreme Court that *Lopez* abrogated or overruled *Scarborough*, this Court should continue to apply *Scarborough*. "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). "This is true even if the lower [C]ourt thinks the precedent is in tension with some other line of decisions." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (internal quotation marks omitted).

Justice Thomas, alone among current justices, has opined that *Scarborough* does not address § 922(g)(1)'s constitutional validity. *See United States v. Hemani*,

608 U.S. 772, 800–01 (2026) (Thomas, J., concurring); *United States v. Rahimi*, 602 U.S. 680, 765 (2024) (Thomas, J., dissenting); *Alderman v. United States*, 131 S. Ct. 700, 703 (2011) (Thomas, J., dissenting from denial of certiorari). No court of appeals has adopted Justice Thomas's position, and the Supreme Court has repeatedly denied certiorari in cases presenting the issue.[5] As the *Rawls* panel members recognized in their concurrence, "the language of [*Scarborough*] and the affirmance of the conviction there carry a strong enough implication of constitutionality to now bind [this Court], as an inferior [C]ourt, on that issue[.]" 85 F.3d at 243.

If there is tension in the Supreme Court's Commerce Clause jurisprudence, then, as Justice Thomas recognized, it is up to the Supreme Court to resolve the issue. "Any doctrinal inconsistency between *Scarborough* and the Supreme Court's more recent decisions is not for this Court to remedy." *See United States v. Patton*, 451 F.3d 615, 636 (10th Cir. 2006).

---

[5] *See, e.g.*, *Hensley v. United States*, 146 S. Ct. 2714 (2026); *York v. United States*, 146 S. Ct. 144 (2025); *Mason v. United States*, 146 S. Ct. 140 (2025); *Freeman v. United States*, 146 S. Ct. 129 (2025); *Martinez v. United States*, 146 S. Ct. 127 (2025); *Dean v. United States*, 145 S. Ct. 2859 (2025); *Riddick v. United States*, 145 S. Ct. 2859 (2025); *Dominguez v. United States*, 145 S. Ct. 2857 (2025); *Hemphill v. United States*, 145 S. Ct. 2855 (2025); *Collette v. United States*, 145 S. Ct. 2853 (2025).

## II. Section 922(g)(1) is valid under the Supreme Court's current Commerce Clause precedent.

Even if this Court considers the constitutionality of § 922(g)(1) anew, the statute is a valid exercise of Congress's Commerce Clause authority.

### A. Congress has broad authority under the Commerce and Necessary and Proper Clauses.

Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]" U.S. CONST. art. I, § 8, cl. 3. This power "is the power to regulate; that is, to prescribe the rule by which commerce is to be governed." *Gibbons v. Ogden*, 22 U.S. 1, 196 (1824). It is "plenary and complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution." *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942) (citing *Gibbons*, 22 U.S. at 196).

Under the Commerce Clause, Congress can regulate "the use of the channels of interstate commerce"; "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and "those activities having a substantial relation to interstate commerce, *i.e.,* those activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558–59 (citation omitted). In exercising that authority, Congress may address harmful consequences associated with particular classes of goods and

transactions. *See, e.g.*, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964); *United States v. Darby*, 312 U.S. 100, 112–15 (1941).

"Congress's power, moreover, is not limited to regulation of an activity that by itself substantially affects interstate commerce, but also extends to activities that do so only when aggregated with similar activities of others." *Sebelius*, 567 U.S. at 549 (2012) (citing *Wickard v. Filburn*, 317 U.S. 111, 127–28 (1942)). "That the regulation ensnares some purely intrastate activity is of no moment." *Raich*, 545 U.S. at 22. The Supreme Court's "case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 17. Thus, "[e]ven if [defendant's] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce," irrespective of whether such effect is direct or indirect. *Lopez*, 514 U.S. at 556 (quoting *Wickard*, 317 U.S. at 125).

Accordingly, "[p]rohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." *Raich*, 545 U.S. at 26. "It is the effect upon interstate commerce or upon the exercise of the power to regulate it, not the source of the injury which is the criterion of Congressional power." *Wrightwood Dairy Co.*, 315 U.S. at 121. Moreover, in assessing the scope of Congress' Commerce Clause

authority, the Court "need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Raich*, 545 U.S. at 22.

Likewise, "[i]n assessing the validity of congressional regulation, none of [the Supreme Court's] Commerce Clause cases can be viewed in isolation." *Id.* at 15. The Commerce Clause emerged as the Framers' response to the absence of federal power under the Articles of Confederation, but, "in response to rapid industrial development and an increasingly interdependent national economy, Congress ushered in a new era of federal regulation under the commerce power, beginning with the enactment of the Interstate Commerce Act in 1887 and the Sherman Antitrust Act in 1890." *Id.* at 16 (quotation marks and citation omitted). Cases decided during that era gave rise to the three general categories of commerce regulation identified in *Lopez*. *See id.* at 16–17. And from this era, "case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 17.

Congress also has the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution [its interstate commerce] Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. CONST. art. I, § 8, cl. 18. The

federal government is a government of limited, enumerated powers, but it is "intrusted with such ample powers, on the due execution of which the happiness and prosperity of the nation so vitally depends, [and] must also be intrusted with ample means for their execution." *McCulloch v. Maryland*, 17 U.S. 316, 408 (1819). Accordingly, "the Necessary and Proper Clause grants Congress broad authority to enact federal legislation" that is "convenient," "useful," or "conducive" to the enumerated power's "beneficial exercise." *United States v. Comstock*, 560 U.S. 126, 133–34 (2010) (quoting *McCulloch*, 17 U.S. at 413, 418)).

As the Supreme Court "implicitly acknowledged in *Lopez*, … Congress's authority to enact laws necessary and proper for the regulation of interstate commerce is not limited to laws directed against economic activities that have a substantial effect on interstate commerce." *Raich*, 545 U.S. at 36 (Scalia, J., concurring in judgment). "[T]he relevant inquiry is simply 'whether the means chosen are "reasonably adapted" to the attainment of a legitimate end under the commerce power' or under other powers that the Constitution grants Congress the authority to implement." *Comstock*, 560 U.S. at 135 (quoting *Raich*, 545 U.S. at 37 (Scalia, J., concurring in judgment)). "[W]here Congress has the authority to enact a regulation of interstate commerce, 'it possesses every power needed to make that

regulation effective.'" *Raich*, 545 U.S. at 36 (Scalia, J., concurring in judgment) (quoting *Wrightwood Dairy Co.*, 315 U.S. at 118–19).

The Necessary and Proper Clause thus "leav[es] to Congress a large discretion as to the means that may be employed in executing a given power"; "allows Congress to adopt any means, appearing to it most eligible and appropriate, which are adapted to the end to be accomplished and consistent with the letter and spirit of the Constitution"; and "authorizes Congress, in the implementation of other explicit powers, to create federal crimes[.]" *United States v. Kebodeaux*, 570 U.S. 387, 394–95 (2013) (quotation marks omitted). "[I]t is now well established that Congress has broad authority under the Clause." *Sebelius*, 567 U.S. at 549. "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCulloch*, 17 U.S. at 421.

### B. Section 922(g)(1) is an integral part of Congress's comprehensive regulation of the interstate firearms market.

Interstate gun trafficking is a commercial activity that Congress may regulate and has regulated under the Commerce Clause. This power is reflected in a "longstanding pattern of federal firearms legislation" intended "to regulate the interstate flow of firearms." *Navegar, Inc. v. United States*, 192 F.3d 1050, 1065 (D.C. Cir. 1999). To that end, Congress has passed laws requiring licenses for

transporting firearms in interstate commerce, preventing the trafficking of stolen firearms, and prohibiting the sale or disposal of guns to certain categories of persons. Section 922(g)(1) is Congress's complementary attempt to address a particular, harmful segment of that industry's interstate market—the acquisition by felons of firearms that have crossed state lines.

### 1. Congress has comprehensively regulated the interstate firearms market.

Congress has long regulated commerce in arms. In 1794, Congress passed a law making it unlawful "to export from the United States" arms and armaments such as "cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls," and "gunpowder" for a period of one year. Act of May 22, 1794, 1 Stat. 369, 369. In 1892, Congress regulated the carrying of pistols in the District of Columbia. *See* 52 Cong. Ch. 159, 27 Stat. 116. In 1927, Congress passed the Nonmailable Firearms Act, banning the mailing of "pistols, revolvers, and other firearms capable of being concealed on the person" via the postal service. *See* 69 Cong. Ch. 75, 44 Stat. 1059; 18 U.S.C. § 1715.[6] And the National Firearms Act of 1934 required nationwide registration of firearms, required federal registration of all firearm manufacturers, dealers, and importers, and required an identification mark to be

[6] The Department of Justice's Office of Legal Counsel recently determined that § 1715 is unconstitutional, not because Congress lacked power to enact it, but because it singles out for unfavorable treatment the mailing of handguns by ordinary citizens. Constitutionality of 18 U.S.C. § 1715, 50 Op. O.L.C. --- (Jan. 15, 2026), https://www.justice.gov/olc/media/1424001/dl.

placed on every manufactured or imported firearm. *See* 73 Cong. Ch. 757, 48 Stat. 1236.

The Federal Firearms Act of 1938, which was passed "to regulate commerce in firearms," specifically required a federal license to transport, ship, or receive firearms in interstate commerce. *See* 75 Cong. Ch. 850, 52 Stat. 1250 (FFA). It also established prohibitions involving the transportation, shipment, and receipt of firearms in interstate commerce, *see* FFA §§ 2(a)–(c); the transporting or trafficking in interstate commerce stolen firearms or firearms from which the serial number had been removed, *see* FFA §§ 2(g)–(i); and the shipping or transporting in interstate commerce of any firearm to a person under indictment or previously convicted of a crime of violence. *See* FFA §§ 2(d)–(f).

In June of 1968, Congress passed the Omnibus Crime Control and Safe Streets Act. Pub. L. No. 90-351, 82 Stat. 197. In § 901 of the Act, Congress found that "there is a widespread traffic in firearms moving in or otherwise affecting inter state or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power[.]" When considering this Act in the context of 18 U.S.C. § 922(a)(6), this Court held "that the acquisition of firearms by convicted felons and persons under indictment for felonies, although arguably intrastate activity, imposes a sufficient burden upon interstate commerce to be a

proper subject for federal regulation." *United States v. Nelson*, 458 F.2d 556, 559 (5th Cir. 1972) (citing U.S. Code Cong. and Admin. News 1968, pp. 2163–2166). "If Congress is to effectively prevent the interstate use of guns for illegal purposes it must control their sources: manufacturers, dealers, and importers." *Id.*

The Gun Control Act of 1968 (GCA) tightened the licensing requirements on the manufacture and sale of firearms and required registration and serial numbers for all manufactured or transferred firearms. *See* Pub. L. No. 90-618, 82 Stat. 1213. The relevant House committee report explained that the GCA was intended "to strengthen Federal controls over inter state and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders." *See Lopez*, 2 F.3d at 1353 (quoting H.R. Rep. No. 90-1577, *reprinted in* 1968 U.S.C.C.A.N. 4410, 4411). The report stated that "[t]he increasing rate of crime and lawlessness and the growing use of firearms in violent crime clearly attest to a need to strengthen Federal regulation of interstate firearms traffic." *Id.* (quotation marks omitted). The GCA "respond[ed] to widespread national concern that existing Federal control over the sale and shipment of firearms across State lines [wa]s grossly inadequate." *Id.* (quotation marks, brackets omitted).

The final stated purpose of the GCA was to "provide support to Federal, State, and local law enforcement officials in their fight against crime and violence[.]" GCA § 101. The Act was "not intended to discourage or eliminate the

private ownership or use of firearms by law-abiding citizens for lawful purposes" or to impose any federal requirements "other than those reasonably necessary to implement and effectuate the [GCA's] provisions[.]" *Id.* The GCA retained the requirement of licensure when engaging in the business of firearms in interstate commerce. *See* GCA § 102 (providing for 18 U.S.C. §§ 922(a)–(e), 923). It also made it unlawful for a person convicted of a felony to ship or transport any firearm in interstate commerce or to receive any firearm that had been shipped or transported in interstate commerce. *See* GCA § 102 (providing for 18 U.S.C. §§ 922(g)(1) & (h)(1)).

The Firearm Owners' Protection Act of 1986 provided safe harbor for interstate transportation of certain firearms through states where they were prohibited, legalized interstate sales of long guns and shipment of ammunition through the postal service, and banned machine guns. *See* Pub. L. No. 99-308, 100 Stat. 449. The Protection of Lawful Commerce in Arms Act of 2005 protects firearm and ammunition manufacturers, among others, from civil liability when firearms they manufactured or sold are used in crimes. *See* Pub. L. No. 109-92, 119 Stat. 2095.

### 2. Firearm possession by felons substantially affects the interstate firearms market.

The Nation's interstate firearms market is extensive. "Companies in the United States that manufacture, distribute, and sell firearms, ammunition and

hunting equipment employ as many as 150,668 people in the country and generate an additional 232,327 jobs in supplier and ancillary industries," creating an annual aggregate economic impact of over $91 billion. *See* National Shooting Sports Foundation, 2025 Firearm & Ammunition Industry Economic Impact Report at 3, https://www.nssf.org/wp-content/uploads/2025/04/2025-NSSF-Firearm-Ammunition-Industry-Economic-Impact-report.pdf. In 2024, American manufacturers manufactured over 9.4 million firearms, including 4,025,829 pistols, 639,742 revolvers, 2,823,770 rifles, 599,775 shotguns, and 1,385,424 miscellaneous firearms. *See* ATF, Annual Firearms Manufacturing and Export Report Year 2024 Final at 1, https://www.atf.gov/media/29786/download. Approximately 400,000 of these firearms were exported, meaning that over 9 million firearms were manufactured and sold within the United States. *Id.*[7] Although some firearms are manufactured in each state, the top 30 largest United States firearm manufacturers are responsible for 8.4 million of the 9.4 million firearms produced in 2024. *See* Orchid Advisors, *Top 30 Largest USA Firearm Manufacturers of 2024*, May 27, 2026, https://orchidadvisors.com/top-30-largest-usa-firearm-manufacturers-of-2024. None of those top 30 manufacturers is based in Louisiana. *Id.*

[7] This data excludes firearms manufactured outside and imported into the United States.

Convicted felons often possess firearms, despite state and federal prohibitions, causing significant market demand. The Department of Justice's Bureau of Justice Statistics found that almost one-fifth (18.4%) of federal recidivist offenders possessed a firearm in connection with their offense. Bureau of Justice Statistics, *Survey of Inmates in State and Federal Correctional Facilities: Firearm Use by Offenders*, November 2001 at 1, https://bjs.ojp.gov/content/pub/pdf/fuo.pdf. These rates increase for violent crimes, as more than one-third (38.4%) of violent federal recidivist offenders carried a firearm in connection with their crime. *Id.* at 6. An Illinois study similarly found that 14% of offenders were rearrested within ten years for a firearm-related charge, a number that increased to over 18% for offenders initially convicted of a firearm-related offense. Illinois Criminal Justice Information Authority, *Examining the Recidivism of Firearm Offenders Using State Criminal History and Mortality Data* at 7, https://researchhub.icjia-api.cloud/uploads/Firearm_study_report_073118-191011T20091765.pdf.

Moreover, the market for guns to be used in crimes or by criminals is interstate. During one five-year period, 413,274 firearms used in crimes in the United States and its territories were sourced from another state. ATF, 2 National Firearms Commerce and Trafficking Assessment, Part III: Crime Guns Recovered and Traced Within the United States and Its Territories at 52, (https://www.atf.gov/media/15426/download) (measuring the five-year period

between 2017 and 2021). The use of out-of-state guns was particularly high in some states, such as New Jersey and New York, where 81.8% and 79.7% of the crime guns were sourced from out of state. *Id.* at 39.

Additionally, stolen guns are a significant source of firearms for lawbreakers. "From 2017 to 2021, there were 1,074,022 firearms reported stolen." ATF, 2 National Firearms Commerce and Trafficking Assessment, Part V: Firearm Thefts at 2, (https://www.atf.gov/media/15416/download). About 8% of firearms stolen from private citizens were recovered in another state. *Id.* at 22–23.

As these sources show, even with the prohibitions in the GCA, the interstate market for firearms includes felons. And that market is difficult to regulate directly. "Those who do acquire guns after their conviction obviously do so surreptitiously[.]" *Scarborough*, 431 U.S. at 576. "Illegal transactions in firearms are often embedded in the much larger formal and informal markets, simply because sellers cannot easily distinguish between legal and illegal buyers even if they are motivated to do so." Philip J. Cook & Rosanna Smart, *Illegal Firearms Markets: Transaction Patterns, Evolving Sources, and Importance in Criminal Misuse*, PNAS 2026, Vol. 123, No. 33, at 1 (Oct. 23, 2025) (https://doi.org/10.1073/pnas.2509754122). Indeed, the majority of state and federal prisoners in a representative survey from 2016 "reported acquiring their firearm from friends or family (31.0%) or 'street' sources (39.7%)[.]" *Id.* at 3.

"[T]hose in social networks where gun ownership is common find access easier than in networks where guns are sparse. Gang members may have ready access through the gang's connections to brokers working with established traffickers, and some individuals may join a gang to access guns." *Id.* at 5. "Most illegally transacted firearms began as legal commodities but were at some point diverted from the legal market." *Id.* at 8.

Without federal regulations, felon participation in the gun market would be even higher. The FBI's Criminal Justice Information Services (CIJS) Division runs the National Instant Criminal Background Check System (NICS), which since November 1998 has performed background checks on all gun sales as required by the GCA and the Brady Handgun Violence Prevention Act of 1993. *See* FBI, National Instant Criminal Background Check System (NICS) Section 2024 Operational Report at 1, [https://www.fbi.gov/file-repository/2024-nics-operational-report.pdf/view](https://www.fbi.gov/file-repository/2024-nics-operational-report.pdf/view). Over the past 26 years, the NICS has processed over 500 million background checks in connection with potential firearm purchases, including over 28 million firearm-related background checks in calendar year 2024. *Id.* at iii. In 2024, the NICS Section denied background checks for 110,505 potential sales that would have violated federal and state law, including 6,458 denials in Louisiana.

*See id at* 8–9.[8] The plurality of NICS denials in 2024 (45%, or 49,665 denials) were for individuals who had previously been convicted of a felony. *Id*. at 8. As this data demonstrates, possession of firearms by felons substantially affects the interstate firearms market—and would do so to an even greater extent without the prohibitions reflected in §§ 922(g)(1) and 922(d)(1).

### 3. Section 922(g)(1) is necessary and proper to Congress's regulation of the firearms market.

Section 922(g)(1)'s felon-in-possession ban is valid under the Commerce and Necessary and Proper Clauses because it is an integral part of Congress's broader regulation of the interstate firearms market. *Raich* demonstrates why.

The respondents in *Raich* were cultivating for their own consumption marijuana, "a fungible commodity for which there is an established . . . interstate market." 545 U.S. at 18. Congress prohibited even the local cultivation and use of marijuana in the Controlled Substances Act (CSA), a "comprehensive regulatory regime" intended to "conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances." *Id.* at 12, 27.

In upholding Congress's commerce authority to prohibit purely intrastate, home-grown marijuana, the Court explained that its precedent "firmly establishes

[8] Certain states, such as California, New York, and Tennessee, manage their own background checks and thus the NICS Section does not process their checks. FBI, National Instant Criminal Background Check System (NICS) Section 2024 Operational Report at 4, 9.

Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.* at 17. The Court explained: "Congress can regulate purely intrastate activity that is not itself 'commercial,' . . . if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Id.* at 18. And the prohibition on personal production of marijuana was "squarely within Congress' commerce power" because such production "has a substantial effect on supply and demand in the national market for that commodity." *Id.* at 19.

*Raich*'s reasoning applies equally to § 922(g)(1), which exists as part of "comprehensive legislation" enacted "to regulate the interstate market in a fungible commodity." *Id.* at 22. Like marijuana, "[g]uns are a fungible commodity for which there is an established interstate market." *United States v. Rose*, 522 F.3d 710, 717–18 (6th Cir. 2008). Like the prohibition in *Raich*, § 922(g)(1) "suppresses the demand from felons for a commodity (firearms) for which there is an established and lucrative interstate market." Alisa B. Klein, *Right Diagnosis, Wrong Cure: Reconceptualizing the Commerce Clause Basis for the Federal Prohibition on Felon Firearm Possession*, 104 Tex. L. Rev. Online 225, 234 (2026). As the Sixth Circuit explained, "[p]rohibiting possession by felons limits the market for firearms, and discourages shipping, transporting, and receiving

firearms in or from interstate commerce." *United States v. Chesney*, 86 F.3d 564, 571 (6th Cir. 1996).

Squire contends that "[t]here is no serious argument that [his] purely intrastate firearm possession, in his own home, affected interstate commerce." Squire En Banc Br. 27. The respondents in *Raich* made the same argument. *See* Respondents Br., 2004 WL 2308766, at *34 ("Respondents' activity is non-commercial in nature, and has no effect, substantial or otherwise, on interstate commerce."). But the *Raich* Court rejected that argument because Congress could "conclude[] that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Raich*, 545 U.S. at 18. And Squire's claim is even weaker than the *Raich* respondents' because, unlike their home-cultivated marijuana, his firearm had previously traveled in interstate commerce—establishing that his possession does affect the interstate firearms market.

The task of resolving the issue here "is a modest one. [The Court] need not determine whether [Squire's] activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *See Raich*, 545 U.S. at 22. Moreover, the Necessary and Proper Clause allows Congress to "regulate even those intrastate activities that do not

themselves substantially affect interstate commerce" where "necessary to make a regulation of interstate commerce effective." *Id.* at 35 (Scalia, J., concurring).

Congress could easily conclude that possession of firearms by felons would undercut its regulation of the interstate firearms market. If the federal prohibition were limited to direct participation by felons in interstate transactions, it would often be difficult to establish the circumstances under which a felon acquired his firearm or ammunition. That difficulty would be especially acute for transactions outside traditional retail channels, such as street-level or straw purchaser transactions. *Cf. Scarborough*, 431 U.S. at 576 ("Those who do acquire guns after their conviction obviously do so surreptitiously"). Given those enforcement problems, Congress could have rationally concluded that a ban on possession by felons of any firearm or ammunition that has previously moved in interstate commerce is a necessary and proper means of achieving its objectives. *See Raich*, 545 U.S. at 22. Indeed, "[p]rohibiting the intrastate possession or manufacture of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." *Id.* at 26. By restricting § 922(g)(1)'s application to firearms that have previously moved in interstate commerce, Congress has ensured an even closer fit between the firearm possession and interstate commerce than was required under the provision in *Raich*. Section 922(g)(1) is therefore a valid exercise of Congress's power.

### D. Squire misreads *Lopez* and *Morrison*.

Squire wrongly contends, *see* Squire En Banc Br. 25–36, that § 922(g)(1) is unconstitutional under *Lopez* and *Morrison*. As explained above, those cases did not call *Scarborough* into question. And those cases must be read in light of the subsequent decision in *Raich*, which, as already explained, strongly supports § 922(g)(1)'s validity. *Lopez* and *Morrison* involved materially distinguishable statutes that cast no doubt on § 922(g)(1).

Take *Lopez* first. The statute there prohibited firearm possession in a school zone, but it had "nothing to do with 'commerce' or any sort of economic enterprise" and was "not an essential part of a larger regulation of economic activity." 514 U.S. at 561. Additionally, the statute "contain[ed] no jurisdictional element" to ensure "that the firearm possession in question affects interstate commerce." *Id.* To defend the statute, the government was forced to rely only on attenuated connections to interstate commerce: that (a) violent crime in school zones results in "costs" that are "spread throughout the population" through insurance premiums, (b) violent crime "reduces the willingness of individuals to travel" to certain areas, and (c) guns pose "a substantial threat to the educational process" that would "result in a less productive citizenry." *Id.* at 564.

Section 922(g)(1), by contrast, bears a direct connection to commerce and economic activity. It regulates who may possess a firearm that has previously

crossed state lines—a focus directly related to the transfer, acquisition, and receipt of firearms. *See Navegar*, *Inc.*, 192 F.3d at 1064–65. As the Sixth Circuit has observed, § 922(g)(1) "satisfies both the spirit and language of *Lopez*" because it "limits the market for firearms, and discourages shipping, transporting, and receiving firearms in or from interstate commerce." *Chesney*, 86 F.3d at 571. Put another way, "[r]egulation of interstate gun trafficking, which is clearly commercial activity, is . . . facilitated by regulation of possession in or affecting commerce." *Id.* at 571–72. And, unlike the statute in *Lopez*, § 922(g)(1) is part of a "larger regulation of economic activity," specifically, the interstate firearms market. *Id*. at 570. Thus, the government's justifications for § 922(g)(1) bear no resemblance to the attenuated chain of reasoning invoked in *Lopez*.

Moreover, unlike the statute in *Lopez*, § 922(g)(1) has a jurisdictional element that requires the possession to be "in or affecting commerce." This "is significant." *Chesney*, 86 F.3d at 570. As this Court explained in upholding § 922(g)(8), "[b]y expressly requiring a nexus between the illegal firearm and interstate commerce, Congress has exercised its delegated power under the Commerce Clause to reach 'a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce.'" *Pierson*, 139 F.3d at 503 (quoting *Lopez*, 514 U.S. at 561–63). Thus, § 922(g)(1) bears no

resemblance to the statute in *Lopez* beyond the fact that it prohibits possession of firearms.

Nor is § 922(g)(1) similar to the invalidated statute in *Morrison*, which provided a civil remedy for victims of gender-motivated violence. As in *Lopez*, the Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Morrison*, 529 U.S. at 617. In doing so, the Court listed four "considerations" it found important in *Lopez* that made the proper disposition in *Morrison* "clear." *Id*. at 609–13. Those factors are irrelevant in this case because, unlike the statutes in *Lopez* and *Morrison*, § 922(g)(1) is part of a broader scheme regulating interstate commerce. *See Raich*, 545 U.S. at 23–24 (explaining that *Lopez* and *Morrison* "were markedly different" and were "at the opposite end of the regulatory spectrum" from the Controlled Substances Act's "comprehensive framework").

Even putting aside that key distinction, none of the considerations outlined in *Morrison* is implicated here. First, as already explained, § 922(g)(1) does have something "to do with 'commerce,'" *Morrison*, 529 U.S. at 610 (quoting *Lopez*, 514 U.S. at 561), because it "regulates the possession of goods moved in interstate commerce." *Dorris*, 236 F.3d at 586.

Second, § 922(g)(1) does contain an "express jurisdictional element." *Morrison*, 529 U.S. at 611 (quoting *Lopez*, 514 U.S. at 562). That element requires proof that the firearm "ha[s] been, at some time, in interstate commerce." *Scarborough*, 431 U.S. at 575. It thereby ensures that the firearm possessed does not simply have a potential future effect on the interstate firearms market but has, in fact, already traveled in that interstate firearms market.

Third, although § 922(g)(1) itself does not contain "express congressional findings regarding the effects upon interstate commerce," Congress is "not required to make formal findings" in that regard. *Morrison*, 529 U.S. at 612 (quoting *Lopez*, 514 U.S. at 562). And congressional findings from a closely related act support § 922(g)(1). In 1968, as part of the Omnibus Crime Control and Safe Streets Act, Congress found the existence of "a widespread traffic in firearms moving in or otherwise affecting interstate [] commerce" and found that "the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders." Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(1), 82 Stat. 225. Congress enacted the Gun Control Act a few months later "to strengthen the firearms provisions which had been enacted as part of the omnibus crime bill." H.R. Rep. No. 90-1577, *reprinted in* 1968 U.S.C.C.A.N. 4410, 4412. "Although Congress deemed it 'unnecessary' to include the Omnibus Act's specific findings in the

GCA, the legislative history to the Gun Control Act makes clear that the rationale remained precisely the same." *United States v. Peters*, 403 F.3d 1263, 1275 (11th Cir. 2005).

Finally, as explained above, § 922(g)(1) does not rest on an "attenuated" link "between gun possession and a substantial effect on interstate commerce." *Morrison*, 529 U.S. at 612. Section 922(g)(1) creates a complementary demand-side restriction to the supply-side restrictions against transferring guns to felons. *Peters*, 403 F.3d at 1277. It is "a necessary and proper measure meant to allow law enforcement to detect illegal transfers where the banned commodity has come to rest: in the receiver's possession." *United States v. Kirk*, 70 F.3d 791, 796 (5th Cir. 1995) (upholding § 922(o)). Thus, § 922(g)(1) is constitutional under *Morrison*.

**E. Section 922(g)(1) does not upset the federal-state balance.**

Contrary to Squire's contention, *see* Squire En Banc Br. 58, § 922(g)(1) does not raise federalism concerns. To be sure, "Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States." *Bass*, 404 U.S. at 349. But § 922(g)(1) fully respects this core tenet of federalism. The statute allows for prosecutions only when the firearm is possessed in or affecting commerce. And *Scarborough* requires the gun to have previously crossed state lines in order "to bring the defendant's possession of the gun within a framework of regulation whose connection to interstate commerce is more

apparent." *United States v. Lewis*, 100 F.3d 49, 52 (7th Cir. 1996). Thus, the exercise of Congress's commerce power reflected in § 922(g)(1) does not "effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937). Instead, § 922(g)(1) can be sustained under "cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *See Chesney*, 86 F.3d at 571–72 (citing *Lopez*, 514 U.S. at 561).

Contrary to Squire's suggestion, *see* Squire En Banc Br. 49–50, 56, the existence of state firearm regulations neither precludes nor vindicates Congress's interest in prohibiting felons from acquiring firearms in interstate commerce. For one thing, although all 50 states "have their own versions of felon-in-possession prohibitions," Squire En Banc Br. 49–50, the very source that Squire cites demonstrates that the state laws vary as to which felons are barred. *See* Margaret Love & Beth Johnson, *Restoration of Firearm Rights after Conviction: A National Survey and Recommendations for Reform, Collateral Consequences Resource Ctr.* at 10, 14 (Dec. 2025) (https://ccresourcecenter.org/wp-content/uploads/2026/01/Restoration-of-Firearm-Rights-After-Conviction-Report-Dec.-2025-1.pdf). As that source points out, the laws in 12 states cover only

specific types of felonies, such as violent crimes or drug crimes. *Id.* at 10, 14; *see, e.g.*, La. Rev. Stat. § 14:95.1. For another, not all states enforce their prohibitions to the same degree or impose similar punishments. Congress need not rely on state firearm laws that are neither consistent with one another nor consistently enforced.

Moreover, state felon-in-possession laws are poorly adapted to control the interstate flow of firearms. The D.C. Circuit has noted "the widely accepted knowledge that there is a vast interstate market in firearms that makes the states unable to control the flow of firearms across their borders or to prevent the crime inevitably attendant to the possession of such weapons once inside their borders." *Navegar, Inc.*, 192 F.3d at 1062–63 (citing congressional findings from the FFA and the Omnibus Crime Control and Safe Streets Act of 1968). Firearms are often easier to acquire illegally in some states, prompting felons and other prohibited persons to obtain firearms from other jurisdictions. *See* Cook & Smart, *supra*, at 5 (explaining that "New York City crime guns typically originate in Eastern seaboard states of the South, while crime guns in Chicago originate in less-regulated states along the Mississippi River"); 2 Crime Guns Recovered and Traced Within the United States and Its Territories, *supra*, at 52. State prosecutors lack jurisdiction to bring prosecutions against unlawful possessors outside their state lines. And states may lack the resources and commitment to effectively

prevent interstate commerce in firearms through enforcement of their felon-in-possession statutes.

Even if § 922(g)(1)'s possession ban were truly "duplicative" of state law, *see* Squire En Banc Br. 50—which it is not, given its jurisdictional element—it would still be constitutional. The Supreme Court has made clear that Congress's Commerce Clause power does not depend on the vagaries of state law. *Wickard* observed that "no form of state activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress." 317 U.S. at 124. *Darby* explained that Congress's power "can neither be enlarged nor diminished by the exercise or non-exercise of state power." 312 U.S. at 114. And *Raich* reiterated that, "[j]ust as state acquiescence to federal regulation cannot expand the bounds of the Commerce Clause, [] so too state action cannot circumscribe Congress' plenary commerce power." 545 U.S. at 29 (quotation omitted).

### F. A holding that § 922(g)(1)'s "possession" prohibition exceeds Congress's authority would not be narrow.

Squire purports to request a "narrow" constitutional holding with "limited practical impact," *see* Squire En Banc Br. 46–59, but that is far from the case. Squire asks this Court to invalidate a statute that contains a jurisdictional element and is a demand-side complement to the several federal supply-side laws precluding felons from acquiring firearms in the interstate firearms market. As one Judge of this Court has stated, "[f]inding that this statute, with an explicit interstate

commerce nexus, must fall would mark the start of a new, severely contracted Commerce Clause era." Doc. 89-1, p. 5 (Higginson, J., dissenting from order granting rehearing en banc).

If this statute exceeds Congress's authority, then Squire's same arguments might undermine other federal crimes having similar jurisdictional elements that are part of broader regulatory schemes for interstate markets. This could include, for example, Hobbs Act robberies, 18 U.S.C. § 1951(a); possession of child pornography, 18 U.S.C. § 2252(a)(4)(B); and possession of explosive materials, 18 U.S.C. § 842(i). *See also* Doc. 89-1, p. 6. It may also significantly minimize or eliminate the ability of federal law enforcement agencies, whose authority comes from express federal powers, to assist state and local law enforcement with the investigation and prosecution of certain firearm offenses.

In sum, the impact of holding that § 922(g)(1) exceeds Congress's commerce authority "is hard to overstate" and "hazards untold consequences for federal law." Doc. 89-1, pp. 5–6. For these reasons, any doubts regarding § 922(g)(1)'s validity under the Commerce Clause should be resolved by the Supreme Court alone. This Court should continue to apply the current precedent to which all Circuits have adhered and uphold § 922(g)(1)'s constitutionality under the Commerce and Necessary and Proper Clauses.

## III. Construing § 922(g)(1) more narrowly than *Scarborough* is neither necessary nor appropriate.

Squire suggests that the Court could avoid the constitutional question by construing the phrase "in or affecting commerce" in § 922(g)(1) "as requiring something more," *i.e.,* "that the firearm possession itself have a substantial and present effect on interstate commerce." Squire En Banc Br. 40. Squire acknowledges that *Scarborough* interpreted the same phrase otherwise in the statute's predecessor and that this Court has applied that construction to § 922(g)(1). *See, e.g.*, *United States v. Fitzhugh*, 984 F.2d 143, 145–46 (5th Cir. 1993). But he asserts that a fresh interpretation of the statute, including a parsing of § 922(g)'s grammatical structure, supports his preferred reading. Squire En Banc Br. 39–46.

As courts have uniformly determined, however, § 922(g)'s statutory history defeats Squire's argument. *See United States v. Palozie*, 166 F.3d 502, 504–05 (2d Cir. 1999); *Fitzhugh*, 984 F.2d at 146 n.11 (collecting cases). Congress enacted § 922(g) to combine existing firearms prohibitions into one provision of the U.S. Code, while preserving the commerce elements of the earlier statutes, by using materially identical language. *United States v. Sherbandy*, 865 F.2d 996, 1000 (9th Cir. 1988); *Palozie*, 166 F.3d at 505; *Fitzhugh*, 984 F.2d at 146. That includes the "affecting commerce" element for possession offenses that the Supreme Court had authoritatively construed in *Scarborough*. Under ordinary principles of statutory

construction, "when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute is presumed to incorporate that interpretation." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 330 (2015) (quotation omitted); *see Shapiro v. United States*, 335 U.S. 1, 16 (1948) ("In adopting the language used in the earlier act, Congress must be considered to have adopted also the construction given by this Court to such language, and made it a part of the enactment.") (citation omitted). Given the statute's lineage, § 922(g)(1) is properly read as carrying forward *Scarborough*'s interpretation of the "affecting commerce" element in the predecessor statute. *See United States v. Gillies*, 851 F.2d 492, 495 (1st Cir. 1988) (Breyer, J.) (finding "no good reason to think that Congress, when picking up the language of [former § 1202(a)], intended to reject *Scarborough*'s authoritative interpretation"); *Palozie*, 166 F.3d at 505 (same).

Moreover, Congress used the specific term "interstate or foreign commerce" in § 922(g) when it prohibited the shipment, transportation, and receipt of a firearm. "But when it prohibited *possession* of a firearm, it did not. Congress instead chose to continue using the term 'commerce' without any modifiers, as in § 1202(a)." *Ervin*, 131 F.4th at 259 (emphasis in original). This legislative choice further supports the fact that "the phrase 'in or affecting commerce' in § 922(g)

maintains the broad meaning consistently recognized by courts since *Scarborough*." *Id.* at 260; *see also Singletary*, 268 F.3d at 199–200.

Another rule of statutory interpretation weighs against Squire's request. Section 922(g) makes it a crime for a felon to "ship", "transport", "possess", or "receive" a firearm within the scope of Congress's commerce power. Squire argues the statute should be re-interpreted so that the possession must have a "present substantial effect on interstate commerce," Squire En Banc Br. 46, but he gives no indication of what that "present substantial effect" would entail. If the gun at issue is presently moving in commerce, it would be covered by the terms "ship", "transport", or "receive." Reading "possess" in Squire's proposed manner would therefore violate "one of the most basic interpretive canons": the canon against surplusage. *See Corley v. United States*, 556 U.S. 303, 314 (2009).

Ultimately, Squire seeks to write "possess" out of the statute and criminalize only possession of guns that are currently moving in commerce and thus are covered by the other operative provisions. But "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous[.]" *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citation omitted); *see also* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, at 174 ("If possible, every word and every provision is to be given effect. . . . None should be ignored. None should needlessly be given an interpretation that causes it to

duplicate another provision or to have no consequence.”). Accordingly, Squire’s proposed interpretation of § 922(g)(1) is inappropriate. This Court should continue to apply *Scarborough* and the minimal nexus requirement for § 922(g)(1).

## CONCLUSION

For the foregoing reasons, the Court should hold that § 922(g)(1) is a valid exercise of Congress’s authority under the Commerce and Necessary and Proper Clauses, uphold the panel’s decision, and affirm Curtis Squire’s judgment.

Respectfully submitted,

DAVID I. COURCELLE
UNITED STATES ATTORNEY

/s/ *Kevin G. Boitmann*
KEVIN G. BOITMANN
Assistant United States Attorney
U.S. Attorney’s Office (E.D. La.)
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3109
E-Mail: kevin.boitmann@usdoj.gov

## CERTIFICATE OF SERVICE AND ECF COMPLIANCE

I hereby certify that on this 2nd day of November, 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. The following ECF-registered counsel of record was served by Electronic Notice of Docket Activity:

Steven Spires, Steven_Spires@fd.org

I further certify the foregoing document meets the required privacy redactions; that it is an exact copy of the paper document; and the document has been scanned with the most recent version of a commercial virus scanning program and is virus-free.

/s/ *Kevin G. Boitmann*
KEVIN G. BOITMANN

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

☒ this brief contains __10,179__ words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f), or

☐ this brief uses a monospaced typeface and contains ___________ lines of text, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

☒ this brief has been prepared in a proportionally spaced typeface using Word 2010 in 14 point New Times Roman, or

☐ this brief has been prepared in a monospaced typeface using _______________[state name and version of word processing program ] with ___________ [state number of characters per inch and name of type style].

/s/ *Kevin G. Boitmann*
KEVIN G. BOITMANN
Assistant U.S. Attorney
November 2, 2026